# No. 13-5061

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SABINA LOVING; ELMER KILIAN; and JOHN GAMBINO,
**Plaintiffs-Appellees**

v.

UNITED STATES OF AMERICA; INTERNAL REVENUE
SERVICE; and DOUGLAS H. SHULMAN, (FORMER)
COMMISSIONER OF INTERNAL REVENUE
**Defendants-Appellants**

ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

## JOINT APPENDIX

KATHRYN KENEALLY
*Assistant Attorney General*

TAMARA W. ASHFORD
*Principal Deputy Assistant Attorney General*

GILBERT S. ROTHENBERG     **(202) 514-3361**
RICHARD FARBER     **(202) 514-2959**
PATRICK J. URDA     **(202) 307-0201**
  *Attorneys, Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel*:
RONALD C. MACHEN JR.
  *United States Attorney*

# TABLE OF CONTENTS

**Document**                                                          **Page**

Docket Sheet (District of Columbia (Washington, DC)
CIVIL DOCKET FOR CASE#: 1:12-cv-00385-JEB                              JA 1

Order (Doc. 21)                                                       JA 9

Memorandum Opinion (Doc. 22)                                          JA 10

Memorandum Opinion and Order (Doc. 28)                                JA 32

Declaration of Sabina Loving (Doc. 12-2)                              JA 39

Declaration of Elmer Kilian (Doc. 12-3)                               JA 43

Declaration of Giovanni Gambino (Doc. 12-4)                           JA 47

Exhibits to Declaration of Dan Alban (Doc. 12-5):
    Exhibit 1 - *West's Tax Law Dictionary* 1054
    (Robert Sellers Smith ed., 2009 ed.) (Doc. 12-6)                 JA 51

    Exhibit 2 - Act of July 7, 1884, ch. 334, sec. 3,
    23 Stat. 258 (Doc. 12-7)                                         JA 54

    Exhibit 3 - 48 Cong. Rec. H5219-22
    (daily ed. June 16, 1884) (Doc. 12-8)                            JA 57

    Exhibit 4 - George M. Morris, *Growth and
    Regulation of Treasury Bar*, 8 A.B.A. J. 742 (1922)              JA 62
    (Doc. 12-9)

**Document**                                                    **Page**

31 C.F.R. Part 10 (June 3, 2011) Preamble and Final
Regulations, 76 Fed. Reg. 32,286-32,213 (Administrative
Record 001220-1246) (Docs. 10-11)                               JA 66

Defendants' Notice of Appeal (Doc. 29)                          JA 93



- Query
- Reports
- Utilities
- Logout

APPEAL,CLOSED,TYPE-C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:12-cv-00385-JEB

LOVING et al v. INTERNAL REVENUE SERVICE et al
Assigned to: Judge James E. Boasberg
Case in other court: 13-05061
Cause: 28:2201 Declaratory Judgement

Date Filed: 03/13/2012
Date Terminated: 01/22/2013
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government
Defendant

**Plaintiff**
**SABINA LOVING**                      represented by   **Daniel L. Alban**
INSTITUTE FOR JUSTICE
901 N. Glebe Road
Suite 900
Arlington, VA 22203
(703) 682-9320
Fax: 703-682-9321
Email: dalban@ij.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott G. Bullock**
INSTITUTE FOR JUSTICE
901 North Glebe Road
Suite 900
Arlington, VA 22203
(703) 682-9320
Fax: (703) 682-9321
Email: sbullock@ij.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**ELMER KILIAN**                       represented by   **Daniel L. Alban**
(See above for address)
*LEAD ATTORNEY*

JA 1

*ATTORNEY TO BE NOTICED*

**Scott G. Bullock**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**JOHN GAMBINO**                  represented by **Daniel L. Alban**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Scott G. Bullock**
                                               (See above for address)
                                               *PRO HAC VICE*
                                               *ATTORNEY TO BE NOTICED*

V.

**Defendant**
**INTERNAL REVENUE SERVICE**      represented by **Joseph E. Hunsader**
                                               U.S. DEPARTMENT OF JUSTICE
                                               Tax Division
                                               P.O. Box 227
                                               Washington, DC 20044
                                               (202) 514-0472
                                               Fax: (202) 514-6866
                                               Email: joseph.e.hunsader@usdoj.gov
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Geoffrey John Klimas**
                                               U.S. DEPARTMENT OF JUSTICE
                                               P.O. Box 227
                                               Washington, DC 20044
                                               (202) 307-6346
                                               Email: geoffrey.j.klimas@usdoj.gov
                                               *ATTORNEY TO BE NOTICED*

**Defendant**
**DOUGLAS H. SHULMAN**            represented by **Joseph E. Hunsader**
*Commissioner of Internal Revenue*             (See above for address)
*Service*                                      *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

                                               **Geoffrey John Klimas**
                                               (See above for address)
                                               *ATTORNEY TO BE NOTICED*

JA 2

**Defendant**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | represented by | **Joseph E. Hunsader**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Geoffrey John Klimas**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 03/13/2012 | 1 | COMPLAINT against INTERNAL REVENUE SERVICE, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA ( Filing fee $ 350, receipt number 4616046725) filed by SABINA LOVING, ELMER KILIAN, JOHN GAMBINO. (Attachments: # 1 Civil Cover Sheet)(td, ) (Entered: 03/14/2012) |
| 03/13/2012 | | SUMMONS (4) Issued as to INTERNAL REVENUE SERVICE, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA, U.S. Attorney and U.S. Attorney General (td, ) (Entered: 03/14/2012) |
| 03/15/2012 | 2 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Scott G. Bullock, :Firm- Institute for Justice, :Address- 901 North Glebe Road, Suite 900, Arlington, VA 22203. Phone No. - 703-682-9320. Fax No. - 703-682-9321 by JOHN GAMBINO, ELMER KILIAN, SABINA LOVING (Attachments: # 1 Declaration_Scott G. Bullock, # 2 Proposed Order)(Alban, Daniel) (Entered: 03/15/2012) |
| 03/15/2012 | | MINUTE ORDER granting 2 Motion of Scott G. Bullock for Leave to Appear *Pro Hac Vice*. Signed by Judge James E. Boasberg on 3/15/2012. (lcjeb1) (Entered: 03/15/2012) |
| 03/21/2012 | 3 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 3/14/2012. (Alban, Daniel) (Entered: 03/21/2012) |
| 03/21/2012 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/15/2012. Answer due for ALL FEDERAL DEFENDANTS by 5/14/2012. (Alban, Daniel) (Entered: 03/21/2012) |
| 03/21/2012 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. INTERNAL REVENUE SERVICE served on 3/14/2012 (Alban, Daniel) (Entered: 03/21/2012) |
| 03/21/2012 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DOUGLAS H. SHULMAN served on 3/14/2012 (Alban, Daniel) (Entered: 03/21/2012) |
| 05/10/2012 | 7 | MOTION for Extension of Time to File Answer re 1 Complaint by UNITED STATES OF AMERICA (Attachments: # 1 Text of Proposed Order)(Hunsader, |

JA 3

| | | |
|---|---|---|
| | | Joseph) (Entered: 05/10/2012) |
| 05/10/2012 | | MINUTE ORDER: Defendants' 7 Motion for Extension of Time to Answer is GRANTED. Defendants shall respond to Plaintiffs' Complaint on or before June 4, 2012. Signed by Judge James E. Boasberg on 5/10/12. (lcjeb4) (Entered: 05/10/2012) |
| 05/11/2012 | | Set/Reset Deadline: Defendants shall respond to Plaintiffs' Complaint on or before 6/4/2012. (ad) (Entered: 05/11/2012) |
| 06/04/2012 | 8 | ANSWER to 1 Complaint *by the United States, Internal Revenue Service and Douglas Shulman sued in official capacity as Commissioner of Internal Revenue* by UNITED STATES OF AMERICA.(Hunsader, Joseph) (Entered: 06/04/2012) |
| 06/04/2012 | | MINUTE ORDER: An Initial Scheduling Conference is set for July 10, 2012, at 10:00 a.m. before Judge James E. Boasberg in Courtroom 19. The parties shall meet, confer, and submit a joint report pursuant to FRCP 26(f) and Local Rule 16.3.. Signed by Judge James E. Boasberg on 6/4/12. (lcjeb4) (Entered: 06/04/2012) |
| 06/05/2012 | | Set/Reset Hearing: An Initial Scheduling Conference is set for 7/10/2012 at 10:00 AM in Courtroom 19 before Judge James E. Boasberg. (ad) (Entered: 06/05/2012) |
| 07/02/2012 | 9 | MEET AND CONFER STATEMENT. (Attachments: # 1 Plaintiffs' Proposed Scheduling Order, # 2 Defendants' Proposed Scheduling Order)(Alban, Daniel) (Entered: 07/02/2012) |
| 07/10/2012 | | Minute Entry for proceedings held before Judge James E. Boasberg: Initial Scheduling Conference held on 7/10/2012. Scheduling Order forthcoming. (Court Reporter Lisa Griffith) (ad) (Entered: 07/10/2012) |
| 07/10/2012 | | MINUTE ORDER: As discussed at today's Scheduling Conference, the Court ORDERS that 1) Any motion to add parties shall be filed on or before August 1, 2012; 2) Any motion to amend the pleadings shall be filed on or before August 22, 2012; 3) Defendants shall file the Administrative Record on or before August 15, 2012; 4) Plaintiffs' Motion for Summary Judgment shall be due on or before September 28, 2012; 5) Defendants' combined Motion and Opposition shall be due on or before October 26, 2012; 6) Plaintiffs' combined Opposition and Reply shall be due on or before November 20, 2012; and 7) Defendants' Reply shall be due on or before December 11, 2012. In addition, parties are advised that they may not extend any deadline by stipulation; instead, they must seek extensions by motion. Consent motions are generally looked upon with favor by the Court. Signed by Judge James E. Boasberg on 7/10/2012. (lcjeb2) (Entered: 07/10/2012) |
| 07/11/2012 | | Set/Reset Deadlines: 1) Any motion to add parties shall be filed on or before 8/01/2012; 2) Any motion to amend the pleadings shall be filed on or before 8/22/2012; 3) Defendants shall file the Administrative Record on or before 8/15/2012; 4) Plaintiffs' Motion for Summary Judgment shall be due on or before 9/28/2012; 5) Defendants' combined Motion and Opposition shall be due on or before 10/26/2012; 6) Plaintiffs' combined Opposition and Reply shall be |

|  |  | due on or before 11/20/2012; and 7) Defendants' Reply shall be due on or before 12/11/2012. (ad) (Entered: 07/11/2012) |
|---|---|---|
| 08/15/2012 | 10 | NOTICE *of Filing of Administrative Record* by UNITED STATES OF AMERICA (Attachments: # 1 Affidavit Certificaiton of Administrative Record) (Hunsader, Joseph) (Entered: 08/15/2012) |
| 08/15/2012 | 11 | ADMINISTRATIVE RECORD by UNITED STATES OF AMERICA. (See Docket Entry 10 to view document). (znmw, ) (Entered: 08/16/2012) |
| 08/16/2012 |  | NOTICE OF ERROR re 10 Notice (Other); emailed to joseph.e.hunsader@usdoj.gov, cc'd 4 associated attorneys -- The PDF file you docketed contained errors: 1. Incorrect event used, 2. In future, use the event Administrative Record under Other Documents; Do not refile. (znmw, ) (Entered: 08/16/2012) |
| 09/28/2012 | 12 | MOTION for Summary Judgment by JOHN GAMBINO, ELMER KILIAN, SABINA LOVING (Attachments: # 1 Text of Proposed Order, # 2 Declaration, # 3 Declaration, # 4 Declaration, # 5 Declaration, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Alban, Daniel) (Entered: 09/28/2012) |
| 10/26/2012 | 13 | MOTION for Summary Judgment *and Opposition to Plaintiffs' motion for summary judgment* by UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Hunsader, Joseph) (Entered: 10/26/2012) |
| 10/26/2012 | 14 | Memorandum in opposition to re 12 MOTION for Summary Judgment filed by INTERNAL REVENUE SERVICE, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA. (See Docket Entry 13 to view document. Counsel is reminded to file the opposition as a separate docket entry in future). (znmw, ) (Entered: 10/29/2012) |
| 11/20/2012 | 15 | Memorandum in opposition to re 13 MOTION for Summary Judgment *and Opposition to Plaintiffs' motion for summary judgment (consolidated with Reply)* filed by JOHN GAMBINO, ELMER KILIAN, SABINA LOVING. (Attachments: # 1 Text of Proposed Order)(Alban, Daniel) (Entered: 11/20/2012) |
| 11/20/2012 | 16 | REPLY to opposition to motion re 12 MOTION for Summary Judgment *and Opposition to Plaintiffs' motion for summary judgment (consolidated with Memorandum in Opposition)* filed by JOHN GAMBINO, ELMER KILIAN, SABINA LOVING. (Attachments: # 1 Text of Proposed Order)(Alban, Daniel) Modified on 11/21/2012 to correct linkage (rdj). (Entered: 11/20/2012) |
| 12/10/2012 | 17 | REPLY to opposition to motion re 13 MOTION for Summary Judgment *and Opposition to Plaintiffs' motion for summary judgment* filed by UNITED STATES OF AMERICA. (Hunsader, Joseph) (Entered: 12/10/2012) |
| 12/17/2012 | 18 | MOTION for Leave to File *Surreply* by JOHN GAMBINO, ELMER KILIAN, SABINA LOVING (Attachments: # 1 Plaintiffs' Surreply to Defendants' Reply Memorandum in Support of Motion for Summary Judgment, # 2 Text of Proposed Order)(Alban, Daniel) (Entered: 12/17/2012) |
| 12/28/2012 | 19 | Memorandum in opposition to re 18 MOTION for Leave to File *Surreply* filed |

JA 5

| | | |
|---|---|---|
| | | by UNITED STATES OF AMERICA. (Hunsader, Joseph) (Entered: 12/28/2012) |
| 01/03/2013 | | MINUTE ORDER: Plaintiffs' 18 Motion for Leave to File Surreply is DENIED. Defendants' 17 Reply does not raise new bases for the grant of summary judgment in their favor. Signed by Judge James E. Boasberg on 1/3/2013. (lcjeb2) (Entered: 01/03/2013) |
| 01/14/2013 | 20 | NOTICE of Appearance by Geoffrey John Klimas on behalf of All Defendants (Klimas, Geoffrey) (Entered: 01/14/2013) |
| 01/18/2013 | 21 | ORDER granting Plaintiffs' 12 Motion for Summary Judgment and denying Defendants' 13 Motion for Summary Judgment. Defendants lack statutory authority to promulgate or enforce the new regulatory scheme for "registered tax return preparers" created by 76 Fed. Reg. 32,286. Defendants are permanently enjoined from enforcing such scheme. Judgment is ENTERED in favor of Plaintiffs. Signed by Judge James E. Boasberg on 1/18/2013. (lcjeb2) (Entered: 01/18/2013) |
| 01/18/2013 | 22 | MEMORANDUM OPINION re 21 Order on Motions for Summary Judgment. Signed by Judge James E. Boasberg on 1/18/2013. (lcjeb2) (Entered: 01/18/2013) |
| 01/23/2013 | 23 | MOTION to Stay re 21 Order on Motion for Summary Judgment,,, *(Request to Suspend Injunction Pending Appeal)* by INTERNAL REVENUE SERVICE, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support, # 2 Declaration of Carol A. Campbell, # 3 Text of Proposed Order #1, # 4 Text of Proposed Order #2)(Klimas, Geoffrey) (Entered: 01/23/2013) |
| 01/24/2013 | | MINUTE ORDER: The Court ORDERS that Plaintiffs shall file any opposition to Defendants' 23 Motion to Suspend Injunction Pending Appeal by January 29, 2013, and Defendants shall file any reply by January 31, 2013. Signed by Judge James E. Boasberg on 1/24/2013. (lcjeb2) (Entered: 01/24/2013) |
| 01/29/2013 | 24 | Memorandum in opposition to re 23 MOTION to Stay re 21 Order on Motion for Summary Judgment,,, *(Request to Suspend Injunction Pending Appeal)* filed by JOHN GAMBINO, ELMER KILIAN, SABINA LOVING. (Attachments: # 1 Text of Proposed Order, # 2 Declaration, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Alban, Daniel) (Entered: 01/29/2013) |
| 01/31/2013 | 25 | REPLY to opposition to motion re 23 MOTION to Stay re 21 Order on Motion for Summary Judgment,,, *(Request to Suspend Injunction Pending Appeal)* filed by INTERNAL REVENUE SERVICE, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA. (Klimas, Geoffrey) (Entered: 01/31/2013) |
| 02/01/2013 | 26 | MOTION for Hearing *Motion for Oral Argument* by JOHN GAMBINO, ELMER KILIAN, SABINA LOVING (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Alban, Daniel) (Entered: 02/01/2013) |
| 02/01/2013 | 27 | Memorandum in opposition to re 26 MOTION for Hearing *Motion for Oral Argument* filed by INTERNAL REVENUE SERVICE, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA. (Klimas, Geoffrey) (Entered: |

JA 6

| | | 02/01/2013) |
|---|---|---|
| 02/01/2013 | 28 | MEMORANDUM OPINION AND ORDER denying Defendants' 23 Motion to Suspend Injunction Pending Appeal. The Injunction is MODIFIED to make clear that the IRS is not required to suspend its PTIN program, nor is it required to shut down all of its testing and continuing-education centers; instead, they may remain, but no tax-return preparer may be required to pay testing or continuing-education fees or to complete any testing or continuing education unless and until this injunction is stayed or vacated by the Court of Appeals. Signed by Judge James E. Boasberg on 2/1/2013. (lcjeb2) (Entered: 02/01/2013) |
| 02/04/2013 | | MINUTE ORDER: In light of the Court's 28 Memorandum Opinion and Order, Plaintiffs' 26 Motion for Oral Argument is denied as moot. Signed by Judge James E. Boasberg on 2/4/2013. (lcjeb2) (Entered: 02/04/2013) |
| 02/20/2013 | 29 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 28 Order on Motion to Stay,, 21 Order on Motion for Summary Judgment,,, 22 Memorandum & Opinion by DOUGLAS H. SHULMAN, INTERNAL REVENUE SERVICE, UNITED STATES OF AMERICA. Fee Status: No Fee Paid. Parties have been notified. (Klimas, Geoffrey) (Entered: 02/20/2013) |
| 02/21/2013 | 30 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the fee was an Appeal by the Government re 29 Notice of Appeal to DC Circuit Court,. (td, ) (Entered: 02/21/2013) |
| 02/22/2013 | | USCA Case Number 13-5061 for 29 Notice of Appeal to DC Circuit Court, filed by INTERNAL REVENUE SERVICE, UNITED STATES OF AMERICA, DOUGLAS H. SHULMAN. (td, ) (Entered: 02/25/2013) |
| 02/27/2013 | 31 | NOTICE *Regarding Order of Transcript* by INTERNAL REVENUE SERVICE, DOUGLAS H. SHULMAN, UNITED STATES OF AMERICA re 29 Notice of Appeal to DC Circuit Court, USCA Case Number, 30 Transmission of Notice of Appeal and Docket Sheet to USCA (Attachments: # 1 Exhibit A)(Klimas, Geoffrey) (Entered: 02/27/2013) |
| 03/25/2013 | 32 | TRANSCRIPT OF PROCEEDINGS before Judge James E. Boasberg held on 7-10-12; Page Numbers: 1-8. Date of Issuance:3-25-13. Court Reporter/Transcriber Lisa Griffith, Telephone number (202) 354-3247, Court Reporter Email Address : Lisa_Griffith@dcd.uscourts.gov.<P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<P>NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at ww.dcd.uscourts.gov.<P></P> Redaction Request due 4/15/2013. Redacted Transcript Deadline set for |

JA 7

| | | 4/25/2013. Release of Transcript Restriction set for 6/23/2013.(Griffith, Lisa) (Entered: 03/25/2013) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/27/2013 12:55:39 | | | |
| PACER Login: | dj0037 | Client Code: | doj |
| Description: | Docket Report | Search Criteria: | 1:12-cv-00385-JEB |
| Billable Pages: | 6 | Cost: | 0.60 |

JA 8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **SABINA LOVING,** *et al.*, |
| **Plaintiffs,** |
| v. |
| **INTERNAL REVENUE SERVICE,** *et al.*, |
| **Defendants.** |

**Civil Action No. 12-385 (JEB)**

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Court

ORDERS that:

1. Plaintiffs' Motion for Summary Judgment is GRANTED;

2. Defendants' Motion for Summary Judgment is DENIED;

3. Defendants lack statutory authority to promulgate or enforce the new regulatory

    scheme for "registered tax return preparers" created by 76 Fed. Reg. 32,286;

4. Defendants are permanently enjoined from enforcing such scheme; and

5. Judgment is ENTERED in favor of Plaintiffs.

**SO ORDERED.**

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: January 18, 2013

JA 9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SABINA LOVING, *et al.*,

     Plaintiffs,

         v.                                     Civil Action No. 12-385 (JEB)

INTERNAL REVENUE SERVICE, *et al.*,

     Defendants.

---

## <u>MEMORANDUM OPINION</u>

To close a gap in the federal oversight of tax professionals, in 2011 the Internal Revenue Service began regulating hundreds of thousands of non-attorney, non-CPA tax-return preparers who prepare and file tax returns for compensation. The new regulations require each such preparer to pass a qualifying exam, pay an annual application fee, and take fifteen hours of continuing-education courses each year. Agency action, however, requires statutory authority. The IRS interpreted an 1884 statute as enabling these new regulations. That statute allows the IRS to regulate "representatives" who "practice" before it. Believing that tax-return preparers are not covered under the statute, and thus cannot be so regulated, Plaintiffs – three independent tax-return preparers – brought this suit. Plaintiffs and the Government have now cross-moved for summary judgment. Concluding that the statute's text and context unambiguously foreclose the IRS's interpretation, the Court will grant Plaintiffs' Motion.

**I.**      **Background**

      **A.**      <u>Statutory and Regulatory Framework</u>

This case turns on whether certain tax-return preparers are representatives who practice before the IRS, and thus are properly subject to the new IRS regulations. (Preparers who are

attorneys, CPAs, enrolled agents, or enrolled actuaries are otherwise regulated by the IRS and

thus have no bone to pick with the new regulations.  See 31 C.F.R. § 10.3 (2009).)  Before

probing that question, however, it helps to know something about the IRS adjudication process.

The Court therefore begins by outlining how the IRS resolves disputes about tax liability, then

moves to the statutes and regulations at issue in this case.

        1.     *Process for Adjudicating Federal Income Taxes*

     "The Internal Revenue Service is a bureau of the Department of the Treasury under the

immediate direction of the Commissioner of Internal Revenue."  26 C.F.R. § 601.101(a); see also

26 U.S.C. § 7803(a) (Commissioner of Internal Revenue is part of Treasury Department with

duties and powers assigned by Treasury Secretary).  Taxpayers can progress through three stages

of interaction with the IRS: assessment and collection, examination, and appeals.

     First up is assessment and collection.  Our federal tax system "is basically one of self-

assessment" in which each taxpayer must compute the tax due, file a return showing "facts upon

which tax liability may be determined and assessed," and pay the tax due.  26 C.F.R.

§ 601.103(a).  After such a filing (or a failure to file), the Government performs an "assessment"

– that is, "the calculation or recording of a tax liability."  United States v. Galletti, 541 U.S. 114,

122 (2004); see 26 U.S.C. §§ 6201-6204.  "In most cases, the Secretary accepts the self-

assessment and simply records the liability of the taxpayer. . . .  [W]here the Secretary rejects the

self-assessment of the taxpayer or discovers that the taxpayer has failed to file a return, the

Secretary calculates the proper amount of liability and records it in the Government's books."

Galletti, 541 U.S. at 122.  After an assessment, the IRS collects unpaid taxes.  See 26 C.F.R.

§ 601.104(c)(1); see also 26 U.S.C. §§ 6301-6306.

Next, for some lucky taxpayers, comes the IRS audit, known in tax jargon as an "examination."  See 26 C.F.R. §§ 601.103(b), 601.105(a).  The IRS may conduct the examination by mail or by in-person interviews, and it will sometimes visit a taxpayer's home or business to examine his books and records.  See 26 C.F.R. § 601.105(b).  "During the examination of a return a taxpayer may be represented before the examiner by an attorney, certified public accountant, or other representative."  26 C.F.R. § 601.105(b)(1); see also 26 U.S.C. § 7521(b)(2) (during a taxpayer interview, taxpayer may suspend questioning to consult with "an attorney, certified public accountant, enrolled agent, enrolled actuary, or any other person permitted to represent the taxpayer before the Internal Revenue Service").

Last, if the taxpayer and the IRS still disagree, the taxpayer can request an in-person conference with an IRS "Appeals office."  See 26 C.F.R. §§ 601.103(b), (c)(1), 601.106.  While "[p]roceedings before Appeals are informal," taxpayers may "designate a qualified representative to act for them."  26 C.F.R. § 601.106(c).  (The taxpayer may then pursue appeals outside the IRS in the U.S. Tax Court, the U.S. Claims Court, or a federal district court.  See 26 C.F.R. § 601.103(c)(2)-(3).)

## 2.   *Statutory and Regulatory Scheme*

With that framework in mind, the Court now outlines the statutory and regulatory scheme at play in this case.  Under 31 U.S.C. § 330, originally enacted in 1884, the Treasury Secretary has authority to regulate people who practice before the Treasury Department.[1]  As the IRS is a

---

[1] The original 1884 statute said:

> [T]he Secretary of the Treasury may prescribe rules and regulations governing the recognition of agents, attorneys, or other persons representing claimants before his Department, and may require of such persons, agents and attorneys, before being recognized as representatives of claimants, that they shall show that they are of good character and in good repute, possessed of the necessary qualifications to enable them to render such claimants valuable service, and otherwise competent to advise and assist such claimants in the presentation of their cases.  And such Secretary may after due notice and opportunity for

bureau of the Treasury Department, <u>see</u> 26 C.F.R. § 601.101(a), this statute covers practice before the IRS as well.  This is so even though the casual student of history knows that the Sixteenth Amendment authorizing the modern federal income tax was not ratified until 1913.  In full, the first two subsections of § 330 currently provide:

> (a) Subject to section 500 of title 5, the Secretary of the Treasury may –
>> (1) regulate the <u>practice of representatives</u> of persons before the Department of the Treasury; and
>> (2) before admitting a representative to practice, require that the representative demonstrate –
>>> (A) good character;
>>> (B) good reputation;
>>> (C) necessary qualifications to enable the representative to provide to persons valuable service; and
>>> (D) competency to advise and assist persons in presenting their cases.
>
> (b) After notice and opportunity for a proceeding, the Secretary may suspend or disbar from practice before the Department, or censure, a representative who –
>> (1) is incompetent;
>> (2) is disreputable;
>> (3) violates regulations prescribed under this section; or
>> (4) with intent to defraud, willfully and knowingly misleads or threatens the person being represented or a prospective person to be represented.
>
> The Secretary may impose a monetary penalty on any representative described in the preceding sentence.  If the representative was acting on behalf of an employer or any firm or other entity in connection with the conduct giving rise to such penalty, the Secretary may impose a monetary penalty on such employer, firm, or entity if it knew, or reasonably should have known, of such conduct.  Such penalty shall not exceed the gross income derived (or to be derived) from the conduct giving rise to the penalty and may be in addition to, or in lieu of, any suspension, disbarment, or censure of the representative.

hearing suspend, and disbar from further practice before his Department any such person, agent, or attorney shown to be incompetent, disreputable, or who refuses to comply with the said rules and regulations, or who shall with intent to defraud, in any manner willfully and knowingly deceive, mislead, or threaten any claimant or prospective claimant, by word, circular, letter, or by advertisement.

Act of July 7, 1884, ch. 334, 23 Stat. 236, 258-59.

(Emphasis added.)

Using this statutory authority, the Secretary publishes regulations governing practice before the IRS in the Code of Federal Regulations, Title 31, part 10.  The Treasury reprints those regulations under the name "Treasury Department Circular No. 230."  The meat of Circular 230 is a long list of duties and restrictions relating to practice before the IRS, giving content to statutory terms like "incompetent" and "disreputable."  <u>See</u> 31 C.F.R. §§ 10.20-.38.  Circular 230 also lays out sanctions and sets the rules for disciplinary proceedings.  <u>See</u> 31 C.F.R. §§ 10.50-.82.  These regulations have long applied to attorneys, CPAs, and a handful of other specified tax professionals.  <u>See</u> 31 C.F.R. § 10.3 (2009).

In 2011, the IRS extended the reach of Circular 230 by bringing tax-return preparers under its coverage.  <u>See</u> Regulations Governing Practice Before the Internal Revenue Service, 76 Fed. Reg. 32,286 (June 3, 2011) (final rule) ("the Rule"); <u>see also</u> Regulations Governing Practice Before the Internal Revenue Service, 75 Fed. Reg. 51,713 (Aug. 23, 2010) (proposed rule).  Although technically promulgated by the Treasury Department, this Opinion will usually attribute the new Rule to the IRS.  Under the Rule, a tax-return preparer is a person who "prepares for compensation, or who employs one or more persons to prepare for compensation, all or a substantial portion of any return of tax or any claim for refund of tax under the Internal Revenue Code."  26 C.F.R. § 301.7701-15(a); <u>accord</u> 26 U.S.C. § 7701(a)(36); <u>see</u> 31 C.F.R. § 10.2(a)(8) ("<u>Tax return preparer</u> means any individual within the meaning of section 7701(a)(36) and 26 CFR 301.7701-15.") (emphasis in original).  The IRS estimated that the new Rule sweeps in 600,000 to 700,000 new tax-return preparers who were previously unregulated at the federal level.  <u>See</u> 76 Fed. Reg. at 32,299.

"Practice" as a tax-return preparer for the most part (and for our purposes) "is limited to preparing and signing tax returns and claims for refund, and other documents for submission to the Internal Revenue Service."  31 C.F.R. § 10.3(f)(2).  (In addition, if the IRS audits a tax return that the preparer signed, the preparer may represent the taxpayer during the examination.  See 31 C.F.R. § 10.3(f)(3).  Plaintiffs raise no objection to the IRS using such additional practice as a basis for regulation.)  The Rule thus encompasses those preparers whose only "appearance" before the IRS is the preparation and submission of tax returns, and this Opinion's subsequent references to tax-return preparers concern this limited role.

Before engaging in such practices, the new regulations force all tax-return preparers to register with the Secretary.  This registration requirement is the vehicle by which the Rule adds burdens on tax-return preparers.  To initially register, a tax-return preparer must pay a fee and pass a qualifying exam.  See 31 C.F.R. §§ 10.4(c), 10.5(b).  Then, to maintain her registration, each year the preparer must pay another fee and complete at least 15 hours of continuing-education courses.  See 31 C.F.R. §§ 10.6(d)(6), (e)(3).  Plus, on pain of censure, suspension, disbarment, or monetary penalties permitted by § 330(b), the preparer must comply with duties and restrictions imposed on other IRS practitioners.

B.    Factual and Procedural History

Plaintiffs are three paid tax-return preparers who were not previously regulated by the IRS.  Sabina Loving works on the South Side of Chicago, serving low-income clients.  Pls. Mot., Exh. 2 (Decl. of Sabina Loving), ¶ 7.  Elmer Kilian has for decades prepared tax returns in his house.  Pls. Mot., Exh. 3 (Decl. of Elmer Kilian), ¶ 4.  And Giovanni Gambino is a financial planner who prepares tax returns for his clients.  Pls. Mot., Exh. 4 (Decl. of Giovanni Gambino), ¶¶ 2, 6.  Loving declares that she will have to increase her prices if forced to comply with the

Rule, likely losing customers.  See Loving Decl., ¶ 13. Kilian and Gambino declare that they will

likely close their tax businesses if forced to comply.  See Kilian Decl., ¶ 15; Gambino Decl.,

¶ 17.

Seeking injunctive and declaratory relief, Plaintiffs sued the IRS, the Commissioner of

Internal Revenue, and the United States under the Administrative Procedure Act, 5 U.S.C.

§§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  (As regulated parties,

Plaintiffs obviously have standing to challenge the regulations – particularly given the annual

fees, the entrance exam, and the hefty continuing-education requirements.)  Both sides now

move for summary judgment.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477

U.S. at 248; Holcomb, 433 F.3d at 895.

Although styled Motions for Summary Judgment, the pleadings in this case more

accurately seek the Court's review of an administrative decision.  The standard set forth in Rule

56(c), therefore, does not apply because of the limited role of a court in reviewing the

administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006)

(citing Nat'l Wilderness Inst. v. Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005);

<u>Fund for Animals v. Babbitt</u>, 903 F. Supp. 96, 105 (D.D.C. 1995), <u>amended on other grounds</u>, 967 F. Supp. 6 (D.D.C. 1997)).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  <u>Id.</u> at 90 (citation omitted).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  <u>Id.</u> (citing <u>Richards v. INS</u>, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), <u>cited in</u> <u>Bloch v. Powell</u>, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), <u>aff'd</u>, 348 F.3d 1060 (D.C. Cir. 2003)).

The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  Such claims "are reviewed under the well-known <u>Chevron</u> framework."  <u>Ass'n of Private Sector Colls. & Univs. v. Duncan</u>, 681 F.3d 427, 441 (D.C. Cir. 2012) (citing <u>Chevron U.S.A. Inc. v. NRDC</u>, 467 U.S. 837 (1984)). <u>Chevron</u> review entails a two-step inquiry.  The first step asks whether "the intent of Congress is clear" – that is, "whether Congress has directly spoken to the precise question at issue." <u>Chevron</u>, 467 U.S. at 842.  "Under the first step of <u>Chevron</u>, the reviewing court must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue."  <u>Bell Atl. Tel. Co. v. FCC</u>, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (internal quotation marks omitted).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  <u>Chevron</u>, 467 U.S. at 842-43.  "[I]f the statute is silent or ambiguous with respect to the specific issue," the reviewing court must proceed to step two, asking whether the agency's interpretation "is based on a permissible construction of the statute."  <u>Id.</u> at 843.  The

agency's construction at step two is permissible "unless it is arbitrary or capricious in substance, or manifestly contrary to the statute."  Mayo Found. for Med. Educ. & Research v. United States, 131 S. Ct. 704, 711 (2011) (citation omitted).

## III.   Analysis

At the threshold, the IRS claims that the Court can bypass the Chevron inquiry altogether because each agency has inherent authority to regulate those who practice before it.  See Goldsmith v. Bd. of Tax Appeals, 270 U.S. 117, 122 (1926) ("[T]he general words by which the Board is vested with the authority to prescribe the procedure in accordance with which its business shall be conducted include as part of the procedure rules of practice for the admission of attorneys.").  An agency, however, "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of [the agency] in a particular area."  Am. Petroleum Inst. v. EPA, 52 F.3d 1113, 1119 (D.C. Cir. 1995).  Because 31 U.S.C. § 330 specifically defines the Treasury Department's authority to regulate the people who practice before it, that statute controls the inquiry here.

Section 330(a) authorizes the Treasury Secretary to "regulate the practice of representatives of persons before the Department of the Treasury."  In dispute is the IRS's interpretation that tax-return preparers are "representatives" who "practice" before the IRS.  The battle here will be fought and won on Chevron step one; Plaintiffs offer no independent argument for why, if the statute is ambiguous, the IRS's interpretation would be "arbitrary or capricious in substance, or manifestly contrary to the statute" under Chevron step two.  Mayo Found., 131 S. Ct. at 711.  This case then boils down to one question:  Is § 330 ambiguous as to whether tax-return preparers are "representatives" who "practice" before the IRS?

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997).  These are the sources the Court considers here.  In so doing, it concludes that § 330 unambiguously forecloses the IRS's interpretation for three reasons:  First, the text of § 330(a)(2)(D) defines the "practice of representatives" in a way that does not cover tax-return preparers.  Second, the IRS's interpretation would displace an existing statutory scheme that comprehensively regulates penalties on tax-return preparers.  Third, under the IRS's interpretation, a federal statute that remedies abusive practice by tax-return preparers would be relegated to oblivion.  After examining the statutory text and context, the Court will resolve other arguments offered by the parties.

A.      Text of § 330

The inquiry here begins "where all such inquiries must begin: with the language of the statute itself."  Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 132 S. Ct. 1670, 1680 (2012) (citation omitted).  Again, § 330(a) says that "the Secretary of the Treasury may . . . regulate the practice of representatives of persons before the Department of the Treasury."

The IRS hurries through Chevron step one, arguing that the statute is ambiguous because it defines neither "representative" nor "practice," and both terms can have broad meanings.  See IRS Mot. at 15-16.  That simplistic approach will not fly, however.  "Ambiguity is a creature not of definitional possibilities but of statutory context . . . ."  Brown v. Gardner, 513 U.S. 115, 118 (1994).  Indeed, the D.C. Circuit has specifically rejected the argument that a statute is ambiguous when it fails to define a broad term.  See Goldstein v. SEC, 451 F.3d 873, 878 (D.C. Cir. 2006) ("The lack of a statutory definition of a word does not necessarily render the meaning

JA 19

of a word ambiguous, just as the presence of a definition does not necessarily make the meaning clear."); id. ("If Congress employs a term susceptible of several meanings, as many terms are, it scarcely follows that Congress has authorized an agency to choose any one of those meanings.") (emphasis in original).

In any event, while the "practice of representatives" may not be defined in § 330(a)(1), the very next subsection of § 330 provides critical guidance on what the term means.  "[B]efore admitting a representative to practice," § 330(a)(2) allows the Secretary to "require that the representative demonstrate . . . (D) competency to advise and assist persons in presenting their cases."  Section 330(a)(2), like § 330(a)(1), does not disclose who these covered "representatives" are.  But it does tell us what the representatives do – what their "practice" is, in the words of both subsections: representatives "advise and assist persons in presenting their cases."  This statutory equating of "practice" with advising and assisting the presentation of a case provides the first strike against the IRS's interpretation.  Filing a tax return would never, in normal usage, be described as "presenting a case."  At the time of filing, the taxpayer has no dispute with the IRS; there is no "case" to present.  This definition makes sense only in connection with those who assist taxpayers in the examination and appeals stages of the process.

The IRS seems to accept that tax-return preparers are not advising and assisting in presenting a case, focusing its fire instead on the premise of the argument.  See IRS Reply at 13 ("It is nonsensical that Congress would authorize the Secretary to ensure the competency of those who present 'cases' but not those who prepare returns, particularly where only a fraction of prepared returns are audited and thereafter become 'cases' upon appeal before the Service."); id. at 2 ("Plaintiffs misread 31 U.S.C. § 330(a) because they again claim that the Secretary only has the authority to regulate the 'practice' of those who 'advise and assist persons in presenting their

cases.'"").  This hardly seems as preposterous as the IRS would lead one to believe.  Congress could well desire that those who represent taxpayers in examinations or appeals be more closely regulated than those who merely prepare returns.  Just so, drafting a will can be done by anyone of mature age and sound mind, but disputing the will entails litigation in probate court, where representatives must be lawyers admitted to the court's bar.  Compare, e.g., D.C. Code § 18-102, with D.C. Code § 20-107(a), and D.C. Super. Ct. R. Civ. P. 101(a).

The IRS also maintains that § 330(a)(2) "is a separate grant of authority" from § 330(a)(1), IRS Mot. at 27, and thus § 330(a)(2)(D) "in no way limits the Service's authority with respect to whom the Secretary may authorize to 'practice' before the agency, and the provision has no bearing on the definition of 'practice' or the bounds of activities that may be defined as 'practice' before the agency."  IRS Reply at 14.  As explained above, however, the grant of authority in § 330(a)(1) – which allows the IRS to regulate the "practice of representatives" – uses the same language as the grant of authority in its near neighbor, § 330(a)(2) – which allows the IRS to require certain qualifications before admitting a "representative to practice."  And "[i]t is a well established rule of statutory construction that a word is presumed to have the same meaning in all subsections of the same statute."  Allen v. CSX Transp., Inc., 22 F.3d 1180, 1182 (D.C. Cir. 1994) (internal quotation marks omitted).  Since § 330(a)(2) makes clear that the "practice" of these representatives is "advis[ing] and assist[ing] persons in presenting their cases," "practice" in § 330(a)(1) must mean the same thing.

    B.    <u>Broader Statutory Context</u>

Moving beyond the language of § 330, other related statutes also undercut the IRS's interpretation.  Statutory language "cannot be construed in a vacuum.  It is a fundamental canon

of statutory construction that the words of a statute must be read in their context and with a view

to their place in the overall statutory scheme."  Roberts v. Sea-Land Servs., Inc., 132 S. Ct. 1350,

1357 (2012) (citation omitted).  Indeed, context can prove dispositive at Chevron step one.  See

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) ("In determining

whether Congress has specifically addressed the question at issue, a reviewing court should not

confine itself to examining a particular statutory provision in isolation.  The meaning – or

ambiguity – of certain words or phrases may only become evident when placed in context.").

Two aspects of § 330's statutory context prove especially important here.  Both relate to

§ 330(b), which allows the IRS to penalize and disbar practicing representatives.  First, statutes

scattered across Title 26 of the U.S. Code create a careful, regimented schedule of penalties for

misdeeds by tax-return preparers.  If the IRS had open-ended discretion under § 330(b) to impose

a range of monetary penalties on tax-return preparers for almost any conduct the IRS chooses to

regulate, those Title 26 statutes would be eclipsed.  Second, if the IRS could "disbar"

misbehaving tax-return preparers under § 330(b), a federal statute meant to address precisely

those malefactors – 26 U.S.C. § 7407 – would lose all relevance.  These two aspects are

considered in turn.

### 1.    *Penalty Provisions in Title 26*

Congress has already enacted a relatively rigid penalty scheme to punish misdeeds by

tax-return preparers.  Title 26, in fact, has at least ten penalties specific to tax-return preparers,

each of which targets particular conduct related to preparing and filing tax returns, and each of

which comes with a specific fine:

- § 6694(a): For an understatement of tax liability due to an unreasonable position, the
  greater of $1000 or 50% of the income that the preparer earned on the return;

- § 6694(b): For an understatement of tax liability due to willful or reckless conduct, the greater of $5000 or 50% of the income that the preparer earned on the return;

- § 6695(a): For failing to give a taxpayer a copy of her return without reasonable cause, $50 (with an annual maximum of $25,000);

- § 6695(b): For failing to sign a return without reasonable cause, $50 (with an annual maximum of $25,000);

- § 6695(c): For failing to list an identifying number without reasonable cause, $50 (with an annual maximum of $25,000);

- § 6695(d): For failing to retain a copy or a list of returns without reasonable cause, $50 (with an annual maximum of $25,000);

- § 6695(f): For endorsing or otherwise negotiating a check issued to a taxpayer, $500;

- § 6695(g): For failing to comply with the due-diligence IRS regulations on the earned income tax credit, $500;

- § 6713: For disclosing or otherwise using information the taxpayer shares for use in preparing a tax return, $250 (with an annual maximum of $10,000); and

- § 7216: For knowingly or recklessly disclosing or otherwise using information the taxpayer shares for use in preparing a tax return, one year in prison or $1000 fine.

Yet if § 330 covers tax-return preparers, the IRS would have the discretion – with few restraints – to impose an array of penalties for this sort of conduct.  Section 330(b) allows the Secretary to "impose a monetary penalty on any representative" who "is incompetent," "is disreputable," "violates regulations prescribed under" § 330, or, "with intent to defraud, willfully and knowingly misleads or threatens the person being represented or a prospective person to be represented."  The IRS may set the penalty between $0 and "the gross income derived (or to be derived) from the conduct giving rise to the penalty."  In other words, if the "representatives" that the IRS could penalize under § 330(b) include tax-return preparers, the IRS would be able to punish everything covered by the ten penalties in Title 26 – and more – with considerable discretion over the size of the penalty.  That unstructured independence by the IRS would trample the specific and tightly controlled penalty scheme in Title 26.  The existing § 330

regulations, moreover, need not actually overlap with the Title 26 scheme; in statutory

interpretation, the question is what the statute allows, not what the current regulations say.

When statutes intersect, the specific statutes (in Title 26) trump the general (§ 330).

"That is particularly true where . . . Congress has enacted a comprehensive scheme and has

deliberately targeted specific problems with specific solutions." RadLAX Gateway Hotel, LLC

v. Amalgamated Bank, 132 S. Ct. 2065, 2071 (2012) (internal quotation marks omitted); see also

Brown & Williamson Tobacco, 529 U.S. at 133 ("the meaning of one statute may be affected by

other Acts, particularly where Congress has spoken subsequently and more specifically to the

topic at hand").  While the general/specific canon most often applies when the general and

specific statutes point in opposite directions, the Supreme Court recently stressed that the canon

also applies when both statutes authorize similar action, as here:  "[T]he canon has full

application as well to statutes such as the one here, in which a general authorization and a more

limited, specific authorization exist side-by-side." RadLAX Gateway Hotel, 132 S. Ct. at 2071.

Because the U.S. Code already sets forth a comprehensive scheme targeting specific problems

with specific solutions, § 330(b) should not be interpreted to allow the IRS to penalize tax-return

preparers for conduct while preparing and filing returns.

Another statute confirms that § 330(b) does not authorize penalties on tax-return

preparers.  Under 26 U.S.C. § 6103(k)(5), the IRS may disclose certain penalties to state and

local agencies that license, register, or regulate tax-return preparers.  Specifically, § 6103(k)(5)

allows the IRS to disclose "information as to whether or not any penalty has been assessed

against such tax return preparer under section 6694, 6695, or 7216."  (Emphasis added.)  If the

IRS may penalize tax-return preparers under § 330(b), as the IRS claims, how curious that

§ 6103(k)(5) omits § 330 from the list of penalties reportable to state and local agencies.  Indeed,

the misdeeds punished by § 330(b) – incompetence, poor reputation, fraud, and regulatory

violations – would seem especially relevant to licensing agencies.  The better answer, consistent

with the general/specific canon, is that § 330(b) does not create a comprehensive penalty scheme

against tax-return preparers.

### 2.    *Injunction under 26 U.S.C. § 7407*

The U.S. Code also permits the IRS to enjoin tax-return preparers under 26 U.S.C.

§ 7407.  If a tax-return preparer has engaged in specified unlawful conduct and injunctive relief

is appropriate, § 7407 allows the IRS to sue the preparer to enjoin further violations:

> **(a) Authority to seek injunction**
> A civil action in the name of the United States to enjoin any
> person who is a tax return preparer from further engaging in any
> conduct described in subsection (b) or from further action as a tax
> return preparer may be commenced at the request of the Secretary.
> Any action under this section shall be brought in the District Court
> of the United States for the district in which the tax return preparer
> resides or has his principal place of business or in which the
> taxpayer with respect to whose tax return the action is brought
> resides. . . .
>
> **(b) Adjudication and decrees**
> In any action under subsection (a), if the court finds –
> > (1) that a tax return preparer has –
> > > (A) engaged in any conduct subject to penalty under
> > > section 6694 or 6695, or subject to any criminal penalty
> > > provided by this title,
> > > (B) misrepresented his eligibility to practice before
> > > the Internal Revenue Service, or otherwise misrepresented
> > > his experience or education as a tax return preparer,
> > > (C) guaranteed the payment of any tax refund or the
> > > allowance of any tax credit, or
> > > (D) engaged in any other fraudulent or deceptive
> > > conduct which substantially interferes with the proper
> > > administration of the Internal Revenue laws, and
> > (2) that injunctive relief is appropriate to prevent the
> > recurrence of such conduct,
> the court may enjoin such person from further engaging in such
> conduct.

The court may enjoin the person from preparing tax returns, however, only if the preparer is such a habitual offender that an injunction against further violations would be insufficient:

> If the court finds that a tax return preparer has continually or repeatedly engaged in any conduct described in subparagraphs (A) through (D) of this subsection and that an injunction prohibiting such conduct would not be sufficient to prevent such person's interference with the proper administration of this title, the court may enjoin such person from acting as a tax return preparer.

26 U.S.C. § 7407(b).

Yet if § 330 covers tax-return preparers, the IRS could sidestep every protection § 7407 affords – judicial review, the demanding standards for the extraordinary remedy of an injunction, and the elevated hurdle for enjoining preparation of tax returns (instead of further violation) – while effectively obtaining the same result. That is because § 330(b) allows the Treasury Department to "disbar from practice before the Department" a "representative" who engages in the conduct listed in § 330(b) (incompetence, being disreputable, violating regulations, and fraud). Using this authority, the IRS could stop a person from preparing tax returns by "disbarring" her from "practice" before the IRS. Unlike under § 7407, however, disbarment under § 330 would put everything in the IRS's control (aside from limited judicial review, presumably, under the APA). With § 330(b) and § 7407 leading to the same destination, but § 330(b) offering a far easier path, it is hard to imagine the IRS turning to § 7407 more than once in a blue moon. The Court will not lightly assume that Congress enacted such a pointless statute.

Two points of caution bear mention here. First, contrary to Plaintiffs' claims, the IRS's interpretation of § 330 would not render § 7407 surplusage because § 7407 still offers a different remedy: a judicial injunction versus IRS disbarment. For the truly abusive tax-return preparer, perhaps the threat of judicial contempt that comes with an injunction would make § 7407 worth the trouble, even though IRS disbarment would surely be sufficient in almost every case.

Second, the Code's next section, 26 U.S.C. § 7408, might challenge the Court's doubt that Congress enacts duplicative statutes.  Section 7408, like § 7407, empowers the IRS to seek injunctions.  Although designed to combat tax shelters, § 7408's broad language allows the IRS to enjoin any "violation of any requirement under regulations issued under section 330 of title 31, United States Code" – potentially applying to all of Circular 230, not simply the tax-shelter regulations.  Unlike § 7407, which is limited to tax-return preparers, § 7408 allows injunctions against "any person."  Assuming that § 7408 means what is says and is not limited to tax shelters, § 7408 allows injunctive relief against "any person," including those attorneys and CPAs admittedly regulated under § 330(b).  So while § 7407 and § 330(b) authorize injunctive and disbarment remedies against the same people only if § 330 includes tax-return preparers, § 7408 and § 330(b) will authorize those remedies against the same people.

Section 7408 thus might seem to undercut the Court's analysis here:  Asserting that the IRS would almost never seek an injunction under § 7407 if it can instead disbar under § 330(b), the Court has said that the IRS's interpretation of § 330 makes § 7407 worthless.  But § 7408 on its very face similarly empowers the IRS to seek an injunction for attorney or CPA conduct covered by § 330, perhaps suggesting that this injunctive remedy remains useful despite the availability of remedies under § 330(b).  On the other hand, a § 7408 injunction is limited to barring further violations – in contrast to a § 7407 injunction which may bar preparation of tax returns – so § 7408 has far less overlap with § 330's disbarment remedy.  Despite flagging this issue here, the Court will pursue it no further.  The IRS never relied on (or even cited) § 7408, and the Court declines to generate arguments that the Government has failed to make.

Without deciding whether any of these three textual points alone would be dispositive, the Court concludes that together the statutory text and context unambiguously foreclose the IRS's interpretation of 31 U.S.C. § 330.

C.   Other Arguments

The IRS also makes a number of nontextual arguments in favor of its interpretation, but none of these can overcome the statute's unambiguous text here.  In the land of statutory interpretation, statutory text is king.

Repeatedly, the IRS argues that regulating tax-return preparers is vital, protecting dual federal interests in collecting the revenue due to the United States and in preventing preparers from bungling clients' returns.  The Court does not gainsay the importance of such regulation in a field of over 80 million tax returns; indeed, it may very well have significant salutary effects in several related areas.  At Chevron step one, however, such policy arguments have no relevance. "The Supreme Court has repeatedly made clear policy considerations cannot override our interpretation of the text and structure of the Act."  SEC v. Johnson, 650 F.3d 710, 715 (D.C. Cir. 2011) (internal quotation marks, alteration, and brackets omitted).

The parties also clash over which way the legislative history cuts.  No clear evidence of congressional intent emerges on this case's point of dispute, which is to be expected for a statute first enacted decades before the modern federal income tax and the modern tax-return preparer. This Court will not use "ambiguous legislative history to muddy clear statutory language." Milner v. Dep't of Navy, 131 S. Ct. 1259, 1266 (2011).  In the same vein, the parties point to unenacted bills introduced in recent sessions of Congress that would explicitly grant the IRS authority to regulate tax-return preparers.  "[F]ailed legislative proposals," however, "are a particularly dangerous ground on which to rest an interpretation of a prior statute."  Cent. Bank

of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 187 (1994).  "A bill can

be proposed for any number of reasons, and it can be rejected for just as many others."  Solid

Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs, 531 U.S. 159, 170 (2001).

The IRS also argues that various regulations support its interpretation of § 330.  For

example, the IRS says it has long given preparers "limited practice rights," proving that preparers

"practice" before the IRS.  See IRS Mot. at 24-25 (citing 31 C.F.R. § 10.7(c)(1)(viii) (2009)).

But regulations promulgated by an agency cannot transform the meaning of the statute.

Finally, the parties scuffle over whether the IRS has changed its interpretation of § 330

over time.  Plaintiffs seem to be correct that the new Rule contradicts previous interpretations of

§ 330.  See, e.g., Fraud in Income Tax Return Preparation: Hearing Before the Subcomm. on

Oversight of the H. Comm. on Ways & Means, 109th Cong. 24 (2005) (statement of Nancy J.

Jardini, Chief, Criminal Investigation Division, IRS) ("Tax return preparers are not deemed as

individuals who represent individuals before the IRS . . . .").  "Agency inconsistency," however,

"is not a basis for declining to analyze the agency's interpretation under the Chevron framework.

Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary

and capricious change from agency practice under the Administrative Procedure Act."  Nat'l

Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005) (citing 5

U.S.C. § 706(2)(A)).  While the Court could find no explanation for the IRS's flip-flop in the

new Rule, Plaintiffs have not claimed here that the IRS was arbitrary and capricious.  Any

change in the IRS's interpretation is therefore irrelevant.

D.     Remedy

Plaintiffs seek declaratory and injunctive relief.  By failing to object to these remedies,

Defendants have forfeited any challenge to them.  The Court, moreover, concludes that both

remedies are appropriate here.

Plaintiffs first seek a declaratory judgment that Defendants lack statutory authority to

promulgate or enforce the new regulatory scheme for "registered tax return preparers" brought

under Circular 230 by 76 Fed. Reg. 32,286.  The Court will grant this declaratory relief.

Plaintiffs also ask the court to permanently enjoin Defendants from enforcing this IRS

registration scheme against tax-return preparers.  As the scheme is impermissible, such

injunctive relief also appears proper.  The Supreme Court, however, has cautioned lower courts

deciding whether to issue an injunction to apply the traditional four-factor test instead of a

categorical rule, see eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 393-94 (2006), so this

Court will do so.

The Supreme Court has said that, under "well-established principles of equity,"

> a plaintiff seeking a permanent injunction must satisfy a four-
> factor test before a court may grant such relief.  A plaintiff must
> demonstrate: (1) that it has suffered an irreparable injury; (2) that
> remedies available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that, considering the
> balance of hardships between the plaintiff and defendant, a remedy
> in equity is warranted; and (4) that the public interest would not be
> disserved by a permanent injunction.

Id. at 391; see also Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2756 (2010) (same).

While the eBay Court articulated the first two requirements as backward looking – requiring that

a plaintiff "has suffered" an injury – an injunction is obviously a forward-looking remedy, and in

applying the eBay test the Court has properly looked to the future threat of injury.  See

Monsanto, 130 S. Ct. at 2759-60 ("Most importantly, respondents cannot show that they will

suffer irreparable injury if APHIS is allowed to proceed with any partial deregulation, for at least two independent reasons.") (emphasis added).

Plaintiffs have satisfied all four prongs of this test. Two Plaintiffs declare that they will likely close their tax businesses if forced to comply with the new Rule, see Kilian Decl., ¶ 15; Gambino Decl., ¶ 17, which the Court concludes would be an irreparable injury. No remedy at law would adequately compensate that injury. See Nat'l Mining Ass'n v. Army Corps of Eng'rs, 145 F.3d 1399, 1408-09 (D.C. Cir. 1998) ("Money damages were never sought in this action, and even if the government were somehow found to have waived its sovereign immunity against damage actions, it is hard to see the relevance of such remedies in the context of a pre-enforcement challenge to agency regulations. The plaintiffs did seek (and obtain) a declaration of the [challenged] Rule's invalidity, but this brand of relief is itself more equitable than legal in nature."). With an invalid regulatory regime on the IRS's side of the scale and a threat to Plaintiffs' livelihood on the other, the balance of hardships tips strongly in favor of Plaintiffs. Finally, the public interest would be served by a permanent injunction because the IRS's new Rule is *ultra vires*. The Court will therefore grant permanent injunctive relief as well.

## IV.  Conclusion

For the aforementioned reasons, the Court will grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  January 18, 2013

JA 31

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SABINA LOVING, *et al.*,

       Plaintiffs,

       v.

INTERNAL REVENUE SERVICE, *et al.*,

       Defendants.

Civil Action No. 12-385 (JEB)

---

## MEMORANDUM OPINION AND ORDER

On January 18, 2013, this Court issued a decision granting Plaintiffs' Motion for Summary Judgment and enjoining the Internal Revenue Service from enforcing its new regulatory scheme for registered tax-return preparers. See Loving v. IRS, No. 12-385, 2013 WL 204667 (D.D.C. Jan. 18, 2013); ECF No. 21 (Order). The IRS now asks the Court to stay the injunction pending its appeal to the D.C. Circuit. Because the Court finds that the relevant factors weigh against such a stay, it will deny the Motion. The Court will, however, modify the injunction to make clear that its requirements are less burdensome than the IRS claims.

### I.    Background

In considering the request for a stay, it is important to state clearly what is at issue here and what is not. Plaintiffs make manifest in their pleadings that their lawsuit does not challenge the IRS's requirement that each tax-return preparer obtain a preparer tax-identification number (PTIN). See Opp. at 1-2. Indeed, Congress has specifically authorized the PTIN scheme by statute. See 26 U.S.C. § 6109(a)(4). That scheme, therefore, does not fall within the scope of the injunction and may proceed as promulgated, except that the IRS may no longer condition PTIN eligibility on being "authorized to practice" under 31 U.S.C. § 330. See 26 C.F.R.

§ 1.6109-2(d) ("[B]eginning after December 31, 2010, to obtain a preparer tax identification number or other prescribed identifying number, a tax return preparer must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer authorized to practice before the Internal Revenue Service under 31 U.S.C. 330 and the regulations thereunder."). What Plaintiffs do challenge – and what the Court has enjoined – are the requirements that tax-return preparers (who are not attorneys, CPAs, enrolled agents, or enrolled actuaries) must pay some fees unrelated to the PTIN, pass a qualifying exam, and complete annual continuing-education requirements.  See Loving, 2013 WL 204667, at *1.

By way of additional background, both sides agree that the current deadline to complete the qualifying exam is December 31, 2013, and that earlier this year, before the Court's decision, the IRS indicated that the required continuing-education hours for 2012 may be made up in 2013. See Mot. at 8; Opp. at 8; Reply at 5 n.4.  As a result, were the injunction lifted, preparers would have until the end of this year to complete these requirements.

## II.    Legal Standard

Federal Rule of Civil Procedure 62(c) provides:  "While an appeal is pending from [a] . . . final judgment that grants . . . an injunction, the court may suspend [or] modify [the] . . . injunction on . . . terms that secure the opposing party's rights."  Although no notice of appeal has yet been filed, that is not a prerequisite for relief under this Rule so long as there is reason to believe an appeal will be taken.  See Common Cause v. Judicial Ethics Comm., 473 F. Supp. 1251, 1254 (D.D.C. 1979); 11 Wright & Miller, Federal Practice and Procedure § 2904, at 707-08 (3d ed. 2012).  The IRS's representations to that effect here are sufficient for it to invoke Rule 62(c).  See Reply at 1.

To assess the propriety of a stay pending appeal, the Court looks to four factors: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." Cuomo v. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985); see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 842 n.1 (D.C. Cir. 1977).

## III.    Analysis

### A.   Likelihood of Prevailing on Merits

In considering the four factors, the Court begins with the likelihood of the IRS's success on appeal.  As the IRS diplomatically notes, it is placed in the uncomfortable position of "asking a district court to determine whether its decision is likely to be overturned."  Mot. at 3.  The IRS is correct that the Court need not determine that it erred and will likely be reversed – an acknowledgment one would expect few courts to make; instead, so long as the other factors strongly favor a stay, such remedy is appropriate if "a serious legal question is presented." CREW v. Office of Admin., 593 F. Supp. 2d 156, 160 (D.D.C. 2009) (citation omitted); see also Holiday Tours, 559 F.2d at 843.  Although the Court continues to believe its decision was correct, it is certainly cognizant that the issue is one of first impression and raises serious and difficult legal questions.  If the other factors tip in favor of a stay, therefore, this factor will not preclude one.

### B.   Harm to Movant

Arguing that it would be irreparably harmed without a stay, the IRS first contends that the injunction substantially disrupts the Service's tax administration.  The IRS has established 250 testing centers, the program has cost over $50 million to roll out, and nearly 100,000 preparers

have registered to take the competency test.  <u>See</u> Mot., Decl. of Carol A. Campbell, ¶¶ 8, 10.

Shutting down the program would be costly and complex, and such steps would be rendered

unnecessary if the Court's decision is reversed by the Court of Appeals.  <u>See id.</u>, ¶¶ 12-14.

These harms, to the extent they exist, are hardly irreparable, and some cannot even be

traced to the injunction.  <u>See</u> <u>Wis. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (To be

irreparable, "the injury must be both certain and great; it must be actual and not theoretical. . . .

[Also,] the party seeking [a stay] must show that the injury complained of is of such imminence

that there is a clear and present need for equitable relief to prevent irreparable harm.") (emphasis,

internal quotation marks, and brackets omitted).  First, the Court is not requiring the IRS to

dismantle its entire scheme.  It may choose to retain the testing centers and some staff, as it is

possible that some preparers may wish to take the exam or continuing education even if not

required to.  Such voluntarily obtained credentials might distinguish them from other preparers.

Another reason some preparers may wish to take the exam is to hedge their bets in case of

appellate reversal, just as the IRS may similarly decide it is financially more prudent not to

shutter the centers in hopes of an appellate victory or congressional action.  Second, to the extent

the IRS is concerned that testing centers and staff will be under-utilized in the coming months,

that would be the case even without the injunction.  This is because the Service is currently

requiring that neither testing nor continuing education be fulfilled until the end of 2013, so

preparers would not have needed to take the exam and the courses anytime soon.  Instead, even

with a stay, preparers would be free to wait and see what happens in the D.C. Circuit.  If they

lose, there might still be time for them to take the test or courses before the end of the year.

Third, the IRS's numbers inflate the true effects of the injunction.  As Plaintiffs point out, the

IRS's expenses and staff cover both the registered-tax-return-preparer program and the PTIN program, and Plaintiffs do not challenge the latter.  See Opp. at 11-12.

The IRS also argues that it will be harmed because it has received over $100 million in registration and testing fees, and, absent a stay, preparers will demand refunds or possibly sue. See Mot. at 7; see also Campbell Decl., ¶ 12.  Yet, as just noted, that estimate combines revenue from both the PTIN and registered-tax-return-preparer programs, and the revenue from the latter program is significantly smaller.  See Opp. at 11-12.  The IRS's liability, moreover, turns on the case's merits, not on the stay.  If the Court issues a stay and its merits decision is affirmed above, then the IRS will be on the hook for even more money in refunds.  In any event, why should tax-return preparers continue to pay into a system the Court has found unlawful?

### C.  Harm to Others

The Service next maintains that staying the injunction would not substantially harm Plaintiffs both because their attorney allegedly told a blogger from *Forbes* that they planned to continue preparing returns this season even without an injunction and because they still have until the end of the year to pass the exam.  See Mot. at 8.  The Court, as a threshold matter, credits sworn declarations of parties over blog posts that attribute comments to an attorney.  And here, as noted in the Opinion, two Plaintiffs indicated that the new regulations would cause them to close their tax-preparation businesses.  See Loving, 2013 WL 204667, at *4.  In addition, if the injunction is stayed, then all preparers are faced with a Hobson's choice: they must decide whether (1) to skip the registration requirements, gambling on an affirmance by the Court of Appeals or a reversal that is issued early enough that they could still fulfill their requirements by the end of the year, or (2) to satisfy the testing and continuing-education requirements, knowing that this might well be wasted time, effort, and expense.  The harm is thus considerable.

D. <u>Public Interest</u>

In assessing where the public interest lies, the IRS argues both that a failure to suspend the injunction would harm "the public fisc," and that "the administrative record shows overwhelming public support for the new regulations," which are meant to protect the public. Mot. at 9; <u>see also</u> Campbell Decl., ¶¶ 15-17.  If the regulations are unlawful, however, the harm to those paying in is just as great (and perhaps considerably greater for certain tax-return preparers) as the deprivation of the same money is to the Government.  The money, the IRS acknowledges, moreover, can only be used to regulate return preparers.  <u>See</u> Reply at 14.  As long as portions of such regulations remain blocked, less money will be needed.

In addition, it is not disputed that these regulations work a substantial change in the oversight of the preparation of tax returns, given that preparers have never been previously licensed.  While the policy behind such regulations may indeed be wise, <u>see</u> <u>Loving</u>, 2013 WL 204667, at *11, the granting of the injunction effects far less a change in the landscape of tax preparation than does implementation of the regulations.  So if the *status quo ante* is a goal, it would counsel in favor of denying a stay.  Of course, should Congress deem such regulations in the public interest, there is nothing in the Court's decision that would preclude their statutory enactment.

As the factors beyond likelihood of success do not decisively tilt in favor of the IRS – indeed, they tip somewhat against – the Court sees no basis to lift its injunction pending appeal. Nor does the Court believe it warranted to suspend the injunction for fourteen days to permit the IRS to seek a stay in the Court of Appeals.  This would only lead to more confusion for preparers and their clients as the tax season gets underway.  While nothing in this decision prevents the IRS from seeking such relief there, the Court sees no benefit of a brief stay while it does so.

**IV.     Conclusion**

The Court, therefore, ORDERS that:

1.   Defendants' Motion to Suspend Injunction Pending Appeal is DENIED; and

2.   The Injunction is MODIFIED to make clear that the IRS is not required to suspend its

      PTIN program, nor is it required to shut down all of its testing and continuing-

      education centers; instead, they may remain, but no tax-return preparer may be

      required to pay testing or continuing-education fees or to complete any testing or

      continuing education unless and until this injunction is stayed or vacated by the Court

      of Appeals.

**SO ORDERED.**

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: February 1, 2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SABINA LOVING, et al. | ) |
|  | ) |
|  | ) |
|  | ) |
| Plaintiffs, | ) |
| v. | ) |
|  | ) |
| INTERNAL REVENUE SERVICE, et al. | ) |
|  | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

Civil Case No. 1:12-cv-00385-JEB

## DECLARATION OF SABINA LOVING IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, SABINA LOVING, declare under penalty of perjury that the following is true:

1. I am a citizen of the United States, a resident of the State of Illinois, and over the age of 18 years. I am also a plaintiff in this action. I make this declaration in support of Plaintiffs' Motion for Summary Judgment; it is based on my personal knowledge of the facts stated herein.

2. I own and operate Loving Tax Services, Inc., a tax preparation business at 6054 South Eberhart Avenue in Chicago, Illinois.

3. I am a graduate of Robert Morris College, hold a Master's degree from Roosevelt University, and am a member of the American Institute of Professional Bookkeepers. I have worked full-time as an accountant for major banks and financial services companies

JA 39

for approximately twelve years.  I have been preparing taxes professionally for the past

three years.  I prepared approximately 100 tax returns for clients in the 2012 tax season.

4.  I have not been subject to any enforcement for violations of any tax laws or regulations,

nor have I had any known customer complaints to the IRS.

5.  I am not an attorney, CPA, or any type of enrolled agent or actuary.  I have a provisional

PTIN.

6.  I understand that I am subject to the new IRS licensing regulations for "registered tax

return preparers."  In order to continue preparing taxes for compensation, I must comply

with the various licensing requirements to become a "registered tax return preparer" and

maintain that status for as long as I continue preparing taxes for compensation.

7.  I live in and operate my tax preparation business in an economically depressed

neighborhood on the South Side of Chicago where there is high unemployment and many

homes and businesses are boarded up.  The storefront in which my business is located

had been closed for at least the preceding twelve years before I opened my business there.

My business serves many low-income clients from the surrounding community, which is

quite impoverished.

8.  I am the only tax return preparer at Loving Tax Services.  During the 2012 tax season, I

had three employees who assisted with data entry and administrative tasks.

9.  I would like to hire additional employees during the tax season as supervised preparers

under my supervision as the signing preparer.  But I understand that I cannot do so

because the new IRS licensing regulations do not permit me to supervise other tax return

preparers since I am not an attorney, CPA, or any type of enrolled agent or actuary, and

[2]

my business is not a law firm, CPA firm, or a recognized firm 80% owned by attorneys, CPAs, or any type of enrolled agent or actuary.

10.  The requirement that I become licensed as a "registered tax return preparer" in order to continue preparing taxes for compensation imposes a substantial burden on me and my business, including time, effort, and monetary costs.

11.  In order to obtain and maintain the status of "registered tax return preparer," I will be forced to pay a substantial amount of money in application fees, exam fees, continuing education course fees, and also face potential costs for travel, lodging, and meals related to taking the competency exam and continuing education courses.

12.  In order to obtain and maintain the status of "registered tax return preparer," I will be forced to spend a substantial amount of my time and effort completing the appropriate forms, studying for the competency examination, taking the competency examination, attending continuing education courses, and travelling to and from the exam and/or continuing education courses.  This imposes substantial opportunity costs on me and my business.

13. The monetary cost, time, effort, and opportunity cost of complying with these new IRS licensing regulations will force me to raise the price I charge my customers, which will make my business less competitive with major tax preparation firms, particularly those that are exempt from these regulations.  This will harm my business because I will likely lose current and potential customers if forced to raise my prices.

14.  I pride myself on offering more affordable tax preparation services than major tax preparation firms.  I object to the costs imposed on me and my business by these new IRS licensing regulations, which will make my business less competitive.

[3]

15. I object on principle to regulations such as these new IRS licensing regulations that are unfairly burdensome on small businesses like mine, but which provide exemptions for powerful interests that had the resources to lobby for these exemptions.

16. If not for these new licensing regulations, I would hire employees during the tax season as supervised tax return preparers under my supervision as signing preparer. This would have increased the number of customers that my business can serve during tax season and expanded my market share. Instead, I am not permitted to supervise other preparers under the new regulations, while many of my competitors at CPA firms, law firms and "recognized firms" have an exemption that permits them to supervise unlicensed preparers. This has harmed my tax preparation business.

17. I plan to continue operating as a tax return preparer indefinitely and will be forced to incur substantial expenses, as well as lost time and effort, to comply with the "registered tax return preparer" requirements if they are not struck down.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on September ___18th___, 2012.

SABINA LOVING

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SABINA LOVING, et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Case No. 1:12-cv-00385-JEB |
| | ) | |
| INTERNAL REVENUE SERVICE, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ELMER KILIAN IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, ELMER KILIAN, declare under penalty of perjury that the following is true:

1. I am a citizen of the United States, a resident of the State of Wisconsin, and over the age of 18 years. I am also a plaintiff in this action. I make this declaration in support of Plaintiffs' Motion for Summary Judgment; it is based on my personal knowledge of the facts stated herein.

2. I own and operate Eagle Tax Services out of my home in Eagle, Wisconsin.

3. I retired from working for the Wisconsin Weights and Measures Office approximately 20 years ago. I have lived in the small village of Eagle for nearly 50 years and am a United States Marine Corps veteran who served in the Korean War. I am 80 years of age.

4. I have been preparing taxes for compensation seasonally and part-time for about 30 years on my dining room table. I began preparing taxes on a part-time basis after studying to

become a bookkeeper at a vocational school.  I prepare approximately 80-100 tax returns each year.

5.  I have not been subject to any enforcement for violation of any tax laws or regulations, nor have I had any known customer complaints to the IRS.

6.  I am not an attorney, CPA, or any type of enrolled agent or actuary.  I have a provisional PTIN.

7.  I understand that I am subject to the new IRS licensing regulations for "registered tax return preparers."  In order to continue preparing taxes for compensation, I would need to comply with the various licensing requirements to become a "registered tax return preparer" and maintain that status for as long as I continue preparing taxes for compensation.

8.  I have a wooden shingle hanging outside my house on Main Street in Eagle, Wisconsin that advertises my tax preparation services, but I mostly serve longtime customers who have sought my help in preparing their taxes for decades.

9.  I pride myself on providing low-cost tax preparation services to the residents of Eagle and nearby communities, and I even prepare a number of returns for free for charitable reasons.

10.  The requirement that I become licensed as a "registered tax return preparer" in order to continue preparing taxes for compensation would impose a substantial burden on me and my business, including time, effort, and monetary costs.

11.  In order to obtain and maintain the status of "registered tax return preparer," I would be forced to pay a substantial amount of money in application fees, exam fees, continuing

education course fees, and also face potential costs for travel, lodging, and meals related to taking the competency exam and continuing education courses.

12.  In order to obtain and maintain the status of "registered tax return preparer," I would be forced to spend a substantial amount of my time and effort completing the appropriate forms, studying for the competency examination, taking the competency examination, attending continuing education courses, and travelling to and from the exam and/or continuing education courses.  This would impose substantial opportunity costs on me and my business.

13.  While I am concerned about the cost of preparing for and taking the competency exam, I am most concerned about the ongoing, annual costs of complying with the continuing education requirements, which I anticipate will be several hundred dollars and at least two days of my time each year, as well as the time and cost of travel, lodging, and meals. Since it is very unlikely that any continuing education courses would be offered in Eagle, my travel time and costs could be substantial.  These costs would be in addition to the annual PTIN renewal fee of more than $60 per year.

14. I objects to the costs imposed on me by these IRS licensing regulations, which would force me to either substantially raise the tax preparation fees I charge my customers or go out of business altogether.

15.  I am not willing to substantially raise the fees I charge my customers, so I will be forced to close my tax business rather than comply with these new IRS licensing regulations.

16.  Without being licensed as a "registered tax return preparer," I will be unable to prepare taxes for compensation, depriving me of income.

17. If not for these new licensing regulations, I would plan to continue operating as a tax

return preparer indefinitely. If the "registered tax return preparer" requirements are

struck down, I plan to continue operating as a tax return preparer.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on September _/9_, 2012.

ELMER KILIAN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SABINA LOVING, et al. | ) |
| | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| INTERNAL REVENUE SERVICE, et al. | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Case No. 1:12-cv-00385-JEB

## DECLARATION OF GIOVANNI GAMBINO IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, GIOVANNI GAMBINO, declare under penalty of perjury that the following is true:

1. I am a citizen of the United States, a resident of the State of New Jersey, and over the age of 18 years. I am also a plaintiff in this action. I make this declaration in support of Plaintiffs' Motion for Summary Judgment; it is based on my personal knowledge of the facts stated herein.

2. I am a Certified Financial Planner™ (CFP®) professional and a registered investment advisor representative in Hoboken, NJ.  I work primarily on assisting my clients with wealth management.

3. My legal name is Giovanni Gambino, but I go by John with most clients and friends.

4. I have received my bachelor's and master's degrees from the Massachusetts Institute of Technology.  I worked on Wall Street from 2001-2003 as an equity analyst for a hedge

JA 47

fund.  I have passed the two-day CFP® examination and must complete 30 hours of

continuing education courses (including two hours of ethics education) every two years to

maintain my CFP® certification.

5. I own and operate Inner Circle Platinum Advisors LLC and Inner Circle Advisors LLC

from my home office.  Inner Circle Platinum Advisors is registered in Delaware and New

Jersey as an LLC; the firm is a registered investment advisor and I am a registered

representative of the firm.  Inner Circle Advisors is my tax preparation business, which is

registered as an LLC in Florida.

6. I offer tax return preparation as a convenient service for my clients, and have done so

since 2004.  I prepare approximately 50 tax returns for compensation annually.

7. I am bilingual and speak English and Spanish fluently.  I also speak Italian

conversationally.  In addition to preparing tax returns for English-speaking clients, I also

prepare tax returns for clients who speak Spanish, Italian, and Portugese as their primary

language.

8. I have not been subject to any enforcement for violations of any tax laws or regulations,

nor have I had any known customer complaints to the IRS.

9. I am not an attorney, CPA, or any type of enrolled agent or actuary.  I have a provisional

PTIN.

10. I understand that I am subject to the new IRS licensing regulations for "registered tax

return preparers."  In order to continue preparing taxes for compensation, I would need to

comply with the various licensing requirements to become a "registered tax return

preparer" and maintain that status for as long as I continue preparing taxes for

compensation.

11. The requirement that I become licensed as a "registered tax return preparer" in order to continue preparing taxes for compensation would impose a substantial burden on me and my business, including time, effort, and monetary costs.

12. In order to obtain and maintain the status of "registered tax return preparer," I would be forced to pay a substantial amount of money in application fees, exam fees, continuing education course fees, and also face potential costs for travel, lodging, and meals related to taking the competency exam and continuing education courses.

13. In order to obtain and maintain the status of "registered tax return preparer," I would be forced to spend a substantial amount of my time and effort completing the appropriate forms, studying for the competency examination, taking the competency examination, attending continuing education courses, and travelling to and from the exam and/or continuing education courses. This would impose substantial opportunity costs on me and my business.

14. I object on principle to the new IRS licensing regulations for tax preparers. I believe they are an unconstitutional infringement on my economic liberty to earn an honest living free from unreasonable and irrational government intrusion.

15. I also object because, although the stated purpose of this licensing scheme is to protect consumers, it will actually harm consumers (including my clients) by reducing their choices in tax preparers and increasing the cost of tax preparation, while benefiting the protected classes of lawyers, CPAs, enrolled agents, and large tax preparation businesses.

16. The monetary cost, time, effort, and opportunity cost of complying with these new regulations will make it unprofitable for me to continue preparing taxes for compensation.

17. Because of both my moral objections to the IRS licensing regulations, and the monetary and opportunity cost of compliance, I have stopped taking new tax clients and I plan to close my tax preparation business and stop preparing taxes for compensation rather than comply with the new IRS licensing regulations.

18. If not for these new licensing regulations, I would plan to continue operating as a tax return preparer indefinitely.  If the "registered tax return preparer" requirements are struck down, I plan to continue operating as a tax return preparer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September __18__, 2012.

_____

GIOVANNI GAMBINO

[4]

JA 50

# Declaration of Dan Alban

# Exhibit 1

*West's Tax Law Dictionary* 1054 (Robert Sellers Smith ed., 2009 ed.).

# West's
# Tax Law
# Dictionary

## 2009 Edition

### Robert Sellers Smith

Definitions of tax terms,
words, and phrases
Listings of Federal Tax
forms and publications

(Document Locator Number).

## TAX COMPLIANCE

See also RETURNS.

Response of a taxpayer to the tax laws including filing appropriate tax returns and paying the taxes due in a timely manner.

1. Code § 6001. Notice Or Regulations Requiring Records, Statements, And Special Returns.
2. Code § 6011. General Requirement Of Return, Statement, Or List.
3. Code § 6012. Persons Required To Make Returns Of Income.

## TAX CONTROVERSY

Distinguishable dispute with respect to a tax matter, usually between a taxpayer and taxing authority, such as the I.R.S. A concrete case admitting of an immediate and definitive determination of legal rights of parties upon facts involving tax issues or claims.

1. Code § 7441. Status.
2. Code § 7442. Jurisdiction.
3. Code § 7443. Membership.

## TAX COUNSELING FOR THE ELDERLY

Free help is available in most communities to older, disabled, and non English-speaking people in preparing I.R.S. tax returns. Taxpayers should call the toll-free telephone number for the area for the location of the volunteer assistance site.

## TAX COURT

Name of the court created under Article I of the Constitution with jurisdiction to try cases involving Federal income, estate, gift and other tax cases. The court is composed of 19 members. Judges of the Tax Court are appointed by the President, by and with the advice and consent of the Senate, solely on the grounds of fitness to perform the duties of the office. Taxpayers may contest their liability for income, estate and gift tax deficiencies without advance payment of such deficiencies in the Tax Court. Decisions of the Tax Court are appealed to the U.S. Courts of Appeals. The Internal Revenue Service Restructuring and Reform Act of 1998 increased the size of the jurisdictional dollar limit on small tax cases in Tax Court from $10,000 to $50,000.

1. Internal Revenue Service Restructuring And Reform Act Of 1998, § 3103(a)(1)(A).

1054

Declaration of Dan Alban

# Exhibit 2

Act of July 7, 1884, ch. 334, sec. 3, 23 Stat. 258

**CLAIMS ALLOWED BY THE SECOND AUDITOR AND SECOND COMPTROLLER.**

Claims allowed by Second Auditor and Second Comptroller.

For pay of volunteers (Mexican war) eighteen hundred and seventy one and prior years, one hundred and fifty six dollars and four cents.

Pay of volunteers, Mexican war.

For pay of mounted riflemen (volunteers) under Colonel John C. Fremont, in eighteen hundred and forty six, eighteen hundred and seventy one and prior years, three hundred and seventy four dollars and ninety nine cents.

Mounted volunteer riflemen.

For traveling expenses of California and Nevada volunteers, prior to July first, eighteen hundred and eighty one, four hundred and thirty one dollars and thirty cents.

California and Nevada volunteers.

For traveling expenses of First Michigan Cavalry, prior to July first, eighteen hundred and eighty one, five hundred and fifty six dollars and four cents.

First Michigan Cavalry.

For artificial limbs, eighteen hundred and eighty one and prior years, four dollars.

Artificial limbs.

For contingencies of the Army, eighteen hundred and eighty one and prior years, three hundred and ninety dollars and seventy one cents,

Army contingencies.

For collecting, drilling, and organizing volunteers, eighteen hundred and seventy one and prior years, three hundred and thirty four dollars and ninety six cents.

Collecting, etc., volunteers.

For draft and substitute fund, eighteen hundred and seventy one and prior years, one dollar and eighty six cents.

Draft and substitute fund.

For expenses of recruiting, eighteen hundred and eighty one and prior years, two hundred and two dollars and twenty seven cents.

Recruiting.

For medical and hospital department, eighteen hundred and eighty one and prior years, three hundred and fifty nine dollars and forty three cents.

Medical and hospital department.

**CLAIMS ALLOWED BY THE THIRD AUDITOR AND SECOND COMPTROLLER.**

Claims allowed by Third Auditor and Second Comptroller.

**INTERIOR DEPARTMENT.**

Interior Department.

For Army pension, eighteen hundred and eighty one and prior years, twenty eight dollars and eighty cents.

Army pensions.

**WAR DEPARTMENT.**

War Department.

For regular supplies, Quartermaster's Department, eighteen hundred and eighty one and prior years, five thousand six hundred and eighty one dollars and eighty four cents.

Quartermaster's regular supplies.

For incidental expenses Quartermaster's Department, eighteen hundred and eighty one and prior years, thirteen thousand and twenty three dollars and ninety nine cents.

Incidental expenses.

For fifty per centum of arrears of Army transportation due certain land-grant railroads, eighteen hundred and eighty one and prior years, eight thousand one hundred and sixty nine dollars and thirty five cents.

Arrears of Army transportation.

For commutation of rations to prisoners of war in rebel States, prior to July first, eighteen hundred and eighty one, sixteen thousand eight hundred and sixty four dollars and fifty eight cents.

Commutation of rations to prisoners of war in rebel States.

For contingencies of fortifications, ninety three dollars and eighty seven cents.

Contingencies of fortifications.

For horses and other property lost in the military service prior to July first, eighteen hundred and eighty one, one hundred and twenty five thousand seven hundred and eighty seven dollars and three cents: *Provided*, That the Secretary of the Treasury may prescribe rules and regulations governing the recognition of agents, attorneys, or other persons representing claimants before his Department, and may require of such persons, agents and attorneys, before being recognized as representatives of claimants, that they shall show that they are of good

Lost horses, etc., in military service prior to July 1, 1881.
*Proviso.*
Secretary of Treasury may prescribe rules for practice of agents, attorneys, etc.

character and in good repute, possessed of the necessary qualifications to enable them to render such claimants valuable service, and otherwise competent to advise and assist such claimants in the presentation of their cases. And such Secretary may after due notice and opportunity for hearing suspend, and disbar from further practice before his Department any such person, agent, or attorney shown to be incompetent, disreputable, or who refuses to comply with the said rules and regulations, or who shall with intent to defraud, in any manner willfully and knowingly deceive, mislead, or threaten any claimant or prospective claimant, by word, circular, letter, or by advertisement.

For refunding to States expenses incurred in raising volunteers for which reimbursement is provided by act of July twenty seventh eighteen hundred and sixty one, and subsequent acts, as follows: *12 Stat., 276. Refund of expenses incurred in raising volunteers, etc., to—*

To the State of Ohio, ninety thousand two hundred and forty six dollars and ninety two cents; to the State of New York, fifty four thousand nine hundred and forty six dollars and fifty two cents; to the State of Michigan, forty two thousand three hundred and forty five dollars and ninety five cents; for the State of Massachusetts, twenty eight thousand six hundred and nineteen dollars and thirty three cents; to the State of Nebraska, four hundred and eighty five dollars; the several allowances having been adjudicated by the accounting officers and reported by the Secretary of the Treasury in conformity with section four of the act of June fourteenth, eighteen hundred and seventy-eight. *Ohio; New York; Michigan; Massachusetts; and Nebraska. 20 Stat., 130.*

## CLAIMS ALLOWED BY THE FOURTH AUDITOR AND SECOND COMPTROLLER.

*Claims allowed by Fourth Auditor and Second Comptroller.*

For provisions, Navy, Bureau of Provisions and Clothing, eighteen hundred and eighty one and prior years, forty eight dollars and forty cents. *Bureau of Provisions and Clothing, Navy.*

For bounty for destruction of enemy's vessels, prior to July first, eighteen hundred and eighty one, seventeen dollars and seventy eight cents. *Bounty for destruction of enemy's vessels.*

For indemnity for lost clothing, prior to July first, eighteen hundred and eighty one, three hundred dollars. *Indemnity for lost clothing.*

For enlistment bounties to seamen, prior to July first, eighteen hundred and eighty one, two thousand and three dollars and thirteen cents. *Enlistment bounties to seamen.*

## CLAIMS ALLOWED BY THE SIXTH AUDITOR.

*Claims allowed by Sixth Auditor.*

For deficiency in the postal revenues, eighteen hundred and eighty one and prior years, ninety thousand eight hundred and forty five dollars and twenty five cents. *Deficiency in postal revenues, 1881 and prior years.*

Sec. 4. For the payment of claims audited and allowed by the Second Auditor and Second Comptroller of the Treasury under the provisions of the act of August seventh, eighteen hundred and eighty two, to "authorize the auditing of certain unpaid claims against the Indian Bureau by the accounting officers of the Treasury," for services rendered and supplies furnished on account of the Indian service, seventy two thousand one hundred and sixty six dollars and seventy nine cents; and for claims audited and allowed by the said accounting officers under the provisions of section four of the act of June fourteenth, eighteen hundred and seventy eight, sixteen thousand seven hundred and ninety eight dollars and forty seven cents, as fully set forth in House Executive Document Number One Hundred and Forty five, first session Forty eighth Congress; in all, eighty eight thousand nine hundred and sixty five dollars and twenty six cents. *22 Stat., 345. Payment of certain claims for Indian service. 20 Stat., 130.*

To pay Van C. Smith five thousand four hundred and fifty eight dollars and fifty two cents, in full of claim of four thousand nine hundred and thirty three dollars and fifty two cents, as allowed by the Second *Van C. Smith, payment to.*

Declaration of Dan Alban

# Exhibit 3

48 Cong. Rec. H5219–22 (daily ed. June 16, 1884).

Case 1:12-cv-00385-JEB Document 12-8 Filed 09/28/12 Page 2 of 5

Mr. RANDALL. I do not know whether they did or not. But the country elected a Democratic House to the Forty-eighth Congress.

Mr. HISCOCK. I do not know that the Committee on Appropriations were ever censured for having passed improper claims. I say again, to turn these parties over to the several committees indicated and to make each claimant come here with his particular bill is simply to deny them payment forever.

Mr. RANDALL. If any time is left, I yield it to the gentleman from Illinois [Mr. SPRINGER].

The CHAIRMAN. One minute is left of the time allowed for debate.

Mr. SPRINGER. All I can say in that one minute is that I am opposed to this amendment, and I hope it will be voted down.

The CHAIRMAN. The question is on the amendment of the gentleman from Illinois [Mr. CANNON].

Mr. YORK. I call for the reading of the amendment.

The CHAIRMAN. It has already been read. It may be read again by unanimous consent.

Mr. RANDALL. I object.

The committee divided; and there were—ayes 53, noes 91.

So (further count not being called for) the amendment was not agreed to.

The Clerk read the following paragraph:

For contingencies of fortifications, $93.87.

Mr. CANNON. I offer the amendment which I send to the desk.

The Clerk read as follows:

On page 45, after line 299, insert the following:

"For pay, transportation, services, and supplies of Oregon and Washington Volunteers in 1855 and 1856, 1871, and prior years, $1,661.20.

"For 32 per cent. additional compensation, prior to July 1, 1881, $115.60.

"For Rogue River Indian war, prior to July 1, 1881, $584.62."

Mr. CANNON. Those claims are audited. They are for supplies furnished and services performed; the same thing precisely as we have been talking about.

Mr. RANDALL. We agree as to that.

Mr. CANNON. Does the gentleman agree to my amendment?

Mr. RANDALL. No, sir; we agree on the fact that the claims are of the same character as in the former amendment.

Mr. CANNON. I ask for a vote.

The amendment was not agreed to.

Mr. WAIT. I rise to a point of order on the proviso in the next paragraph. I make the point of order that it is not germane to the bill and that it is an attempt to connect general legislation with a bill appropriating money for specific purposes.

The CHAIRMAN. The paragraph has not yet been read.

Mr. RANDALL. I suppose the gentleman makes the point of order on the proviso, not on the whole paragraph, as we want the appropriation for lost horses, &c.

The Clerk commenced to read the next paragraph.

Mr. KEIFER (interrupting the reading). I want to suggest that this is a long proviso and some question might arise whether it is not divisible into paragraphs. I think it might be read with the understanding that the point of order might be made on the whole or on any portion of it.

Mr. WARNER, of Ohio. I give notice that I will make a point of order on all of the paragraph from the word "provided."

The Clerk resumed and completed the reading of the paragraph, as follows:

For horses and other property lost in the military service prior to July 1, 1881, $125,787.63: Provided, That hereafter no agent, attorney, or other person shall demand or receive any fee for his services in claims for lost horses, bounty, and arrears of pay for military services until the allowance of such claim. That all fees last above mentioned shall be paid by the Treasurer of the United States out of the amount allowed and due the claimant; and no agent, attorney, or other person shall receive any fee for his services in such claims except through the Treasurer of the United States. That the fee in all claims for lost horses, bounty, and arrears of pay shall be $10, except in case of special written contract filed in the office of the Auditor who may have charge of the auditing of such claim, and approved by such Auditor as hereinafter provided. The claimant may contract with his attorney or agent of record in writing, in such form as such Auditor having charge of auditing such claim may prescribe, for an additional fee to an amount not exceeding 5 per cent. of the amount allowed for such claim; and in all claims filed prior to the passage of this act the attorney shall file a statement, under oath, duly attested, setting forth the amount of fee already received by him, and the amount already received shall be deducted from the fee allowed by this act. This act shall apply to pending as well as all future applications for allowance of claims for lost horses, bounty, and arrears of pay. That the Secretary of the Treasury may prescribe rules and regulations governing the recognition of agents, attorneys, or other persons representing claimants before his Department, and may require of such persons, agents, and attorneys, before being recognized as representatives of claimants, that they shall show that they are of good character and in good repute, possessed of the necessary qualifications to enable them to render such claimants valuable service, and otherwise competent to advise and assist such claimants in the presentation of their cases. And such Secretary may suspend, debar, dismiss, and disbar from further practice before his Department any such person, agent, or attorney shown to be incompetent, disreputable, or who refuses to abide by the said rules and regulations, or who shall in any manner deceive, mislead, or threaten any claimant or prospective claimant by word, circular, letter, or by advertisement. That any agent or attorney or other person instrumental in procuring any claim for lost horses, bounty, and arrears of pay, who shall, directly or indirectly, contract for, demand, or receive, or retain any compensation for his services or instrumentality for prosecuting such claims greater than is herein provided, or in any other manner than herein provided, or shall willfully or knowingly make a false statement in regard to the amount of fee already received, shall be deemed guilty of a high misdemeanor, and, upon conviction thereof, shall, for every such offense, be fined not exceeding $1,000, or be confined at hard labor not exceeding two years, or both, at the discretion of the court, and be forever afterward debarred from practicing before the Treasury Department.

Mr. ELLIS. I make the point of order on the proviso that it is obnoxious to the third clause of Rule XXI.

Mr. TOWNSHEND. The gentleman from Ohio [Mr. KEIFER] indicated that he had some further points to make.

Mr. ELLIS. I yield to the gentleman from Connecticut [Mr. WAIT,] who, I understand, rose some time ago to make the point of order.

Mr. WAIT. The point I make is that the entire proviso is not germane but is foreign to the bill and to this paragraph, which appropriates money to pay specific debts which it is claimed the Government owes to individuals. The proviso goes on and attempts to regulate contracts which the parties having these claims against the Government shall make with the attorneys they employ, and, further, to decide what kind of men shall practice before the Departments, and to provide for their punishment if they do not practice in accordance with certain rules of the Department. The whole proviso, I submit, is subject to the point of order, being not germane, and foreign to the bill and to the section under consideration.

Mr. KEIFER. The point of order I think is well taken and does not require much discussion. This proviso is obnoxious to paragraph 3 of Rule XXI. In the first place it must be conceded that it is new legislation. It is a proposition to legislate for the purpose of determining the fees of agents, attorneys, or persons who may be connected with a class of claims for lost horses, for bounty, and for arrears of pay for military services.

This is not a bill for general legislation; it is not a bill treating upon any specific subject. There is an attempt in this proviso to regulate the pay of claim agents or attorneys, and to add to the criminal laws of the United States. All that might be done I suppose under paragraph 3 of Rule XXI if it came within any one of the exceptions mentioned in the rule. Let us see whether it is possible to bring it within either of those exceptions. I will read from that clause.

Nor shall any provision in any such bill or amendment thereto changing existing law be in order, except such as, being germane to the subject-matter of the bill, shall retrench expenditures by the reduction of the number and salary of the officers of the United States.

That is one method, and certainly it will not be claimed that this proviso reduces the number or the salary of the officers of the United States. The next is this:

By the reduction of the compensation of any person paid out of the Treasury of the United States.

Under existing law these claim agents are not paid out of the Treasury of the United States. It may be said that there is an attempt in this proviso to provide for their payment out of the Treasury; but they are paid simply out of the money allowed on the claims; so that it can not be held to come within the letter or the spirit of that exception. Then the other is:

Or by the reduction of the amounts of money covered by the bill.

This proviso does not reduce the amount of money covered by this bill. There is a further clause which does not help out this matter at all.

Provided, That it shall be in order further to amend such bill upon the report of the committee having jurisdiction of the subject-matter of such amendment, which amendment, being germane to the subject-matter of the bill, shall retrench expenditures.

Of course this is not an amendment put on the bill on the recommendation of any committee. It is a provision found in the bill as it comes from the Committee on Appropriations. It can not, therefore, come within this rule, which allows legislation germane to the subject-matter of the bill under certain circumstances. I think the point of order ought to be sustained against the whole proviso.

Mr. TOWNSHEND. I had hoped that no point of order would be made against this provision of the bill. I have no doubt it has been the experience of every member here that great wrongs have been practiced upon persons presenting claims for lost horses; many soldiers have been victimized by very disreputable claim agents in Washington.

While there are some very reputable gentlemen engaged in the business, who charge reasonable fees, there are many who are very disreputable, and who have been guilty of bad practices, and have victimized many a poor soldier who was unable to take care of himself. I myself know of many cases where large fees have been exacted by claim agents, who have succeeded in obtaining from one-third to one-half of the amount of the claim allowed. The object of this proviso is to protect soldiers against such practices.

The CHAIRMAN. The Chair would suggest to the gentleman the propriety of confining his argument to the point of order.

Mr. TOWNSHEND. All I want to say on the point of order is this: I do not think the point which has been made is good in every respect. In the first place, the point made by the gentleman from Connecticut [Mr. WAIT] is clearly not good. The proviso is germane to the bill and to the paragraph to which it is attached; unquestionably it is germane.

The gentleman from Ohio [Mr. KEIFER] urges that this proviso pro-

poses to change existing law. The gentlemen is clearly mistaken in that; the proviso does not change the existing law in any particular. The gentleman may call it new legislation if he will, but it certainly does not change the law, because unfortunately we now have no law which regulates these charges and which protects the soldier.

Mr. KEIFER.　All new legislation is a change of law.

Mr. TOWNSHEND.　If the Chair is of the opinion that legislation of that character must likewise retrench expenditures, I apprehend that the point of order is good.

The CHAIRMAN.　Does the gentleman from Illinois [Mr. TOWNSHEND] think that a new law which makes a thing unlawful which before was lawful is not a change of law?

Mr. TOWNSHEND.　The point I make is this: there is no positive statute on the subject.

The CHAIRMAN.　Still these acts that are here prohibited are now lawful.

Mr. TOWNSHEND.　If the Chair is of opinion that new legislation falls under the same rule as a provision which changes a positive existing statute, then I apprehend the point of order is good.

The CHAIRMAN.　Undoubtedly it does.

Mr. TOWNSHEND.　Then I want to say that I am sorry any member here makes a point of order on this proviso. I will not discuss the matter further.

Mr. SPRINGER.　I would inquire if points of order were reserved on this bill?

Mr. HAMMOND.　Yes.

Mr. SPRINGER.　Who reserved them?

Mr. HAMMOND.　The gentleman from Iowa [Mr. KASSON] especially reserved them this morning.

Mr. SPRINGER.　I am asking the Chair if the points of order were reserved.

The CHAIRMAN.　The Chair is advised that when the bill was referred to the Committee of the Whole House on the state of the Union points of order were not reserved.

Mr. HAMMOND.　This morning when the House was about to vote on the proposition to go into Committee of the Whole on this bill the gentleman from Iowa [Mr. KASSON], as I understood, reserved all points of order.

Mr. KEIFER.　We have been proceeding all day upon that understanding, that points of order were reserved.

The CHAIRMAN.　The Chair will cause the record to be examined. If the gentleman from Georgia [Mr. HAMMOND] feels assured that the gentleman from Iowa [Mr. KASSON] did reserve points of order, that would be decisive. But the Journal Clerk informs the Chair that points of order were not reserved.

Mr. SPRINGER.　The gentleman from Georgia [Mr. HAMMOND] states that points of order were reserved this morning. Now, the bill was not referred to the Committee of the Whole this morning. It has been in Committee of the Whole for several days.

Mr. WARNER, of Ohio.　From the beginning of the consideration of this bill amendments have been ruled out on points of order.

Mr. SPRINGER.　Those were amendments offered in the Committee of the Whole; but this provision is a part of the bill.

Mr. TOWNSHEND.　I think my colleague [Mr. SPRINGER] is correct in the statement that points of order were not reserved upon the bill when it was referred to the Committee of the Whole.

Mr. HAMMOND.　Certainly it is incumbent upon the gentleman, if he makes that assertion, to show the fact.

Mr. TOWNSHEND.　No, sir; it is incumbent upon the member making the point of order to show that points of order were reserved when the bill was referred to the Committee of the Whole.

Mr. KEIFER.　It is rather late to raise this point after discussion on the point of order has proceeded and after we have been all day striking out portions of the bill which were subject to points of order.

Mr. TOWNSHEND.　Does the gentleman remember any point of order made upon any provision in the bill?

Mr. CHACE.　Yes; this evening we filibustered for an hour upon a point of order.

Mr. TOWNSHEND.　That was on an amendment.

The CHAIRMAN.　What is the point made by the gentleman from Illinois [Mr. SPRINGER]?

Mr. SPRINGER.　I submit that points of order, not having been reserved upon this bill when it was referred to the Committee of the Whole, can not now be made to any part of the text of the bill.

The CHAIRMAN.　The Chair is of opinion that the practice has been otherwise; but at any rate the gentleman's point comes too late.

Mr. TOWNSHEND.　Why does it come too late? He is making no point of order, but answering a point of order.

The CHAIRMAN.　The point of order has been made, and has been some time under discussion.

Mr. TOWNSHEND.　The gentleman is answering that point of order with an argument in opposition. He is making no point of order.

The CHAIRMAN.　The Chair understood him to make a point of order.

Mr. TOWNSHEND.　Not at all; he is opposing the point of order made by the gentleman from Ohio [Mr. KEIFER].

at a time. The point of order in this case was made by the gentleman from Connecticut, and in opposition to that point I stated that points of order were not reserved when the bill was referred to the Committee of the Whole. Now I have the RECORD before me, and I was about to refer to it. I remember very well——

Mr. KEIFER.　I suggest that all day points of order have been made against provisions of the bill. In the matter of payment for expenses in election cases a point of order was made.

Mr. TOWNSHEND.　Those were new provisions, new amendments.

The CHAIRMAN.　Those were amendments.

Mr. KEIFER.　That is true.

Mr. TOWNSHEND.　I desire to call attention to the fact that the other day, when the river and harbor appropriation bill was under consideration, the chairman ruled that unless points of order had been reserved when the bill was referred to the Committee of the Whole, no point of order could be made as against any provision of the bill.

Mr. HAMMOND.　The occupant of the chair at that time did so hold; but the ruling was not correct. An appropriation bill is never before the House for consideration until it is considered in Committee of the Whole; up to that time it can not be considered in the House. Therefore it is folly to talk about reserving points of order on a general appropriation bill in the House where the bill can not be considered at all.

Mr. SPRINGER.　Then the uniform practice has been "folly."

Mr. HAMMOND.　I know it; but a great deal of folly is practiced at times.

Mr. TOWNSHEND.　I wish to say in reply to the gentleman from Georgia that when an appeal was taken from that decision of the Chair the other day upon the river and harbor bill the House sustained the Chair.

Mr. HAMMOND.　Because it wanted to adopt the Hennepin Canal provision until the question came to the yeas and nays.

Mr. TOWNSHEND.　I call attention to the fact that this House within the last four or five days——

Mr. HAMMOND.　There is no rule requiring the reservation of points of order in the House and there is no sense in it.

Mr. TOWNSHEND.　Be that as it may, the House sustained the ruling of the Chair on that point and established a precedent which I hope we are not now going to depart from when only a few days have elapsed.

Mr. SPRINGER.　I regret to hear the gentleman from Georgia [Mr. HAMMOND] impeach the practice of this House from the very beginning by the statement that there is "no sense" or necessity in reserving points of order when a bill is referred to the Committee of the Whole. I hope the gentleman will not forget the fact that this is simply one of the committees of the House of Representatives. It is a committee consisting of all the members. When the House sends a proposition to a committee for its consideration that committee can not raise a point of order upon it and deny the jurisdiction which has been conferred by the House. This is the reason points of order must be reserved upon a bill when it is referred to the Committee of the Whole, for otherwise every portion of the bill so referred goes there with the sanction of the House so far as questions of order are concerned; and the House directs it shall be considered in that shape.

Mr. HERBERT.　I will ask the gentleman whether it has not always been the custom to require points of order to be reserved in cases of this kind?

Mr. SPRINGER.　Always.　The practice has never been departed from.　[Cries of "Decide!"]

The CHAIRMAN.　The Chair will cause to be read a passage from page 265 of the Digest.

The Clerk read as follows:

[In the case of an appropriation reported by the Committee on Appropriations in conflict with Rule XXI, clause 3, and committed with the bill, it is not competent for the Committee of the Whole or its chairman to rule it out of order, because the House, having committed the bills (of course it is otherwise where the point was reserved before commitment), are presumed to have received, as in order, the report in its entirety. So far as proposed amendments are concerned, the current of decisions in Committees of the Whole has been to exclude not only all appropriations not previously authorized by law (with the exceptions contained in the rule), but also independent legislation; admitting, however, limitations and provisos as to appropriations which are themselves in order.]

Mr. HERBERT.　What does the Journal say? Does it say points of order were reserved or not?

The CHAIRMAN.　The Chair is advised the Journal shows that no points of order were reserved at the time the bill was referred to the Committee of the Whole. The Chair is of opinion this point comes too late, and is overruled.

Mr. LONG rose.

Mr. KEIFER.　I move to strike out the whole proviso.

Mr. TOWNSHEND.　The gentleman from Massachusetts has the floor.

The CHAIRMAN.　The Chair recognizes the gentleman from Georgia.

Mr. HAMMOND.　Mr. Chairman, I move, in line 341, after the word "manner," to insert "willingly or knowingly;" and in line 351 to strike out the word "high," so it will read "shall be deemed guilty of a misdemeanor." The language now is, "or who refuse to abide by said rules and regulations;" that is, the attorney who may be disbarred, "or

who shall in any manner deceive, mislead, or threaten any claimant or prospective claimant by word, circular, letter, or any advertisement." Now, a man may deceive or mislead a claimant unintentionally, or because he himself is misled or he himself is deceived. When they went further, to make it a crime to make a false statement, the committee used the words "willingly or knowingly." But they simply, I suppose carelessly, omitted to use them at the other place.

Mr. TOWNSHEND. I am willing to accept that modification suggested by the gentleman from Georgia.

Mr. HAMMOND. As the gentleman from Illinois accepts it, I presume the whole of the committee will do so. Does the gentleman from Illinois accept it for the committee?

Mr. TOWNSHEND. I am willing, so far as I am concerned, to see his modification adopted in the bill.

The amendment of Mr. HAMMOND was agreed to.

Mr. HAMMOND. The language in line 351 is "shall be deemed guilty of a high misdemeanor." The Constitution says we may impeach a President and Vice-President, &c., "for high crimes and misdemeanors." But I do not know what sort of a crime a "high misdemeanor is." [Laughter.]

The CHAIRMAN. That amendment has been adopted with the other.

Mr. HAMMOND. Was my whole proposition adopted in one vote?

The CHAIRMAN. It was.

Mr. HAMMOND. Then I have nothing further to say.

Mr. KEIFER. I insist on my motion to strike out the whole proviso.

Mr. RANDALL. I move to amend that proviso, which is in order before the motion is taken on striking out. I move in lines 308 and 311 to strike out the words "Treasurer of the;" so it will read as follows:

That all fees last above mentioned shall be paid by the United States out of the amounts allowed and due the claimant; and no agent, attorney, or other person shall receive any fee for his services in such claims except through the United States.

Mr. TOWNSHEND. What is that amendment?

Mr. RANDALL. It is your own amendment in committee.

Mr. TOWNSHEND. All right.

Mr. KEIFER. Why not provide the particular officer to pay this money out of the claimant's allowance?

Mr. RANDALL. A part might be paid by the Quartermaster-General and a part out of the Treasury. I wish to provide it may be paid by the United States, and then the proper officer can pay it. ["Cries of Vote!"]

Mr. TOWNSHEND. I wish to say this provision of the bill has the sanction of the Third Auditor of the Treasury. Those officers of the Treasury Department have seen how the rights of soldiers are often abused, and they naturally wish to see something of this sort provided for their protection. After this was prepared the Second Auditor of the Treasury sent a communication requesting a modification, and I will send his letter to the Clerk's desk to be read.

The Clerk read as follows:

TREASURY DEPARTMENT, SECOND AUDITOR'S OFFICE,
Washington, D. C., June 10, 1884.

SIR: On page 48, lines 307-311, House bill No. 7253, making appropriations to supply deficiencies for 1884 and prior years, the following proviso appears:

"That all fees last above mentioned shall be paid by the Treasurer of the United States out of the amount allowed and due the claimant; and no agent, attorney, or other person shall receive any fee for his services in such claims except through the Treasurer of the United States."

I have the honor to invite your attention to the fact that if this proviso becomes law it will revolutionize the old-established method of adjusting claims for arrears of pay and bounty, and will very materially increase the work of the warrant division and the offices of the First and Second Comptroller, Second Auditor, Register of the Treasury, and Treasurer of the United States.

These claims have always been paid by paymasters of the Army on certificates of the Second Auditor and Second Comptroller, commonly called Treasury certificates. In cases where the law or existing regulations require it the amount of attorneys' fees are written on the certificate, and the paymaster draws his check to the order of the attorney for the fee and to the order of the claimant for the remainder of the sum allowed. In the cases of colored soldiers payment is made in like manner, except that the claimant is paid in currency or by postal money order. (15 Stat., 26; 16 Stat., 54; 20 Stat., 402.) But under the proviso which is the subject of this letter an account will have to be stated with each agent or attorney and the amount due him certified by the Second Auditor and Second Comptroller, on whose certificate the Secretary of War will issue his requisition, which will be countersigned by the Second Comptroller, registered by the Second Auditor, and passed to the warrant division of the Department, where your warrant will issue and be countersigned by the First Comptroller and registered by the Register of the Treasury. On that warrant the Treasurer of the United States will issue his draft, which must be registered by the Register and mailed to the payee. All this will be new work, which I have mentioned in detail to show the extent of it.

If the provisions of section 3 of the joint resolution of April 10, 1869 (16 Stat., 54), that fees allowed by law to attorneys or agents shall be reserved by the Pay Department and paid to said attorneys or agents were extended to all claims for arrears of pay and bounty the object now sought to be accomplished would be attained. The same end might be reached by striking out the words "the Treasurer of," where they occur in lines 308 and 311, page 48, of the deficiency bill (H. R. 7253), so that the proviso would read:

"That all fees last above mentioned shall be paid by the United States out of the amount allowed and due the claimant; and no agent, attorney, or other person shall receive any fee for his services in such claims except through the United States."

I suggest the propriety of submitting this amendment to the chairman of the House Committee on Appropriations.

Very respectfully,
O. FERRISS, Auditor.

The honorable SECRETARY OF THE TREASURY.

During the reading of the above paper the hammer fell.

Mr. TOWNSHEND. I ask unanimous consent that the reading of that paper may be concluded.

The CHAIRMAN. The time of the gentleman has expired.

Mr. TOWNSHEND. I move to strike out the last word.

I now ask the Clerk to conclude the reading of the paper.

The Clerk resumed and concluded the reading of the paper as above.

Mr. LONG. I wish to offer an amendment which I send to the desk.

Mr. KEIFER. I have a pending amendment to strike out the whole proviso, and yielded only until the section was perfected, according to parliamentary practice.

The CHAIRMAN. The Chair will recognize the gentleman from Ohio to submit that motion, but does not recognize it as a pending motion. Another gentleman had the floor when the gentleman from Ohio rose for that purpose.

Mr. KEIFER. My motion was in order, as I understand it, at the time.

The CHAIRMAN. The gentleman was not recognized for the purpose of submitting the motion at that time.

The Chair, on an examination of the amendment proposed by the gentleman from Massachusetts, would suggest to him that it would come in properly in the next paragraph.

Mr. LONG. It is intended as an amendment to that paragraph.

Mr. KEIFER. Then I submit now the motion to strike out the proviso.

The CHAIRMAN. The Chair will recognize the gentleman to submit that motion.

Mr. KEIFER. I do not desire, Mr. Chairman, to occupy any considerable time in reviewing this long paragraph.

Mr. TOWNSHEND. I rise to a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. TOWNSHEND. Has not the gentleman from Massachusetts submitted an amendment to this paragraph?

The CHAIRMAN. Not to this paragraph; the amendment will come in when a succeeding paragraph is reached. The gentleman from Ohio has the floor.

Mr. KEIFER. This proviso should have gone out on the point of order, and I doubt not that it would have been ruled out had points of order been reserved in the first instance upon the bill. It is very objectionable legislation. We are now pretty nearly through with the work of paying off claims for lost horses during the war, as well as for arrears of pay and for bounty, and it seems a little strange that we are called upon after the bulk of these payments have been made to pass a law limiting the fees of agents or attorneys, when perhaps the most difficult cases are those now to be disposed of. There are few of these people who have claims for pay for arrears or for lost horses who are able to take care of themselves in making contracts with their attorneys. The limitation upon their power to make a contract I do not think is a wise one, even if it be constitutional, which is questionable.

I have had occasion to say to the committee before that the whole system of providing methods of paying the fees for pension agents and to parties representing, persons having claims against the Government of the character referred to in this proviso was so bad that it forced all this kind of work into the hands of men who were not so well qualified to do it; and I think the Government should protect these claimants in some manner so as to avoid producing that result.

The attorneys who will accept employment as claim agents for pensioners are not as a rule the reputable able attorneys in the different counties of the States of this Union. If a proper fee were paid for the service to be rendered, the Government would be better protected and there would be less of this trouble in the consideration of claims that ought to be rejected and that are often rejected in the Department. The best class of attorneys ought to be employed in this kind of work. If we say that $10 shall be the full pay for the service, no attorney of good standing will accept the employment at all; and the whole scheme of such legislation is to force this class of business into the hands of men not qualified—I will not say always disreputable, but not qualified attorneys to do the work and present the claims properly and intelligently before the proper officers of the Government; and this constitutes chiefly my objection to this legislation.

I hope the proviso will be stricken out.

Mr. WARNER, of Ohio. Mr. Chairman, a word on this subject. We have already adopted a provision in another appropriation bill carefully and in my judgment sufficiently guarding the disabled soldiers in all pension cases as far as they are concerned. These claims now before us pertain mostly to officers of the Army. Now, is it necessary or proper that Congress should step in and act as a guardian for officers of the Army who have claims against the Government? I think not.

Mr. TOWNSHEND. Does my friend forget the fact that many of these are soldiers——

Mr. WARNER, of Ohio. I do not yield to the gentleman for an argument.

Again, many of these claims are already pending, and contracts have been made with the attorneys who have charge of them here. Why should the Government step in now and say that these contracts shall not be carried out? It should also be remembered that the Department has a rule, which claim agents voluntarily comply with, of allow-

ing 10 per cent. where the claim is under $100 and 15 per cent. where it is over. I see no necessity, therefore, for this provision in the bill.

Again, there can be no future claims arising under the present law, which expired in January last. I see no occasion therefore in any view of the case for this clause. It seems to me that on all these grounds this provision should be stricken out. [Cries of "Vote!" "Vote!"]

Mr. TOWNSHEND. Mr. Chairman, I shall detain the committee but a moment. Is it possible that members on this floor are willing to hear but one side of this question? Have the soldiers no friends here to speak for them?

The friends of the claim agents have been heard. Let a word be now said on behalf of the soldiers victimized by the sharks that lie around this city and who make their living by practicing deception on soldiers living hundreds—in some instances thousands—of miles away. I shall be glad to see this provision perfected. I will be glad to have gentlemen offer amendments, if necessary, that will do justice to claim agents and at the same time prevent soldiers from being victimized by disreputable claim agents. The officers of the Department have done their duty in endeavoring to guard the interests of claimants against these claim agents, but they have been unable to do so because no law authorized them to disbar the disreputable claim agents from practice. I know there are honest and upright men engaged in the business, and they can not object to a law which will protect the soldier from the disreputable class of attorneys to whom I have referred. It may be the scale of fees fixed in the proviso is not high enough. If not, let an amendment be offered and let a reasonable and fair compensation be fixed in the law.

But I tell you to-day many a poor soldier is being victimized to the extent of one-half his claim because he is unable to be here in person to attend to it or to get an attorney in his own neighborhood who can attend to it. The other day we passed a similar provision in regard to pension claims. If it was right to protect applicants for pensions, why is it not right to protect in the same way applicants for lost horses?

The CHAIRMAN. The question is on the motion of the gentleman from Ohio [Mr. KEIFER] to strike out the proviso.

The question being taken, there were—ayes 61, noes 68.

So (further count not being called for) the motion to strike out was not agreed to.

Mr. CUTCHEON. I move to amend the proviso by striking out, in line 319, the word "five" and inserting "ten;" so that it shall permit the claimant to contract with his attorney at his discretion at 10 per cent. I believe this will be in the interest of these claimants.

The CHAIRMAN. The question is on the amendment of the gentleman from Michigan [Mr. CUTCHEON].

Mr. TOWNSHEND. What is the amendment?

Mr. CUTCHEON. It allows the claimant to contract at the rate of 10 per cent.

Mr. TOWNSHEND. Let the amendment be read by the Clerk.

Mr. RANDALL. I ask unanimous consent that debate on this paragraph be closed.

The CHAIRMAN. The gentleman from Pennsylvania asks unanimous consent to close debate on the pending paragraph and amendments thereto.

There was no objection.

Mr. TOWNSHEND. Now let us understand the nature of this amendment.

The Clerk read the proposed amendment, as follows:

In line 319, strike out the word "five" and insert the word "ten;" so that it will read:

"The claimant may contract with his attorney, or agent of record, in writing, in such form as such Auditor having charge of auditing such claim may prescribe, for an additional fee to an amount not exceeding 10 per cent. of the amount allowed for such claim."

The amendment was agreed to.

Mr. LONG. I offer the amendment which I send to the desk.

The Clerk read as follows:

Insert as an independent paragraph, after line 356, the following:

"For refunding to States expenses incurred in raising volunteers for which reimbursement is provided by the act of July 27, 1861, and subsequent acts, as follows:

"To the State of Ohio, $90,246.92; to the State of New York, $54,946.52; to the State of Michigan, $42,345.95; to the State of Massachusetts, $28,610.33.

"The several allowances having been adjudicated by the accounting officers and reported by the Secretary of the Treasury in conformity with section 4 of the act of June 14, 1878."

The CHAIRMAN. The question is on the amendment proposed by the gentleman from Massachusetts [Mr. LONG].

Mr. LONG. I desire to be heard on it.

The CHAIRMAN. All debate has been closed on this paragraph.

Mr. LONG. But this amendment is offered as an independent paragraph.

The CHAIRMAN. The gentleman from Massachusetts will proceed.

Mr. LONG. This is an amendment which was handed to me by a member of the Committee on Appropriations, Judge FOLLETT, of Ohio, who has been called home. It is an amendment which involves certain claims that stand almost in the nature of judgments, having been passed upon in accordance with the law of the United States by the

proper accounting officers. These claims do not come under the law of 1874, which the gentleman from Missouri referred to as having been repealed by the act of 1878. They rest upon an earlier statute, that of July 27, 1861, which provided that the Secretary of the Treasury is directed to pay costs, charges, and expenses incurred by each State for enrolling and supplying volunteers—

To be settled—

These are the important words—

To be settled upon proper vouchers, to be filed and passed upon by the proper accounting officers of the Treasury.

That is the law upon which these claims rest and are forwarded to the House. That law referred not only to claims against the Government which existed at that time, but by a resolution which was passed a year later applies to expenses which were incurred by States at that time. The proper accounting officers in whose hands by the law of 1861 these claims are put for settlement are the Secretary of the Treasury, and under him the Third Auditor and the Second Auditor. The Third Auditor and Second Auditor have passed upon these claims. They have adjudicated them in the manner which has been referred to by the gentleman from Illinois, not cursorily but judicially, carefully, and thoroughly. Let me read to the committee a letter from the Secretary of the Treasury dated June 6, addressed to Judge FOLLETT:

TREASURY DEPARTMENT, June 6, 1884.

SIR: I have the honor to acknowledge the receipt of your letter of this date, in which you ask if the awards recently made in favor of the States of Ohio, New York, Massachusetts, and Michigan, and transmitted to Congress for appropriation, differ in any way from those heretofore made to, and appropriated for by, Congress in favor of all the States, including Missouri, Indiana, and Pennsylvania, that have expended money in raising troops for defense of the United States, for repayment whereof the faith of the nation is pledged by the act of July 27, 1861; and whether the awards made include interest paid. In reply I have to inform you that the allowances made in favor of the States of Ohio, New York, Massachusetts, and Michigan were made under act of Congress approved July 27, 1861, and are the same class of expenses which were incurred by the several States referred to and that have been paid by appropriations of Congress and were reported to Congress annually by the Secretary of the Treasury under section 4 of the act of June 14, 1878. No claims for interest have been allowed to any of the States referred to under said act of July 27, 1861, and none are included in the allowances to the States specially mentioned above.

The decision of the accounting officers is that no claim for interest or discount can be allowed except by special act of Congress.

Very respectfully,

CHAS. J. FOLGER, Secretary.

Hon. JOHN F. FOLLETT,
House of Representatives.

So that these claims include no allowance for interest; they are simply for cash paid out, under the law of 1861, by these four several States for furnishing troops to the United States. In reference to one of these States with which I am familiar—and I presume the same is true in regard to the other States—I will say that these claims have been allowed by the Auditor and Comptroller of the Treasury upon vouchers furnished from the State-house in the capital of that State, and every one of those vouchers is now here in the hands of the United States accounting officers.

The CHAIRMAN. The time of the gentleman has expired.

Mr. RYAN. If I can be recognized, I will yield my time to the gentleman from Massachusetts [Mr. LONG].

Mr. LONG. I thank the gentleman for his courtesy. It is true that these claims are ascertained by careful search. It is true that the various States have here not only their Representatives in Congress, but proper persons and agents whose duty it is, and whose proper and respectable duty it is, to ascertain what amounts this great Government of the United States is owing to the several States, and to aid in the adjustment, settlement, and payment of those amounts.

Now, if these men who ascertain these facts, who ascertain how much the United States owes to the State of Michigan, the State of Pennsylvania, the State of Massachusetts, or the State of New York, are "gophers," then every lawyer upon this floor who takes a case for a client, who collects a claim, who carries out a matter of dispute to final adjustment, is a "gopher." You can not escape it.

The fact is, and that is the important fact, the United States owes every dollar that is embraced within these four accounts. We have nothing to do with the manner in which these items of account have been ascertained. The question with us is, does the United States owe these items? That is proved, and proved as judicially and as fully as if it had been passed upon by a court of claims.

If the insinuation is to be made here that an accounting officer of this Government, the Auditor or the Comptroller of the Treasury, because he is a poor man, because his salary is not large, is therefore liable to be influenced in his action, is therefore liable to be corrupt in his decision, then you may as well say that every judge who sits upon the judicial bench, living upon his salary of $4,000, $5,000, or $6,000 a year, is liable to be corrupt in the decision of every case involving money which comes under his jurisdiction.

These are not the grounds upon which such claims are to be tested and determined. The simple question before the honest mind of this House is: Does the United States owe the State of Michigan, the State of New York, the State of Massachusetts anything? If so, has that fact been ascertained? If it has been ascertained, then I care not whether the matter is before us for payment or for consideration; it is

# Declaration of Dan Alban

# Exhibit 4

George M. Morris, *Growth and Regulation of Treasury Bar*, 8 A.B.A. J. 742 (1922).

# GROWTH AND REGULATION OF TREASURY BAR

An Unusual Institution Which Has Come to Have Much Significance for the Profession
Generally and Which Has Necessitated the Exercise of Departmental Control
Through Rules Laid Down as a Result of Statutory Authority

By George Maurice Morris

*Of the Washington, D. C., Bar.   Secretary A. B. A. Committee on Federal Taxes*

WITH the increasing intrusion of federal tax questions into the practice of almost every member of the bar, that unusual institution commonly miscalled "The Treasury Bar" has come to have a growing significance to the members of the profession generally. This is materially evidenced by the fact that since the beginning of record keeping, March 15, 1886, there have been admitted to practice before the United States Treasury Department in the City of Washington and elsewhere approximately seven thousand lawyers in addition to about the same number of "agents," i. e. those deemed qualified for the purpose but not members of the bar. At the present time, applications for additions to this list are being made by members of the profession at the rate of fifteen to twenty per day. With many authorities predicting that the income and kindred taxes are with us to stay and with every Congress considering amendments to existing revenue laws, there is reason to believe that the number of lawyers seeking enrollment before the Treasury Department will continue to be large.

The question as to what attorneys, agents or representatives the Treasury Department shall recognize in the transaction of its business is by no means a new one. Early in the history of the Federal Government representatives of various private and public interests began to appear before the Treasury officers seeking the payment by the Treasury of awards made by other executive departments as well as by branches of the Treasury. As the result of the conveyance by claimants of their claims to their representatives questions began to arise between such claimants and their agents as to which was entitled actually to receive the warrants from the Treasury in payment. Rival agents and attorneys also engaged in such disputes. At first these controversies were not frequent and for years these questions were informally settled by the officers in the Department. However, with the claims for damages, pensions, bounties, back pay, etc., arising out of the Civil War a swarm of individuals, recognizing no ethical restraints, solicited representation of claimants and engaged in the buying and selling of the claimants' rights. As a result of this situation which reached the proportions of a national scandal, the extent of the jurisdiction of Department heads over the representatives of claimants against the United States appearing before the Departments became necessary of a clearer definition.

On October 8, 1866, (12 Op. Atty. Gen. 66), Attorney General Stanbery, replying to an inquiry from the Secretary of War, who evidently was being somewhat irritated by the conduct of certain claim agents in connection with his department, delivered an opinion on the subject. The Attorney General held that with respect to the Act of July 28, 1866 (providing certain bounties for private soldiers), the Secretary of War, in the absence of express legislative action, had no power to refuse to recognize the agent or attorney designated by the claimant. However, somewhat later when the Inspector General of the War Department had uncovered the perpetration of numerous frauds by claim agents upon discharged negro soldiers at Memphis, Tennessee, Attorney General Hoar went more fully into the question of a Department head's jurisdiction over attorneys and agents appearing before his department. In Attorney General's Opinion Vol. 13, p. 150, 153, the Attorney General recognizing the soundness of the Stanbery opinion, declares that opinion is no limitation on the power of a Secretary to deal with fraudulent practices. It is pointed out that the power of the Secretary under such circumstances is a natural one arising from the necessity of the protection by the Secretary of the public interest committed to his charge. Says the Attorney General:

> He (the Secretary) is not bound to recognize or to do business with any claim agent who is known to have perverted his vocation for the purposes of fraud, and whose character is such that a reasonable degree of confidence cannot be placed in his integrity and honesty in dealing with the Government. Such, I am informed, has long been the practice of the Departments, and it is founded upon the very necessity that exists for its adoption in administering the laws relating to the settlement and payment of claims upon the Government, as a safeguard against fraud.

The opinion makes no reference to the authority conferred upon the Department head in the first session of Congress, by the Act of July 27, 1789, C. 4 (1 Stat. 28; Rev. Stat. Sec. 161), ". . . to prescribe regulations, not inconsistent with the law, for the Government of his Department. . . ."

The War Department apparently was not the only government office having trouble with those doing business before it and in 1870 on the occasion of the passage of a general Patent Office bill, the principle announced by Attorney General Hoar was amplified and incorporated in the statutes altho confined in application to the Commissioner of Patents and the Secretary of the Interior. This act, that of July 8, 1870, c. 230, sec. 19 (16 Stat. 200; Rev. Stat. Sec. 483) provides as follows:

> The Commissioner of Patents, subject to the approval of the Secretary of the Interior, may from time to time establish regulations, not inconsistent with the law, for the conduct of proceedings in the Patent Office.

Section 19 of the same Act (Rev. Stat. Sec. 487) provides:

> For gross misconduct the Commissioner of Patents may refuse to recognize any person as a patent agent, either generally or in any particular case; but the reasons for such refusal shall be duly recorded, and be subject to the approval of the Secretary of the Interior.

This last section seems to be the first statutory specific empowering of an administrative officer to

accept or disbar an agent or attorney in accordance with rules laid down by an administrative officer.

The officers in other Departments seem to have been left to get along as best they could without enabling legislation until June 1, 1872, when the Act of that date, c. 256, Sec. 5; (17 Stat. 202; Rev. Stat. 190), was passed to restrain the activities of former employees of the Departments who were going into the "claims business." This act reads as follows:

It shall not be lawful for any person appointed after the first day of June, one thousand eight hundred and seventy-two, as an officer, clerk, or employee in any of the Departments, to act as counsel, attorney, or agent for prosecuting any claim against the United States which was pending in either of said Departments while he was such officer, clerk, or employee, nor in any manner, nor by any means, to aid in the prosecution of any such claim, within two years next after he shall have ceased to be such officer, clerk, or employee. (Sec. 190, Revised Statutes.)

To digress for a moment from the chronological development of the subject, it is worthy of note that this fifty year old act is just at present of rather vital importance to the small army of former employees of the Bureau of Internal Revenue who are specializing in federal tax practice. The Commissioner of Internal Revenue has but recently informed the writer in response to his request, that on the authority of 31 Opinions of the Attorney General, 472, the Commissioner interprets the word "Departments" as used in the foregoing section as meaning "Executive Departments in Washington, D. C."

In 31 Op. Atty. Gen. 472 (the opinion referred to by the Commissioner) it was held that an officer of the United States Army, as such, is not an officer or employee of a "Department" within the meaning of the quoted section. In reaching this conclusion, Attorney General Palmer quotes from the opinions of the Judge Advocate General of the Army and of the Comptroller of the Treasury. He also quotes with approval from the opinion given in 15 Op. Atty. Gen. (262, 267) construing the statute authorizing the use of the government's "penalty envelope." The quoted language of the earlier opinion includes the following:

The several Executive Departments are by law established at the seat of Government; they have no existence elsewhere. Only those bureaus and offices can be deemed bureaus or offices in any of these Departments which are constituted such by the law of its organization. The Department, with its bureaus or offices, is in contemplation of the law an establishment distinct from the branches of the public service and the offices thereof which are under its supervision. Thus, the office of post-master, or collector of internal revenue, or of pension agent, or of consul, is not properly a Departmental office —not an office in the department having supervision over the branch of the public service to which it belongs.

In view of the extensive field work now carried on by the Bureau of Internal Revenue for instance, there may be still some question as to how far the language just quoted may be applicable to individuals formerly employed by a Collector or an Agent in Charge engaging in tax practice before the Treasury Department.

It has been said that the word "claim" as appearing in the Act of June 1, 1872, quoted in the foregoing, may be open to some dispute. The Income Tax regulations issued by the Bureau refer to three principal kinds of claims, i. e. Claims for Refund, wherein the taxpayer is endeavoring to recover taxes paid by him, alleging that the payment was in error, or the collection was illegally made; Claims for Credit, wherein the taxpayer seeks to have credited against subsequent assessment taxes which he alleges were paid in error or were illegally collected; and Claims in Abatement, wherein the taxpayer alleges that an assessment is incorrect. Obviously, there is a difference between a contention that the United States owes the taxpayer because of an improper collection of taxes and the contention that the taxpayer does not owe the Government what the Bureau of Internal Revenue claims. Some, and perhaps all, of the former employees of the Bureau of Internal Revenue, take the position that if, while employees of the Department, they had no actual personal knowledge of the facts relating to a claim in Abatement, that they are not barred from representing the taxpayer making the protest under the heading.

The position of these former employees with reference to the meaning of the statutory word "claim" would seem to be supported by the Commissioner of Internal Revenue who has written:

With respect to the construction placed by the Department in the word "claim" as used in Section 190, Revised Statutes, you are advised that in the leading case of Hobbs v. McLean, (117 U. S. 567) it was stated, "It is well understood that a claim against the United States is a right to demand money from the United States." This definition of claim against the United States has been followed in later Federal cases as in Milliken v. Barrow (65 Fed. 888,894) and has been held by this office to apply to the words "claim against the United States," as used in Section 190, Revised Statutes.

After the act of June 1, 1872, the next legislation by Congress on the subject was in July, 1884. As the result of a report made to Congress on May 7, 1884, by the Secretary of the Interior, stating that he had been forced to disbar three hundred and twelve "agents" operating before the Pension Office, Congress passed the Act of July 4, 1884, c. 181, sec. 5 (23 Stat. 101), giving him specific power to prescribe rules and regulations for the recognition and disqualification of agents, attorneys and others representing claims before the Department. Inasmuch as the same agents or attorneys operating before the Department of the Interior in the normal course would appear before the Treasury Department to follow the payment of awards, Congress conferred substantially the same power on the Secretary of Treasury in the Act approved July 7, 1884, c. 334, sec. 3 (23 Stat. 258), reading as follows:

That the Secretary of the Treasury may prescribe rules and regulations governing the recognition of agents, attorneys, or other persons representing claimants before his Department, and may require of such persons, agents and attorneys, before being recognized as representatives of claimants, that they shall show that they are of good character and in good repute, possessed of the necessary qualifications to enable them to render such claimants valuable service, and otherwise competent to advise and assist such claimants in the representation of their cases. And such secretary may after due notice and opportunity for hearing suspend, and disbar from further practice before his Department any such person, agent, or attorney shown to be incompetent, disreputable, or who refuses to comply with the said rules and regulations, or who shall with intent to defraud, in any manner willfully and knowingly deceive, mislead, or threaten any claimant or prospective claimant, by word, circular, letter, or by advertisement.

It is upon the authority granted by this act that the Secretary of the Treasury has promulgated the extensive rules governing the practice before the Treasury Department of attorneys and agents, as set forth in Circular 230. This circular first appeared February 15, 1921, announcing among other things the appointment of a Committee on Enrollment and Disbarment, was amended June 7, 1921, July 21, 1921, December 23, 1921, and finally rather drastically revised April 25, 1922. This document may be had upon application to

the Treasury Department. Its possession is a highly essential requisite for any member of the bar expecting to represent a client before the Department.

Prosecution of claims against the United States by persons holding any place of trust or profit or discharging any official function under, or in connection with any Executive Departments, or the Congress, is effectively prevented by the Act of March 4, 1909, c. 321, sec. 109 (35 Revised Stat. 1107). It is noteworthy that, in contrast to the Act of June 1, 1872, barring former employees from presenting claims but attaching no penalty for disobedience, this act of 1909 relating to employees still in the service carries as a penalty for its infraction a fine of not more than five thousand dollars or imprisonment for not more than one year, or both.

This section has been interpreted to apply to: retired officers of the army (Tyler's Motion v. U. S., 18 Ct. Cl. 25; In re. Winthrop, 31 Ct. Cl. 35); the Commissioner of Deeds of the District of Columbia (28 Op. Atty. Gen. 131); an internal revenue storekeeper (Angell v. Rowlett's Admir., 4 Ky. Law Rep. 909); and counsel for delegates to the Pan-American Conference (23 Op. Atty. Gen. 533). The prohibition has been held not to apply to an assistant attorney of the District of Columbia (18 Op. Atty. Gen. 161).

While several bills have been presented to Congress extending the restriction on former government employees these have all died in the process of legislation with the exception of the following rider to the Army appropriation bill contained in the Act of July 11, 1919, 41 Stat. 131:

> That it shall be unlawful for any person who, as a commissioned officer of the Army, or officer or employee of the United States, has at any time since April 6, 1917, been employed in any Bureau of the Government and in such employment been engaged on behalf of the United States in procuring or assisting to procure supplies for the Military Establishment, or who has been engaged in the settlement or adjustment of contracts or agreements for the procurement of supplies for the Military Establishment, within two years next after his discharge or other separation from the service of the Government, to solicit employment in the presentation or to aid or assist for compensation in the prosecution of claims against the United States arising out of any contracts or agreements for the procurement of supplies for said Bureau, which were pending or entered into while the said officer or employee was associated therewith. A violation of this provision of this chapter shall be punished by a fine of not more than $10,000, or imprisonment for not more than one year, or both.

While not applying to the Treasury Department, directly, this statute would necessarily disqualify any attorney or agent who came before that Department pursuing an award made in a claim against the United States, in which the agent or attorney represented a claimant in violation of the prohibition contained in the statute.

The only other legislation of importance intended to exercise direct statutory control of individuals appearing in a representative capacity before the Executive Departments is contained in the Act of June 29, 1906, 34 Stat. 622, prohibiting, in substance, notary publics from performing their functions as notaries in connection with matters pending before the Departments in which they are employed as attorneys or agents or are interested parties.

In general the control over attorneys and agents appearing before the Department is exercised by the Departments heads through rules laid down as the result of authority conferred upon them by the statutory enactments which have hereinbefore been set out. In spite of sporadic agitation to the contrary, most of

the governmental officers dealing with the situation at present seem to be satisfied with the powers given by the existing laws. The reason for this feeling would seem to lie in the fact that the existing statutory authority is broad enough to permit of regulations which can be made sufficiently comprehensive to prevent continued improper practices on the part of any one individual even though a single offense might not be reachable by the authorities. It is hardly a paying proposition to incur the settled ill-will of the forum before which one regularly appears. Just now it seems unlikely that new legislation will be requested, at least by the Treasury Department, to control its "bar," although occasional amendments to the regulations for the purpose may be expected.

---

## Speaking of Lady Solicitors

"During the coming term we shall have lady solicitors. As an admirer of the fair sex, I hope they will receive from the reputed sterner sex that courtesy and encouragement which is their due. Although there may be some cases in which lady solicitors may do good and effective work, I cannot help thinking (though I speak with bated breath) that ladies by their character and temperament are not built for the rough-and-tumble life and work of the ordinary solicitor, and that they would be far better employed in attending to homework and the bringing up of future generations of solicitors of the male sex.

"Portias will, I am afraid, be few and far between; but now that the fair sex have got the entrée to the profession, it behooves the male sex to look to its laurels. What mixups may be looked for—solicitor marries solicitor? Will the male client want to consult the female solicitor and vice versa? Situations may arise which are altogether too complicated to contemplate. If any lady friend of mine asks for my opinion as to entering the Profession, my advice will be the same as Punch's to those about to marry—'Don't.'"—From Presidential Address to Law Society. *The Law Times,* Sept. 30.

---

## Popularizing Jury Service

"The Supreme Court of Washington, in State v. Bucham, 187 Pacific Reporter, 352, points a way to an oasis where the thirsty may indulge legally and without hazard. The court advises serving on the jury; for in the above-mentioned case the judges hold that, in a prosecution for unlawfully having in possession intoxicating liquors, it was not error to send to the jury room twenty-four bottles which had been introduced in evidence, nor was it error for the jury to smell and sample it."—*Virginia Law Register,* September, 1922.

---

## Proctor Knott's View of His Reputation

"Mr. Knott's reputation as a humorist was not a source of unmixed pleasure to them. He fancied that it impaired his reputation both as a lawyer and as a statesman. When Cleveland was making his race for President in 1892, Mr. Knott was asked to make some speeches for him in Indiana. At one of his appointments he was greatly disgusted to see on a billboard in very large letters the announcement of a speech to be made on that afternoon by Knott, the funny man. Whatever adjective might be used to define his profound sense of humor, funny was not the word. Although his humor was a never-failing delight to his friends, like all humorists he was a man whom melancholy had somewhat marked for its own."—From address of Judge Hazelrigg at the 1922 Meeting, Kentucky State Bar Association.

# DEPARTMENT OF THE TREASURY

## Office of the Secretary

### 31 CFR Part 10

[TD 9527]

RIN 1545–BH01

## Regulations Governing Practice Before the Internal Revenue Service

**AGENCY:** Office of the Secretary, Treasury.

**ACTION:** Final regulations.

**SUMMARY:** This document contains final regulations governing practice before the Internal Revenue Service (IRS). The regulations affect individuals who practice before the IRS and providers of continuing education programs. The regulations modify the general standards of practice before the IRS and the standards with respect to tax returns.

**DATES:**

*Effective Date.* These regulations are effective on August 2, 2011.

*Applicability Date:* For dates of applicability, see §§ 10.0(b), 10.1(c), 10.2(b), 10.3(j), 10.4(f), 10.5(g), 10.6(n), 10.7(f), 10.8(d), 10.9(c), 10.20(c), 10.25(e), 10.30(e), 10.34(e), 10.36(c), 10.38(b), 10.50(e), 10.51(b), 10.53(e), 10.60(d), 10.61(c), 10.62(d), 10.63(f), 10.64(f), 10.65(c), 10.66(b), 10.69(c), 10.72(g), 10.76(e), 10.77(f), 10.78(d), 10.79(e), 10.80(b), 10.81(b), 10.82(h), and 10.90(c).

**FOR FURTHER INFORMATION CONTACT:** Matthew D. Lucey at (202) 622–4940 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## Paperwork Reduction Act

The collection of information contained in these regulations was previously reviewed and approved by the Office of Management and Budget in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)) under control number 1545–1726. The collection of information in these regulations is in §§ 10.6 and 10.9. The total annual burden of this collection of information is an increase from the burden in the current regulations. This information is required in order for the IRS to ensure that individuals permitted to prepare tax returns are informed of the latest developments in Federal tax practice.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number. Books or records relating to a collection of information must be retained as long as their contents might become material in the administration of any internal revenue law.

## Background

Section 330 of title 31 of the United States Code authorizes the Secretary of the Treasury (the Secretary) to regulate the practice of representatives before the Treasury Department. The Secretary is authorized, after notice and an opportunity for a proceeding, to censure, suspend, or disbar from practice before the Treasury Department those representatives who are incompetent, disreputable, or who violate regulations prescribed under section 330 of title 31. The Secretary also is authorized to impose a monetary penalty against these individuals and the individuals' firms or other entities that employ them. Additionally, the Secretary may seek an injunction against these individuals under section 7408 of the Internal Revenue Code (Code).

The Secretary has published regulations governing the practice of representatives before the IRS in 31 CFR part 10 and reprinted the regulations as Treasury Department Circular No. 230 (Circular 230). These regulations authorize the IRS to act upon applications for enrollment to practice before the IRS; to make inquiries with respect to matters under Circular 230; to institute proceedings to impose a monetary penalty or to censure, suspend, or disbar a practitioner from practice before the IRS; to institute proceedings to disqualify appraisers; and to perform other duties necessary to carry out these functions.

Circular 230 has been amended periodically. The regulations were amended most recently on September 26, 2007 (TD 9359, 72 FR 54540), to modify various provisions relating to the general standards of practice. For example, the 2007 regulations established an enrolled retirement plan agent designation, modified the conflict of interest rules, limited the use of contingent fees by practitioners, and required public disclosure of OPR disciplinary decisions after the decisions become final.

Those final regulations, however, did not finalize the standards with respect to tax returns under § 10.34(a) and the definitions under § 10.34(e) because of the amendments to section 6694(a) of the Code made by the Small Business and Work Opportunity Tax Act of 2007, Public Law 110–28, 121 Stat. 190. Rather, the IRS and the Treasury Department reserved § 10.34(a) and (e) in those final regulations and also simultaneously issued a notice of proposed rulemaking (REG–138637–07) in the **Federal Register** (72 FR 54621) proposing to conform the professional standards under § 10.34 of Circular 230 with the civil penalty standards under section 6694(a) as amended by the 2007 Act.

On October 3, 2008, the Tax Extenders and Alternative Minimum Tax Relief Act of 2008, Div. C. of Public Law 110–343, 122 Stat. 3765, again amended the standard of conduct that must be met to avoid imposition of the tax return preparer penalty under section 6694(a). The IRS and the Treasury Department published final regulations (TD 9436) in the **Federal Register** (73 FR 78430) implementing amendments to the tax return preparer penalties on December 22, 2008. To generally be consistent with the return preparer penalty regulations, these final regulations provide updated rules with respect to the standards for tax returns under § 10.34(a).

These final regulations also provide new rules governing the oversight of tax return preparers. Previously, an individual tax return preparer generally was not subject to the provisions in Circular 230 unless the tax return preparer was an attorney, certified public accountant, enrolled agent, or other type of practitioner identified in Circular 230. Prior to the issuance of these final regulations, any individual could prepare tax returns and claims for refund without meeting any qualifications or competency standards. A tax return preparer also used to be able to exercise the privilege of limited practice before the IRS pursuant to the rules in former § 10.7(c)(1)(viii) of Circular 230 and Revenue Procedure 81–38 (1981–2 CB 592). See § 601.601(d)(2)(ii)(*b*).

In June 2009, the IRS launched a review of tax return preparers with the intent to propose a comprehensive set of recommendations to ensure uniform and high ethical standards of conduct for all tax return preparers and to increase taxpayer compliance. As part of this effort, the IRS received input from a large and diverse community through numerous channels, including public forums, solicitation of written comments, and meetings with advisory groups.

The IRS made findings and recommendations in Publication 4832, "Return Preparer Review" (the Report), which was published on January 4, 2010. The Report recommends increased oversight of the tax return preparer industry through the issuance of regulations.

To implement recommendations made in the Report, the IRS issued final

JA 66

USA-LOV-001220

regulations under section 6109 of the Code (TD 9501) published in the **Federal Register** (75 FR 60309) on September 30, 2010. The final regulations under section 6109 provide that, for returns or claims for refund filed after December 31, 2010, the identifying number of a tax return preparer is the individual's preparer tax identification number (PTIN) or such other number prescribed by the IRS in forms, instructions, or other appropriate guidance. The regulations also provide that the IRS is authorized to require through other guidance (as well as in forms and instructions) that tax return preparers apply for a PTIN or other prescribed identifying number, the regular renewal of PTINs or other prescribed identifying number, and the payment of user fees. The IRS also issued final regulations (TD 9503) establishing a user fee to apply for or renew a PTIN published in the **Federal Register** (75 FR 60316) on September 30, 2010.

On August 23, 2010, the Treasury Department and the IRS published in the **Federal Register** (75 FR 51713) a notice of proposed rulemaking (REG–138637–07) proposing amendments to Circular 230 based upon certain recommendations made in the Report. The proposed regulations provided that registered tax return preparers are practitioners under Circular 230 and described the process for becoming a registered tax return preparer, as well as the scope of a registered tax return preparer's practice before the IRS. Amendments were also proposed to § 10.30 regarding solicitation, § 10.36 regarding procedures to ensure compliance, and § 10.51 regarding incompetence and disreputable conduct. A public hearing was held on the proposed regulations on October 8, 2010. Written public comments responding to the proposed regulations were received. After consideration of the public comments, the proposed regulations are adopted as revised by this Treasury decision.

**Plain Language Summary of the Requirements for Becoming a Registered Tax Return Preparer or Continuing Education Provider**

*Am I affected by this regulation?*

If you are an attorney or certified public accountant, then the amendments to §§ 10.3, 10.4, 10.5, 10.7 and 10.9 of Circular 230 (rules regarding registered tax return preparers) do not affect you. If you are not an attorney or certified public accountant and you prepare, or assist in preparing, all or substantially all of a tax return or claim

for refund for compensation, then you may be affected by this regulation.

Section 10.2(a)(8) of the final regulations clarifies that the definition of "tax return preparer" in Circular 230 is the same as the meaning in section 7701(a)(36) of the Code and 26 CFR 301.7701–15. If you only furnish typing, reproduction, or other mechanical assistance with respect to a tax return or a claim for refund, you are not a tax return preparer under Circular 230.

*How am I affected by this regulation and how does this regulation work with other recently issued IRS guidance?*

The final regulations, in part, provide details about: (1) The application process to become a registered tax preparer, (2) the renewal process to remain a registered tax return preparer, and (3) other rules that govern practice before the IRS that affect all practitioners.

*Application Process*

Generally, you must do the following to apply to become a registered tax return preparer: (1) Pass a one-time competency exam, (2) pass a suitability check, and (3) obtain a PTIN (and pay the amount provided in the PTIN User Fee regulations).

To allow tax return preparers a transition period to pass the competency examination and, because the competency examination will not be available until after these final regulations are published, Notice 2011–6 (2011–3 IRB 315), which was published on December 30, 2010, provides the following guidance to tax return preparers who obtain a PTIN (in accordance with the PTIN regulations) and pay the applicable user fee (set forth in the PTIN User Fee regulations) before the competency examination is offered:

Individuals who obtain a provisional PTIN before the competency examination is offered may prepare for compensation any tax return or claim for refund until December 31, 2013, as long as the individual renews their PTIN, passes a suitability check (when available), and pays the applicable user fee. After the examination is offered, only attorneys, certified public accountants, enrolled agents, and registered tax return preparers, or individuals defined in section 1.02(a) or (b) of Notice 2011–6 may obtain a PTIN.

The tax returns and claims for refund covered by the competency examination initially offered will be limited to individual tax returns (Form 1040 series tax returns and accompanying schedules). As provided in Notice 2011–6, individuals may certify that they do not prepare individual tax returns and,

as a result, will not be required to pass this initial competency examination or become a registered tax return preparer at this time.

The process for becoming a registered tax return preparer is comparable to the existing process for enrolled agents. Enrolled agents must pass the Special Enrollment Examination and complete continuing education requirements. These regulations, however, do not change enrolled agents' status as practitioners under Circular 230.

*Renewal Process*

You must complete continuing education to maintain your status as a registered tax return preparer. A registered tax return preparer must annually renew their PTIN and pay a user fee every year. Generally, registered tax return preparers must complete a minimum of 15 credits of continuing education annually. This regulation specifies what constitutes continuing education. Registered tax return preparers must retain records of continuing education courses for four years.

If you prepare or assist in preparing all or substantially all of a tax return for compensation but do not sign the tax return, you are exempt from the competency examination and continuing education requirements if the requirements of section 1.02(a) of Notice 2011–6 are met. You must, however, renew your PTIN, pay the applicable PTIN user fee, and certify that the requirements of Notice 2011–6 are met.

*Continuing Education Providers*

You are subject to requirements in the final regulations. The final regulations provide requirements applicable to continuing education providers who provide continuing education programs to registered tax return preparers and enrolled agents. Continuing education providers must obtain and renew continuing education provider numbers and continuing education provider program numbers and pay any applicable fees.

**Summary of Comments and Explanation of Revisions**

The IRS received more than 50 written comments in response to the notice of proposed rulemaking. All of the comments were considered and are available for public inspection. Most of the comments that addressed the proposed regulations are summarized in this preamble. Some comments addressed other regulations or notices of proposed rulemaking and are not discussed in this preamble.

USA-LOV-001221

The scope of these rules is limited to practice before the IRS. These regulations do not change the existing authority of attorneys, certified public accountants, and enrolled agents to practice before the IRS under Circular 230 and do not alter or supplant ethical standards that might otherwise be applicable to these practitioners.

*IRS Offices Administering and Enforcing Circular 230*

To fully implement the return preparer initiative, the IRS announced that a new return preparer office was created to administer PTIN applications, competency testing, and continuing education. The IRS decided that an office dedicated solely to resolving these matters will allow the IRS to best serve tax return preparers and taxpayers by providing efficiency and expertise in this area.

Concurrently, the Office of Professional Responsibility will continue to enforce the Circular 230 provisions relating to practitioner conduct and discipline. The Office of Professional Responsibility will continue to carry out its mission to interpret and apply the standards of practice for tax professionals in a fair and equitable manner. As discussed in the Report, a strong enforcement regime is a key component to increased oversight of the tax return preparer industry. Commentators on the proposed regulations also suggested that the return preparer initiative must be met with appropriate enforcement measures. The IRS recognizes that the Office of Professional Responsibility is central to the IRS' goal of maintaining high standards of ethical conduct for all practitioners and that the Office must operate independently from IRS functions enforcing Title 26 requirements.

The final regulations accommodate the internal structure by generally removing references to the Office of Professional Responsibility. The final regulations allow the flexibility to adjust responsibility appropriately between the offices as the return preparer initiative is implemented. The Commissioner may delegate necessary authorities to appropriate offices.

*Definitions—Practice Before the Internal Revenue Service, Tax Return Preparer*

The final regulations adopt the proposed amendments to § 10.2(a)(4), which clarify that either preparing a document or filing a document may constitute practice before the IRS. The final regulations also adopt the proposed amendments to § 10.2(a)(8), which clarify that the definition of "tax

return preparer" in Circular 230 is the same as the meaning in section 7701(a)(36) of the Code and 26 CFR 301.7701–15.

*Who May Practice*

The final regulations adopt the proposed amendments to § 10.3(f), which establish a new "registered tax return preparer" designation. A registered tax return preparer is any individual so designated under § 10.4(c) who is not currently under suspension or disbarment from practice before the IRS. An individual who is a registered tax return preparer pursuant to this part is a practitioner authorized to practice before the IRS, subject to the limitations identified in these regulations. Some commentators stated that the term registered tax return preparer would confuse the public because it implies a high level of professional capability. As stated in the Report, the goal of the return preparer initiative is increased oversight of the tax return preparer industry and to institute standards for minimum competence. For those individuals who have passed a competency examination and have met continuing education requirements, the Treasury Department and the IRS conclude that the term "registered" is appropriate.

Some commentators requested that the IRS not include registered tax return preparers as individuals who may practice under proposed § 10.3. Representation is defined as "[a]cts performed on behalf of a taxpayer by a representative before the Internal Revenue Service." See 26 CFR 601.501(b)(13) (Conference and Practice Requirements). As discussed earlier in this preamble, practice before the IRS includes preparing or filing tax returns and other documents with the IRS. Thus, preparation of a tax return is practice before the IRS. Because registered tax return preparers are individuals who prepare all or substantially all of a tax return or claim for refund on behalf of a taxpayer for compensation, they practice before the IRS and must be included in § 10.3 of the final regulations.

The Treasury Department and the IRS received comments requesting clarification with respect to which forms registered tax return preparers are permitted to prepare. The IRS will prescribe by forms, instructions, or other appropriate guidance the tax returns and claims for refund registered tax return preparers are permitted to prepare after successfully completing the competency examination. Forms, instructions, or other appropriate guidance may also provide rules with

respect to forms that may be prepared without completion of the competency examination. Notice 2011–6 permits individuals who prepare tax returns not covered by the competency examination to obtain a PTIN if certain requirements are met.

Registered tax return preparers also may represent taxpayers before revenue agents, customer service representatives, or similar officers and employees of the IRS (including the Taxpayer Advocate Service) during an examination if the registered tax return preparer signed the tax return or claim for refund for the taxable year or period under examination. Consistent with the limited practice rights previously available to unenrolled return preparers under former § 10.7(c)(1)(viii), registered tax return preparers are not permitted to represent taxpayers, regardless of the circumstances requiring representation, before appeals officers, revenue officers, Counsel, or similar officers or employees of the IRS or the Treasury Department. A registered tax return preparer's authorization to practice under this part also does not include the authority to provide tax advice to a client or another person except as necessary to prepare a tax return, claim for refund, or other document intended to be submitted to the IRS.

Some commentators inquired as to whether the federally authorized tax practitioner privilege under section 7525 applies to communications between a taxpayer and a registered tax return preparer. The Treasury Department and the IRS have concluded that the federally authorized tax practitioner privilege generally does not apply to communications between a taxpayer and a registered tax return preparer because the advice a registered tax return preparer provides ordinarily is intended to be reflected on a tax return and is not intended to be confidential or privileged.

The conduct of a registered tax return preparer in connection with the preparation of the return, claim for refund, or other document, as well as any representation of the client during an examination, will be subject to the standards of conduct in Circular 230. Inquiries into possible misconduct and disciplinary proceedings relating to registered tax return preparer misconduct will be conducted under the provisions in Circular 230.

Numerous members of the tax return preparation industry submitted comments requesting that certain individuals be exempted from the requirements in the proposed regulations. Commentators suggested that tax return preparers who are

USA-LOV-001222

supervised by certain practitioners currently authorized to practice under Circular 230 should not be required to become registered tax return preparers if the supervising practitioner signs the tax return prepared in part by the supervised tax return preparer. Commentators reasoned that certain practitioners who sign tax returns are subject to, in addition to Circular 230, professional standards and oversight by state licensing authorities and other professional organizations that place professional responsibility for the tax return on the signing practitioner.

In Notice 2011–6, the Treasury Department and the IRS provided, pursuant to § 1.6019–2(h), that individuals who are not attorneys, certified public accountants, enrolled agents, enrolled retirement plan agents, enrolled actuaries, or registered tax return preparers will be eligible to obtain a PTIN and, thus, prepare, or assist in preparing, all or substantially all of a tax return or claim for refund for compensation in certain discrete circumstances. Section 1.02(a) of the notice permits certain individuals supervised by an attorney, certified public accountant, enrolled agent, enrolled retirement plan agent, or enrolled actuary who signs the return or claim for refund prepared by the individual to obtain a PTIN. These individuals also are required to certify in their application to receive a PTIN that they are supervised by an attorney, certified public accountant, enrolled agent, enrolled retirement plan agent, or enrolled actuary who signs the tax return or claim for refund and provide a supervising individual's PTIN or other number if prescribed by the IRS. These individuals may not sign any tax return they prepare or assist in preparing for compensation. If at any point, the individual is no longer supervised by the signing attorney, certified public accountant, enrolled agent, enrolled retirement plan agent, or enrolled actuary, the individual must notify the IRS if prescribed in forms, instructions, or other appropriate guidance and will no longer be permitted to prepare or assist in preparing all or substantially all of a tax return or claim for refund for compensation under this exception. Because individuals meeting these requirements, as fully set forth in § 1.02(a) of Notice 2011–6, are permitted to obtain a PTIN, they are not required to become registered tax return preparers to obtain a PTIN.

*Eligibility To Become an Enrolled Agent or Enrolled Retirement Plan Agent*

The final regulations provide that an enrolled agent or enrolled retirement

plan agent must be eighteen years old and obtain a PTIN to be eligible to practice before the IRS as an enrolled agent or enrolled retirement plan agent.

Section 10.4(d) of the final regulations also provides that a former employee who, by virtue of past service and technical experience in the IRS, may be granted enrollment as an enrolled agent or enrolled retirement plan agent if certain criteria are satisfied. Some commentators on the proposed regulations suggested that former IRS employees should not be granted enrollment because the IRS is not exempting, or "grandfathering," experienced unenrolled practitioners from the testing and continuing education requirements. This recommendation is not adopted because the IRS may easily check a former employee's IRS employment record to ensure the individual has the past service and technical experience for the scope of enrollment sought by the former employee.

*Eligibility To Become a Registered Tax Return Preparer*

The final regulations require that an individual must be eighteen years old, possess a current or otherwise valid PTIN or other prescribed identifying number, and pass a minimum competency examination to become a registered tax return preparer. Many commentators supported the IRS' effort to increase the overall competency of tax return preparers by implementing reasonable standards. The minimum age requirement included in the final regulations will assist the Treasury Department and the IRS in efficient tax administration by ensuring that registered tax return preparers have a minimum level of experience, knowledge, judgment, and maturity. Other categories of Circular 230 practitioners are generally subject to state requirements that result in the individual possessing a minimum level of experience, knowledge, judgment, and maturity.

The competency examination will be administered by, or administered under the oversight of, the IRS, similar to the special enrollment examinations for enrolled agents and enrolled retirement plan agents. Tax return preparers will be subject to suitability checks to determine whether the tax return preparer has engaged in disreputable conduct, which, at the time the application is filed with the IRS, could result in suspension or disbarment under Circular 230. An individual who has engaged in disreputable conduct is not eligible to become a registered tax return preparer.

Commentators requested that the IRS delay implementation of the testing requirement. The Treasury Department and the IRS did not adopt any delay in implementation of the testing requirement because it is currently anticipated that the examination to become a registered tax return preparer will not be available until after the effective date of these regulations. Notice 2011–6 provides guidance establishing transition rules explaining the steps individuals must take to prepare all or substantially all of a tax return or claim for refund while awaiting full implementation of the examination process. The IRS will provide administrative information about the competency examination to tax return preparers via appropriate channels, including the Tax Professionals page of the IRS website, *http://www.irs.gov/taxpros.*

Some commentators also requested that the Treasury Department and the IRS delay implementation of the continuing education requirements. In response to these concerns and to ensure the IRS has sufficient time to implement these requirements appropriately, the Treasury Department and the IRS announced that the implementation of the continuing education requirement will be postponed and that there will be no continuing education requirement at least during the first year of registration, which commenced on September 30, 2010. The IRS will provide administrative information about continuing education to tax return preparers via appropriate channels, including the Tax Professionals page of the IRS Web site, *http://www.irs.gov/ taxpros.*

*Procedures for Becoming or Renewing an Individual's Designation as a Registered Tax Return Preparer*

Section 10.5 of the final regulations sets forth the applicable procedures related to becoming a registered tax return preparer, which generally are consistent with the procedures currently utilized for enrolled agents and enrolled retirement plan agents. The regulations provide that individuals who want to become a registered tax return preparer or renew their designation as a registered tax return preparer must utilize forms and comply with the procedures established and published by the IRS. The final regulations permit the IRS to change the procedures to apply to become a registered tax return preparer.

As a condition for consideration of an application, the IRS may conduct a Federal tax compliance check and

JA 69

suitability check. The tax compliance check will be limited to an inquiry regarding whether the individual has filed all required individual or business tax returns (such as employment tax returns that might have been required to be filed by the applicant) and whether the individual has failed to pay, or make proper arrangements with the IRS for payment of, any Federal tax debts. The suitability check will be limited to an inquiry regarding whether the individual has engaged in any conduct that would justify suspension or disbarment of any practitioner under the provisions of this part, including whether the applicant has engaged in disreputable conduct.

The IRS may not designate an individual as a registered tax return preparer only if the results of the tax compliance or suitability check are sufficient to establish that the individual engaged in conduct subject to sanctions under Circular 230 at the time the individual seeks to become a registered tax return preparer or the individual does not pass the required competency examination or meet other established standards. If the individual does not pass the competency examination or the tax compliance or suitability check, the individual will not be designated as a registered tax return preparer. Pursuant to § 10.5(f) of these regulations, an applicant denied status as a registered tax return preparer will be informed in writing as to the reason(s) for any denial of the application. The applicant may file a written protest within 30 days after receipt of the denial. The written protest must be filed as prescribed by the Internal Revenue Service in forms, guidance, or other appropriate guidance. An individual who is initially denied status as a registered tax return preparer for failure pass a tax compliance check may reapply after the initial denial if the individual becomes current with respect to the individual's tax liabilities.

Once an individual is approved as a registered tax return preparer, the IRS will issue a registration card or certificate to each individual. The card or certificate will be in addition to any notification provided to an individual who obtains a PTIN. Registered tax return preparers must have both a valid registration card or certificate and a current and valid PTIN number to practice before the IRS.

Section 10.6 of the final regulations sets forth the procedures for renewing an individual's designation as a registered tax return preparer. Registered tax return preparers must renew their designation as prescribed in forms, instructions, or other appropriate

guidance. A condition of renewal is the completion of the requisite number of continuing education hours by registered tax return preparers. Registered tax return preparers must complete 15 hours of continuing education during each registration year, with a minimum of three hours of Federal tax law updates, two hours of tax-related ethics and 10 hours of Federal tax law topics. The registration year is defined as each 12-month period that the registered tax return preparer is authorized to practice before the IRS.

Registered tax return preparers must maintain records with respect to completion of the continuing education credit hours and to self-certify the completion of the continuing education credit at the time of renewal. These regulations require that a qualifying continuing education course enhance professional knowledge in Federal taxation or Federal tax related matters and be consistent with the Code and effective tax administration.

Section 10.6(f)(2)(iii) of the proposed regulations provided that the maximum continuing education credit allowed for instruction and preparation is four hours annually. The proposed regulations also removed the ability to receive hours for authoring articles, books, or other publications that was formerly allowed with respect to enrolled agents and enrolled retirement plan agents. The Treasury Department and the IRS did receive comments objecting to the reduction of maximum credit and the removal of the ability to receive credit for authoring publications. The comments stated that the rules would result in a lower quality of education and lower diversity.

In § 10.6(f)(2)(iii) of the final regulations, the Treasury Department and the IRS modified the proposed rules regarding the maximum credit allowed for instruction and preparation to allow enrolled agents and enrolled retirement plan agents to earn six hours annually. The final regulations allow registered tax return preparers to earn four hours annually. The Treasury Department and the IRS do not agree with the comments concerning receiving credit for authoring publications because the learning involved with authoring a publication does necessarily not equate to the knowledge derived from a continuing education program that is current and developed by an individual qualified in the relevant subject matter. Therefore, the final regulations remove the ability to receive hours for authoring articles, books, or other publications that was formerly allowed with respect to enrolled agents and enrolled retirement plan agents.

Sections 10.5(b) and 10.6(d)(7) of the final regulations provide that the IRS may charge a reasonable nonrefundable fee for each initial application and renewal of status as a registered tax return preparer submitted to the IRS. At the outset, the initial application fee refers to the initial PTIN user fee and the user fee applicable to any required competency examination. Similarly, a registered tax return preparer must renew a PTIN and pay the applicable user fee as prescribed by the IRS in forms, instructions, or other appropriate guidance. The IRS in future regulations add or remove fees applicable to becoming a registered tax return preparer.

The Treasury Department and the IRS received numerous comments requesting that certain non-signing tax return preparers be exempt from the testing and continuing education requirements. Commentators reasoned that the testing and continuing education requirements are not necessary for non-signing tax return preparers who are supervised because a supervising practitioner is responsible for the accuracy of the underlying return and must generally comply with continuing professional education requirements and ethical standards. Comments also suggested that fees for the competency examination and continuing education for paraprofessionals and those assisting in return preparation would not be justified when the signing tax return preparer ultimately reviews, and is responsible for, the accuracy of the tax return. Overall, these comments suggested that the costs of requiring testing and continuing education for tax return preparers who are supervised by attorneys, certified public accountants, enrolled agents, enrolled retirement plan agents, and enrolled actuaries outweighed the attendant benefits.

The Treasury Department and the IRS addressed these concerns in Notice 2011–6, which, as previously stated in this preamble, allows individuals who are not attorneys, certified public accountants, enrolled agents, or registered tax return preparers to obtain a PTIN provided the individual is supervised by an attorney, certified public accountant, enrolled agent, enrolled retirement plan agent, or enrolled actuary who signs the tax return or claim for refund when the individual prepares all or substantially all of a tax return or claim for refund. Because individuals meeting these requirements, as fully set forth in § 1.02(a) of Notice 2011–6, are permitted to obtain a PTIN, they are not required to become registered tax return

JA 70

USA-LOV-001224

preparers and, therefore, are not required to pass the competency examination or meet the continuing education requirements.

Some commentators requested that the Treasury Department and the IRS exempt student interns from the requirement to obtain a PTIN. These commentators suggested that the PTIN requirement would deter interest in tax accounting internships and make internship programs a money-losing proposition. The PTIN requirement applies to anyone who prepares all or substantially all of a tax return for compensation. If an intern does not receive compensation, the intern is not required to obtain a PTIN under the § 1.6109–2 regulations. If, however, an intern engages in tax return preparation activities that make the intern a tax return preparer for purposes of the § 1.6109–2 regulations and the intern is compensated for these activities, the intern must obtain a PTIN.

*Continuing Education Providers*

In § 10.9 of the proposed regulations, the Treasury Department and the IRS proposed a new requirement that continuing education providers obtain approval of each program to be qualified as a continuing education program. The proposed regulations also required providers of continuing education courses to maintain records and educational material concerning continuing education programs and the individuals who attended them. Section 10.9(a)(6) of the proposed regulations indicated that the IRS may charge a reasonable nonrefundable fee for each application for qualification as a qualified continuing education program.

The Treasury Department and the IRS received numerous comments requesting that the IRS reconsider the change in the continuing education approval process. Comments questioned why the IRS would require pre-approval of continuing education requirements when the number of individuals required to complete continuing education requirements is being significantly increased. Commentators suggested that the pre-approval process would be a substantial burden to continuing education providers and the IRS. In response to these comments, the Treasury Department and the IRS chose not to finalize the rules in proposed § 10.9 regarding pre-approval of individual continuing education programs.

Because the Treasury Department and the IRS are not finalizing the rules in proposed § 10.9 with respect to pre-approval of individual continuing education programs, § 10.9 of these final

regulations adopts rules similar to the rules in former § 10.6(g) applicable to qualified sponsors. Under § 10.9 of the final regulations, continuing education providers must be qualified and must obtain a qualified continuing education provider number to be eligible to offer qualified continuing education. While continuing education providers initially will not be required to obtain the IRS' approval of each continuing education program offered, the regulations authorize the IRS to require such approval, at its discretion, in appropriate forms, instructions or other appropriate guidance. Under the final regulations, continuing education providers are required to obtain a continuing education program number for each qualified continuing education program offered. Although the IRS is not currently proposing charging providers a fee for obtaining a continuing education provider number or a continuing education program number, these regulations provide that providers must pay any user fee applicable to obtaining either number established in future regulations.

Section 10.9 of these final regulations allows those listed in former § 10.6(g) to be qualified continuing education providers. Commentators on the proposed regulations suggested that the Treasury Department and the IRS consider that some professional organizations have nationally recognized standards for approving continuing education programs that are comparable to the IRS standards in Circular 230. Specifically, the comments requested that continuing education providers approved by these organization's standards be exempted from the requirement to seek additional approval from the IRS with respect to each continuing education program.

The Treasury Department and the IRS agree with the commentators that there is merit in recognizing continuing education providers that have been approved previously by professional organizations with standards comparable to Circular 230. Accordingly, § 10.9 of these regulations includes as qualified continuing education providers those providers that are recognized and approved as providers of continuing education on subject matters within § 10.6(f) of these regulations by a qualifying organization that has minimum education standards comparable to those set forth in Circular 230. The IRS intends to identify in forms, instructions, or other appropriate guidance the professional organizations whose approval will allow a continuing education provider to be qualified within § 10.9.

*Limited Practice Before the IRS, Return Preparation, and Application to Other Individuals*

Section 10.3(f) of these regulations permits registered tax return preparers to represent a taxpayer during an examination if the registered tax return preparer prepared the return for the taxable period under examination. Therefore, the final regulations remove the limited practice authorization in former § 10.7(c)(1)(viii), which allowed an unenrolled tax return preparer to represent a taxpayer during an examination if that individual prepared the return for the taxable period under examination. Additionally, the final regulations remove former § 10.8 regarding customhouse brokers from Circular 230 and move the language in former § 10.7(e) to new § 10.8.

Section 10.8(a) of the final regulations provides that any individual who for compensation prepares or assists with the preparation of all or substantially all of a tax return or claim for refund must have a PTIN. Except as otherwise prescribed in forms, instructions, or other appropriate guidance, an individual must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer to obtain a preparer tax identification number. These rules are consistent with the final PTIN regulations under section 6109. An individual who is not an attorney, certified public accountant, enrolled agent, or registered tax return preparer who nevertheless prepares for compensation all or a substantial portion of a document (including tax returns and claims for refund) for submission to the IRS is engaged in practice before the IRS and is subject to the rules and standards of Circular 230.

Section 10.8(b) of the final regulations provides that any individual, whether or not the individual is a practitioner, may assist with the preparation of a tax return or claim for refund (provided the individual prepares less than substantially all of the tax return or claim for refund). This revision is consistent with the inclusion of registered tax return preparers as practitioners authorized to practice before the IRS and the practice rights available to these practitioners.

These regulations also establish a new § 10.8(c) regarding other individuals. Any individual who prepares for compensation all or a substantial portion of a document pertaining to a taxpayer's tax liability for submission to the IRS is subject to the duties and restrictions relating to practice before the IRS and may be sanctioned, after notice and opportunity for a conference,

USA-LOV-001225

for any conduct that would justify a sanction under § 10.50. An individual described in 26 CFR 301.7701–15(f) is not treated as having prepared all or a substantial portion of the document by reason of such assistance. For example, an individual who only furnishes typing, reproducing, or other mechanical assistance with respect to a document is not subject to the duties and restrictions relating to practice before the IRS.

*Solicitation*

Section 10.30(a)(1) of these regulations provides that a practitioner may not, with respect to any IRS matter, in any way use or participate in the use of any form of public communication or private solicitation containing a false, fraudulent, coercive, misleading, or deceptive statement or claim. In describing their designation, registered tax return preparers may not utilize the term "certified" or imply an employer/ employee relationship with the IRS.

The proposed regulations provided that registered tax return preparers were permitted to use the term "designated as a registered tax return preparer with the Internal Revenue Service" when describing their designation. Some commentators expressed concern that the word "with" may imply a closer relationship with the IRS than exists, such as an employer-employee relationship. These commentators suggested using the term "by" instead. Accordingly, the IRS revised the language in final § 10.30(a)(1) to take into account this suggestion.

*Standards With Respect to Tax Returns and Documents, Affidavits and Other Papers*

After careful consideration, the IRS and the Treasury Department continue to conclude that the professional standards in § 10.34(a) generally should be consistent with the civil penalty standards in section 6694 for tax return preparers. As discussed in this preamble, the limited differences between the standards in § 10.34 and section 6694 arise from the different purposes served by those provisions and the different manner in which the two standards will be administered.

The standards with respect to tax returns in § 10.34(a) in the final regulations provide broader guidelines that are more appropriate for professional ethics standards. Under § 10.34(a)(1)(i) of the regulations, a practitioner may not willfully, recklessly, or through gross incompetence, sign a tax return or claim for refund that the practitioner knows or reasonably should know contains a

position that: (A) Lacks a reasonable basis; (B) is an unreasonable position as described in section 6694(a)(2) (including the related regulations and other published guidance); or (C) is a willful attempt by the practitioner to understate the liability for tax or a reckless or intentional disregard of rules or regulations by the practitioner as described in section 6694(b)(2) (including the related regulations and other published guidance).

Under § 10.34(a)(1)(ii) of these regulations, a practitioner may not willfully, recklessly, or through gross incompetence, advise a client to take a position on a tax return or claim for refund, or prepare a portion of a tax return or claim for refund containing a position, that: (A) Lacks a reasonable basis; (B) is an unreasonable position as described in section 6694(a)(2) (including the related regulations and other published guidance); or (C) is a willful attempt by the practitioner to understate the liability for tax or a reckless or intentional disregard of rules or regulations by the practitioner as described in section 6694(b)(2) (including the related regulations and other published guidance).

Commentators on proposed § 10.34 requested that the IRS clarify whether Notice 2009–5 (2009–3 IRB 309) applies for purposes of determining whether the tax return preparer prepared a return or claim for refund with an unreasonable position under § 10.34. An unreasonable position for purposes of § 10.34 is an unreasonable position as described in section 6694(a)(2) and related published guidance. Thus, Notice 2009–5 applies to determine whether the tax return preparer took an unreasonable position to the extent that it applies to the tax return preparer for purposes of section 6694.

Some commentators were concerned that a violation of section 6694 would translate to a per se violation of § 10.34. If the IRS, however, assesses a penalty against a practitioner under section 6694 and also refers the practitioner for possible discipline under Circular 230, an independent determination as to whether the practitioner engaged in willful, reckless, or grossly incompetent conduct subject to discipline under § 10.34(a) will be made before any disciplinary proceedings are instituted or any sanctions are imposed. Thus, a practitioner liable for a penalty under section 6694 is not automatically subject to discipline under § 10.34(a) of these regulations.

Several commentators recommended that the final regulations adopt the reasonable basis standard as the appropriate return position standard

under § 10.34(a) rather than the civil penalty standards in section 6694(a) (the substantial authority and reasonable basis with adequate disclosure standards). These commentators similarly requested clarification providing that a practitioner is not subject to discipline under § 10.34(a) if the practitioner fails to adequately disclose a position on a return or claim for refund for which there is a reasonable basis. These comments are not adopted in final § 10.34(a). Proposed § 10.34(a)(1)(i)(A) and (a)(1)(ii)(A) established reasonable basis as the minimum threshold standard for practitioners because a practitioner acts unethically when the practitioner advises a taxpayer to take a position on a return or claim for refund that lacks a reasonable basis. The Treasury Department and the IRS continue to believe that a practitioner also acts unethically in violating the civil penalty standards under section 6694(a) (including when there is a reasonable basis for a position on a return or claim for refund but the practitioner does not adequately disclose the position within the meaning of § 1.6694–2(d)(3)) through willful, reckless, or grossly incompetent conduct. Accordingly, final § 10.34(a)(1)(i) and (a)(1)(ii) provide three independent standards of practitioner conduct and a practitioner who fails to satisfy any one of these three standards is subject to discipline under § 10.34(a).

*Procedures To Ensure Compliance*

Section 10.36(b) of these regulations provides that firm management with principal authority and responsibility for overseeing a firm's practice of preparing tax returns, claims for refunds and other documents filed with the IRS must take reasonable steps to ensure that the firm has adequate procedures in effect for purposes of complying with Circular 230. The Treasury Department and the IRS continue to believe that expansion of § 10.36 to require firm procedures for tax return preparation practice, in addition to the pre-existing application to covered opinions, will help ensure compliance and encourage firms to self-regulate. Firm responsibility is a critical factor in ensuring high quality advice and representation for taxpayers.

*Authority To Accept a Practitioner's Consent To Sanction*

Section 10.50 of the final regulations provides that the IRS has the authority to accept a practitioner's offer of consent to be sanctioned under § 10.50 in lieu of instituting or continuing a proceeding under § 10.60(a). Section 10.61(b)(2)

<div align="center">JA 72</div>

USA-LOV-001226

currently provides that the IRS may accept or decline such an offer from a practitioner. A provision similar to the provision added to these regulations was removed during a previous revision of Circular 230. Due to the removal, some stakeholders have expressed concern over whether the IRS has the authority to accept an offer of consent to sanction. The provision added in the final regulations is merely intended to clarify any ambiguity with respect to the authority of the IRS to accept an offer of consent to sanction in lieu of instituting or continuing a proceeding.

*Incompetence and Disreputable Conduct*

Section 10.51 of Circular 230 defines disreputable conduct for which a practitioner may be sanctioned. Section 6011(e)(3) of the Code, enacted by section 17 of the Worker, Homeownership, and Business Assistance Act of 2009, Public Law 111–92 (123 Stat. 2984, 2996) (Nov. 6, 2009), requires certain specified tax return preparers to file individual income tax returns electronically. Because the Treasury Department and the IRS believe that the failure to comply with this requirement is disreputable conduct, these regulations are amended to add a new paragraph in § 10.51 to address practitioners who fail to comply with this requirement. Under § 10.51(a)(16), disreputable conduct includes willfully failing to file on magnetic or other electronic media a tax return prepared by the practitioner when the practitioner is required to do so by Federal tax laws (unless the failure is due to reasonable cause and not due to willful neglect). Some commentators stated that a failure to electronically file is only a procedural failure and suggested that it could only constitute disreputable conduct when coupled with an attempt to defraud the government. Commentators also suggested that a failure to electronically file should not constitute disreputable conduct because there are many valid reasons why a practitioner would not choose to electronically file tax returns.

The Treasury Department and the IRS, however, conclude that it is appropriate to include as disreputable conduct a tax return preparer's willful failure to electronically file tax returns subject to the mandatory electronic filing requirement. The IRS cannot permit tax return preparers to intentionally disregard the internal revenue laws and continue to practice before the IRS. Section 6011(e)(3) only applies to certain tax return preparers who file a specified number of returns per year and these tax return preparers need to

be aware of the new electronic filing requirement. The Treasury Department and the IRS have issued final regulations (TD 9518) published in the **Federal Register** (76 FR 17521) on March 30, 2011, that provide exclusions from the electronic filing requirement. The exclusions in the final regulations include undue hardship waivers and administrative exemptions. *See* Rev. Proc. 2011–25 for additional information on hardship waivers and Notice 2011–16 for additional information on administrative exemptions. Moreover, tax return preparers are only subject to sanction under § 10.51(a)(16) of the final regulations for not electronically filing if such a failure is willful. Accordingly, § 10.51(a)(16) is sufficiently narrowly tailored to only apply to these tax return preparers who willfully fail to comply with the electronic filing requirement.

Under § 10.51(a)(17) of the final regulations, disreputable conduct also includes willfully preparing all or substantially all of, or signing as a compensated tax return preparer, a tax return or claim for refund when the practitioner does not possess a current or otherwise valid PTIN or other prescribed identifying number. Section 10.51(a)(18) of these regulations states that it is disreputable conduct for a practitioner to willfully represent a taxpayer before an officer or employee of the IRS unless the practitioner is authorized to do so pursuant to Circular 230. These changes are consistent with the other revisions in these regulations and under section 6109.

*Proceedings Against Appraisers*

The regulations also contain amendments to § 10.60(b) relating to institution of proceedings against appraisers to better reflect the modifications made by section 1219 of the Pension Protection Act of 2006, Public Law 109–280 (120 Stat. 780), and the enactment of the section 6695A penalty. The IRS may reprimand or institute a proceeding for disqualification against an appraiser assessed a penalty under sections 6694, 6695A, or 6701, among any other relevant penalty provisions, as long as it is determined that the appraiser acted willfully, recklessly, or through gross incompetence with respect to the proscribed conduct.

*Appeal of Decision of Administrative Law Judge*

These regulations amend § 10.77 to provide additional, clarifying information regarding the procedure for filing an appeal of an Administrative Law Judge's decision with respect to a

proceeding under subpart D of Circular 230.

*Records*

Section 10.90 of these final regulations clarify that the roster requirements also pertain to registered tax return preparers and qualified continuing education programs.

**Effective Date**

These final regulations generally apply 60 days after the date the regulations are published in the **Federal Register.**

**Special Analyses**

Executive Order 12866, as supplemented by Executive Order 13563, provides that regulations must promote predictability and reduce uncertainty, and in developing regulations, agencies must take into account benefits and costs, both quantitative and qualitative. Specifically, agencies are directed, to the extent permitted by law, to propose or adopt regulations only upon a reasoned determination that its benefits justify its costs (recognizing that some benefits and costs are difficult to quantify); tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives; and in choosing among alternative regulatory approaches, select those approaches that maximize net benefits. This rule has been designated a "significant regulatory action" under section 3(f) of Executive Order 12866, inasmuch as it may adversely affect in a material way the economy, a sector of the economy, productivity, competition, or jobs. Accordingly, the rule has been reviewed by the Office of Management and Budget. The Regulatory Assessment prepared for this regulation is provided in this preamble under the heading "Regulatory Assessment Under E.O. 12866, as Supplemented by E.O. 13563."

It has been determined that a final regulatory flexibility analysis is required for this final regulation under 5 U.S.C. 604. This analysis is set forth later in this preamble under the heading "Final Regulatory Flexibility Analysis."

Section 202 of the Unfunded Mandates Reform Act of 1995 ("Unfunded Mandates Act"), Public Law 104–4 (March 22, 1995), requires that an agency prepare a budgetary impact statement before promulgating a rule that may result in expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year. If a budgetary impact statement is required, section 205 of the Unfunded Mandates Act also requires an agency to

USA-LOV-001227

identify and consider a reasonable number of regulatory alternatives before promulgating a rule. Please see the Regulatory Assessment for a discussion of the budgetary impact of this final rule.

Pursuant to section 7805(f) of the Internal Revenue Code, the notice of proposed rulemaking was submitted to Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business and no comments were received.

*A. Regulatory Assessment Under E.O. 12866, as Supplemented by E.O 13563*

**1. Statement of the Need for the Regulatory Action**

Although the IRS has exercised its authority to regulate attorneys, certified public accountants, and other specified tax professionals, regulations under Circular 230 currently do not apply to a critical group of tax professionals: Tax return preparers. As discussed in the Report, taxpayers' reliance on tax return preparers has grown steadily in recent decades. The number of taxpayers who prepared their own tax returns without assistance fell by more than two-thirds between 1993 and 2010. In fact, today, tax return preparers assist a majority of U.S. taxpayers in meeting their Federal tax filing obligations. In 2008 and 2009, for example, paid tax return preparers, including attorneys, certified public accountants, enrolled agents, and unenrolled tax return preparers, prepared almost 60 percent of all federal tax returns filed, including approximately 87 million Federal individual income tax returns. The IRS expects these numbers to increase in 2010 and the coming years.

Tax return preparers are not only responsible for assisting taxpayers in filing complete, timely, and accurate returns, but also help educate taxpayers about the tax laws, and facilitate electronic filing. Tax return preparers provide advice to taxpayers, identify items or issues for which the law or guidance is unclear, and inform taxpayers of the benefits and risks of positions taken on a tax return, and the tax treatment or reporting of items and transactions. The IRS and the Treasury Department recognize that the majority of tax return preparers serve the interests of their clients and the tax system by preparing complete and accurate returns.

The tax system is best served by tax return preparers who are ethical, provide good service, and are qualified. Recent government studies, including studies from the Government

Accountability Office and the Treasury Inspector General for Tax Administration, see, for example, Government Accountability Office, *Paid Tax Return Preparers: In a Limited Study, Chain Preparers Made Serious Errors*, GAO–06–563T (Apr. 4, 2006); Treasury Inspector General for Tax Administration, *Most Tax Returns Prepared by a Limited Sample of Unenrolled Preparers Contained Significant Errors*, Rept. # 2008–40–171 (Sept. 3, 2008), illustrate the losses incurred by both taxpayers and the system of Federal tax administration when tax return preparers fail to properly prepare tax returns. Additionally, many of the more than 500 public comments received by the IRS during the agency's review of the return preparer industry expressed concern for taxpayers, tax administration and the return preparer industry, all of whom are hurt when tax returns are not accurately prepared.

An overwhelming number of commentators (98 percent of the persons who offered comments on oversight and enforcement) supported increased government oversight of tax return preparers, particularly for individuals who are not attorneys, certified public accountants or others currently authorized to practice before the IRS. These commentators argued that taxpayers, the IRS and tax administration generally would benefit from the registration of tax return preparers. Eighty-eight percent of the persons who expressed an opinion on registering paid tax return preparers favor registration. Ninety percent of the persons who commented on testing and education favor minimum education or testing requirements for paid tax return preparers. And 98 percent of the persons who commented on quality and ethics favor establishment of quality and ethics standards for paid tax return preparers.

Because the IRS has not adopted a uniform set of regulations for tax return preparers, the amount of oversight of tax return professionals varies greatly depending on professional affiliations and the geographic area in which they practice. Most tax return preparers do not have to pass any government or professionally mandated competency requirement. Most tax return preparers are not required to participate in a specified program of continuing professional education. And the ethical rules found in Circular 230 currently are not applicable to all tax return preparers.

As such, the IRS recognizes the need to apply a uniform set of rules to offer taxpayers some assurance that their tax

returns are prepared completely and accurately. Increasing the completeness and accuracy of returns would necessarily lead to increased compliance with tax obligations by taxpayers.

**2. Potentially Affected Tax Returns**

These regulations generally extend pre-existing regulations that apply to attorneys, certified public accountants and other specified tax professionals to tax return preparers, including currently unenrolled tax return preparers, who prepare all or substantially all of a tax return or claim for refund for compensation. The rules potentially apply to all returns prepared by tax return preparers regardless of the taxpayer. For example, the rules apply to self-employed tax return preparers who prepare individual tax returns for persons who have only wage and interest income. The IRS is authorized to extend the application of the rule to corporate and large partnership returns, which are prepared predominately by tax return preparers employed by large accounting firms. These examples are nonexclusive and the application or potential application of these rules is not limited to only those tax return preparers covered by the examples.

The current expansion of these regulations to currently unenrolled tax return preparers will impact individual taxpayers more than large corporate taxpayers.

**3. An Assessment of Benefits Anticipated From the Regulatory Action**

The primary benefit anticipated from these regulations is that they will improve the accuracy, completeness, and timeliness of tax returns prepared by tax return preparers. As illustrated in the recent government studies, including the IRS' recent review of the tax return preparer industry, inaccurate tax returns are costly both to taxpayers and the government. Inaccurate returns may affect the finances of taxpayers, who might overpay their respective share of taxes or fail to take advantage of available tax benefits. Inaccurate tax returns may also affect the U.S. government because of overpayments, underpayments and increased costs of enforcement and collection.

The regulations are expected to improve the accuracy, completeness, and timeliness of tax returns in a number of ways. First, requiring registered tax return preparers to demonstrate the necessary qualifications to provide a valuable service by successfully completing a government or professionally mandated competency examination and continued competence

USA-LOV-001228

by completing the specified continuing education credits annually will result in more competent and ethical tax return preparers who are well educated in the rules and subject matter. A more competent and ethical tax return preparer community will prevent costly errors, potentially saving taxpayers from unwanted problems and relieving the IRS from expending valuable examination and collection resources. Thus, regulations are critical to assisting the IRS curtail the activities of noncompliant and unethical tax return preparers.

Second, these regulations, in association with new and separate regulations under section 6109 requiring all individuals who prepare all or substantially all of a tax return for compensation to obtain a PTIN, are expected to improve the accuracy, completeness and timeliness of tax returns because they will help the IRS identify tax return preparers and the tax returns and claims for refund that they prepare, which will aid the IRS' oversight of tax return preparers, and to administer requirements intended to ensure that tax return preparers are competent, trained, and conform to rules of practice. Individuals who prepare all or substantially all of a tax return or claim for refund will be required to obtain a PTIN prescribed by the IRS and furnish the PTIN when the tax return preparer signs (as the tax return preparer) a tax return or claim for refund. Given the important role that tax

return preparers play in Federal tax administration, the IRS has a significant interest in being able to accurately identify tax return preparers and monitor the tax return preparation activities of these individuals. These regulations, in conjunction with the final PTIN regulations, will enable the IRS to more accurately identify tax return preparers and improve the IRS' ability to associate filed tax returns and refund claims with the responsible tax return preparer.

Third, the regulations are expected to improve the accuracy of tax returns by providing that all registered tax return preparers are practicing before the IRS and, therefore, are practitioners subject to the ethical standards of conduct in Circular 230. This change will authorize the IRS to inquire into possible misconduct and institute disciplinary proceedings relating to registered tax return preparer misconduct under the provisions of Circular 230. A registered tax return preparer who is shown to be incompetent or disreputable, fails to comply with the provisions in Circular 230, or with intent to defraud, willfully and knowingly misleads or threatens a client or prospective client, is subject to censure, suspension, or disbarment from practice before the IRS, as well as a monetary penalty.

The availability of these sanctions will act as a deterrent to registered tax return preparers engaging in misconduct because disreputable or incompetent registered tax return preparers who are

suspended or disbarred from practice will no longer be able to prepare tax returns, claims for refund, and other documents submitted to the IRS. Competent and ethical tax return preparers who are well educated in the rules and subject matter of their field can prevent costly errors, potentially saving a taxpayer from unwanted problems later on and relieving the IRS from expending valuable examination and collection resources.

The IRS and the Treasury Department expect that the largest marginal improvements in accuracy will be with regard to tax returns prepared by tax return preparers who previously were unregulated through the Circular 230 requirements. Unlike certified public accountants, attorneys, and enrolled agents, unenrolled tax return preparers generally are not subject to any form of testing, continuing professional education, or uniform ethical standards. The tax returns prepared by unenrolled tax return preparers may involve tax issues that are less complicated and smaller in amount than issues in tax returns prepared by other types of tax professionals. In addition, individual taxpayers may face a variety of complex tax issues, for which the advice of a qualified tax advisor will improve the accuracy on the return.

4. An Assessment of Costs Anticipated From the Regulatory Action

There are various costs anticipated from this regulatory action.

| Cost category | Preliminary cost estimate |
| --- | --- |
| COMPETENCY EXAMINATION: | *Costs to Registered Tax Return Preparers:* |
| • Costs to registered tax preparers: Costs associated with taking a minimum competency examination (including costs of examination, amount of time required to study for the exam, and any associated travel). | The costs associated with competency examinations for registered tax preparers are currently unknown. The competency examination has not been developed and an examination vendor has not been selected. The cost of the examination and amount of time required to study for it, therefore, are unknown. The costs for any associated travel will depend on what locations the test is offered in and how close the applicant lives to those locations. While there is currently no vendor for the examination, it is expected that the vendor will offer the test in many locations across the United States and multiple locations outside the United States. |
| | *Costs to Vendors:* |
| • Costs to vendors: User fee costs IRS will charge to recover the costs to third-party vendors who administer the registered tax return preparer competency examination. | The vendor for the examination has not been selected so these fees cannot yet be determined. |
| | *Costs to Government:* |
| • Costs to government: Costs associated with creating, administrating, and reviewing competency exams. | These costs are currently unknown. The costs to the government will depend, in part, on which functions will be performed by a vendor. Also, the vendor may recover the vendor's associated costs through a separate fee charged by the vendor. |
| PTIN: | *Costs to Registered Tax Return Preparers and Certain Other Individuals Eligible to Receive a PTIN Under Notice 2011–6:* |

USA-LOV-001229

| Cost category | Preliminary cost estimate |
|---|---|
| • Costs to registered tax preparers: User fees for applying for a PTIN and renewing a PTIN. | The fees registered tax preparers and certain other individuals under Notice 2011–6 will face for applying for a PTIN and renewing a PTIN is $64.25 annually. Given that there are an estimated 800,000 to 1,200,000 individuals who will apply for or renew a PTIN annually, we estimate that the aggregate annual PTIN registration costs will be from $51 million to $77 million. |
| • Costs to vendors: User fee assessed by third-party vendor to administer the PTIN application and renewal process. | *Costs to Vendors:* <br> The fee charged by the vendor is $14.25. The $14.25 fee reflects costs incurred by the vendor in processing a PTIN application or renewal. Given that there are an estimated 800,000 to 1,200,000 individuals who will apply for or renew a PTIN annually, we estimate that the aggregate annual PTIN registration costs will be from $11 million to $17 million. |
| • Costs to government: Administration of PTIN registration program. | *Costs to Government:* <br> The $50 annual fee is expected to recover the $59,427,633 annual costs the government will face in its administration of the PTIN registration program. This fee includes: (1) The costs the government faces in administering registration cards or certificates for each registered tax preparer, (2) costs associated with prescribing by forms, instructions, or other guidance which forms and schedules registered tax preparers can sign for, and (3) tax compliance and suitability checks conducted by the government. |
| **RECORDKEEPING:** | |
| • Costs to continuing education providers: Recordkeeping requirements on continuing education providers to maintain records and educational material concerning these programs and the individuals who attend them. | *Costs to Continuing Education Providers:* <br> $38,632,500 annual costs. |
| • Costs to registered tax preparers: Recordkeeping requirements on registered tax preparers to maintain records and educational materials regarding the completion of the required qualifying continuing education credits. | *Costs to Registered Tax Return Preparers:* <br> $9,880,000 annual costs. |
| **CONTINUING EDUCATION:** | |
| • Costs to registered tax preparers: Completing continuing education coursework requirement. | *Costs to Registered Tax Return Preparers:* <br> We do not have a cost estimate available for continuing education costs borne by the tax preparers. The cost of continuing education courses generally range from $20 to $300 per course. |
| • Costs to continuing education providers: Obtaining required numbers from the IRS. | *Costs to Continuing Education Providers:* <br> Continuing education providers are not currently charged a fee for obtaining a provider number or program number. |
| **FINGERPRINTING:** | |
| • Costs to registered tax return preparers: Fingerprinting | *Costs to Registered Tax Return Preparers and Certain Other Individuals Eligible to Receive a PTIN Under Notice 2011–6:* <br> The fees that will be imposed on registered tax return preparers and certain other individuals eligible to receive a PTIN under Notice 2011–6 for fingerprinting are not available because the vendor processing the fingerprinting check has not been selected. |

Tax return preparers will incur costs associated with taking a minimum competency examination, including the cost of the examination, the amount of time required to study for the examination, and any associated travel depending on the proximity of tax return preparer to the test site location. Although it is anticipated that the vendor will offer the test at multiple locations in the United States and outside the United States, the vendor and the test locations have not been selected at this time. Future regulations will be proposed that address the costs to the government for creating, administering, and reviewing the examination and the user fee the IRS will charge to recover these costs. The third-party vendor who helps administer the registered tax return preparer competency examination also will charge a reasonable fee to take the registered tax return preparer examination and a reasonable fee to be fingerprinted.

Additionally, preparers are subject to user fees for applying for a PTIN and renewing the PTIN. Final regulations establish a $50 fee to apply for a PTIN. A third party vendor administers the PTIN application and renewal process and charges a $14.25 fee that is independent of the user fee charged by the government.

The PTIN user fee recovers the full cost to the government to administer the PTIN application and renewal program. The administration of the PTIN application and renewal program requires the use of IRS services, goods, and resources. For the PTIN application and renewal program to be self-sustaining, the IRS must charge a user fee to recover the costs of providing the special benefits associated with PTIN. A PTIN confers a special benefit because without a PTIN, a tax return preparer could not receive compensation for preparing all or substantially all of a

USA-LOV-001230

Federal tax return or claim for refund. This analysis is consistent with the current practice of charging a user fee on individuals seeking to become enrolled agents. Being an enrolled agent confers special benefits; and, therefore, the IRS currently charges a user fee on applicants seeking those special benefits.

Tax return preparers will incur recordkeeping and other costs associated with taking continuing education classes and any associated travel. Section 10.6 of these final regulations requires a registered tax return preparer to maintain records and educational materials regarding the completion of the required qualifying continuing education credits. The IRS and the Treasury Department estimate that there are 650,000 practitioners who will be affected by these recordkeeping requirements and the estimated annual burden per practitioner will vary from 30 minutes to one hour, depending on individual circumstances, with an estimated average of 54 minutes. The total annual costs resulting from these recordkeeping requirements will be $9,880,000 for all affected practitioners.

Continuing education providers will be subject to recordkeeping costs. Section 10.9 of these final regulations requires providers of qualifying continuing education programs to maintain records and educational material concerning these programs and the individuals who attend them. Approximately 500 continuing education providers are currently approved to provide continuing education programs for the approximately 50,000 enrolled agents, enrolled actuaries and enrolled retirement plan agents who must complete continuing education currently, but the IRS and the Treasury Department estimate that there are 2,250 continuing education providers who will be affected by these recordkeeping requirements and the estimated annual burden per continuing education provider will vary from 5 hours to 5,000 hours, depending on individual circumstances, with an estimated average of 500 hours. The estimated total annual costs resulting from these requirements will be $38,632,500 for all affected continuing education providers.

Currently, the cost to the tax return preparer of any particular continuing education course can vary greatly from free to hundreds of dollars. Many tax return preparation firms either provide continuing education courses at the firm to their employees for no charge or sponsor the cost of external courses for their employees. Other tax return preparers, however, will have to

personally pay the cost of each continuing education course, which generally ranges anywhere from $20 to $300 per course depending on whether the continuing education provider offers the course in person, online, or over the phone. Tax return preparers also may incur additional costs if they travel to attend continuing education programs. These costs may include the time to travel to the program, transportation, lodging and incidentals.

Entities may be directly affected by the competency examination, PTIN and continuing education costs if they choose to pay any or all of the user fees or expenses for their employees. Some individuals and entities also may lose sales and profits while preparers are studying and sitting for the examination or taking the continuing education courses. Finally, individual tax return preparers and entities that employ individuals who prepare tax returns may need to close or change their business model if all, or a majority, of their employees cannot satisfy the necessary qualifications and competency requirements. The IRS and the Treasury Department believe that only a small percentage of tax return preparers will need to close or change their business model based upon these rules.

5. An Assessment of Costs and Benefits of Potential Alternatives

The IRS and the Treasury Department considered various alternatives in determining the best ways to implement proposed changes to the regulation of tax return preparers. In order to place the costs and benefits of the final rule in context, E.O. 12866 requires a comparison between the final rule, a baseline of what the world would look like without the final rule, and reasonable alternatives to the proposed rule.

i. Baseline Scenario

Under a baseline scenario, the current ethical standards in Circular 230 would continue to apply only to attorneys, certified public accountants, enrolled agents, and other practitioners who prepare tax returns and claims for refund, but not to unenrolled tax return preparers. Also, any unenrolled tax return preparer under this baseline scenario would be able to prepare and sign tax returns and claims for refund without passing an examination to establish competence or satisfying continuing education requirements.

Remaining under the current rules regarding tax return preparers would eliminate the benefits of the rule described in section A3 of this

preamble. For example, under the baseline, OPR would not be authorized to institute disciplinary proceedings seeking disciplinary sanctions against unenrolled tax return preparers.

Continuing to authorize any individual to prepare tax returns and claims for refund for compensation without passing an examination or taking continuing education courses also would eliminate any costs associated with the rule described in section A4 of this preamble. Tax return preparers, however, would still potentially be subject to user fees for obtaining a PTIN and renewing the PTIN if other Treasury Department and IRS regulations specifically prescribed those fees.

ii. Alternative One

The first alternative that was considered is to require all tax return preparers to comply with the ethical standards in Circular 230, but not to require any tax return preparer to pass an examination and complete continuing education courses. Under this alternative, the provisions of the rule clarifying that tax return preparers are subject to the ethical rules in Circular 230 would remain intact, but all of the other changes would not be adopted.

The benefits resulting from this alternative would likely be less than the benefits resulting from these regulations because tax return preparers would not need to meet a minimum competency level and keep educated and up-to-date on Federal tax issues. The most significant drawback to this alternative is the potential loss of these benefits and the benefits that result from monitoring the return preparation activities of tax return preparers generally. Under this alternative, however, tax return preparers would not incur the majority of costs that exist under the regulations.

iii. Alternative Two

A second alternative is to require tax return preparers who are not currently authorized to practice before the IRS to apply for such authorization with the IRS, satisfy annual continuing education requirements, and meet certain ethical standards, but not to pass a minimum competency examination. This alternative is identical to the regulations other than requiring certain preparers to successfully pass an examination administered by, or under the oversight of, the IRS.

The benefits resulting from this alternative are more comparable to the benefits in the regulations than under alternative one. Nevertheless, the lack of an examination would not be as

USA-LOV-001231

effective in ensuring that tax return preparers are qualified to obtain professional credentials and practice before the IRS. Tax return preparers under this alternative would incur all of the same costs that are in the regulations other than the costs associated with taking the examination.

iv. Alternative Three

A third alternative is to "grandfather in" unenrolled tax return preparers who have accurately and competently prepared tax returns for a certain amount of years. This alternative is the same as the rules in the regulations other than authorizing some unenrolled return preparers who have a specified amount of prior experience preparing tax returns and claims for refund to continue to prepare and sign returns without passing a minimum competency examination.

The benefits resulting from this alternative would likely be less than the benefits resulting from these regulations because the IRS and the Treasury Department believe a minimum level of competency needs to be assured through examination. Additionally, this alternative is not as likely to promote the same taxpayer confidence in the tax return preparation community as the regulations, which may, in turn, influence taxpayers when choosing a tax return preparer. Tax return preparers under this alternative would incur all of the same costs that are in the regulations except certain unenrolled preparers would avoid the costs associated with taking the examination.

v. Alternative Four

A fourth alternative is to require all tax return preparers, regardless of whether the tax return preparer is supervised, to complete the competency examination and continuing education requirements. This alternative is identical to the proposed regulations, which proposed requiring all unenrolled tax return preparers to meet the examination and education requirements.

Numerous commentators suggested that the costs of requiring testing and continuing education for tax return preparers who are supervised by attorneys, certified public accountants and enrolled agents outweighed the attendant benefits. After fully considering these comments, the IRS decided that the best alternative was not requiring testing and continuing education for tax return preparers who are employed by law firms, certified public accounting firms and certain other recognized firms and are supervised by attorneys, certified public

accountants, enrolled agents, enrolled retirement plan agents and enrolled actuaries who sign the returns that these individuals prepare.

*B. Final Regulatory Flexibility Analysis*

When an agency promulgates a final regulation that follows a required notice of proposed rulemaking, the Regulatory Flexibility Act (5 U.S.C. chapter 6) (RFA) requires the agency "to prepare a final regulatory flexibility analysis." A final regulatory flexibility analysis must, pursuant to 5 U.S.C. 604(a), contain the five elements listed in this final regulatory flexibility analysis. Section 605 of the RFA provides an exception to this requirement if the agency certifies that the rulemaking will not have a significant economic impact on a substantial number of small entities. A small entity is defined as a small business, small nonprofit organization, or small governmental jurisdiction. See 5 U.S.C. 601(3) through (6). The IRS and the Treasury Department conclude that the final regulations will impact a substantial number of small entities and the economic impact will be significant. As a result, a regulatory flexibility analysis is required.

1. Statement of the Need for and Objectives of The Proposed Rule

Tax return preparers are critical to ensuring compliance with the Federal tax laws and are an important component in the IRS' administration of those laws. More than eighty percent of U.S. taxpayers use a tax return preparer or consumer tax return preparation software to help prepare and file tax returns. Most tax return preparers are currently not subject to the ethical rules governing practice before the IRS and do not have to pass any competency requirement established by the government or a professional organization. After completing a comprehensive six-month review of tax return preparers, which included receiving input through public forums, solicitation of written comments, and meetings with advisory groups, the IRS concluded that there is a need for increased oversight of the tax return preparer industry.

The principal objective of the regulations is to increase oversight of tax return preparers and to provide guidance to tax return preparers about the new requirements imposed on them under Circular 230. These regulations implement higher standards for the tax return preparer community with the goal of significantly enhancing protections and service for taxpayers, increasing confidence in the tax system,

and resulting in greater long-term compliance with the tax laws.

Specifically, the regulations clarify that a registered tax return preparer is a practitioner practicing before the IRS and thereby is subject to the ethical rules in Circular 230. The regulations require a registered tax return preparer to demonstrate the necessary qualifications and competency to advise and assist other persons in the preparation of all or substantially all of a tax return or claim for refund.

2. Summaries of the Significant Issues Raised in the Public Comments Responding to the Initial Regulatory Flexibility Analysis and of the Agency's Assessment of the Issues, and a Statement of Any Changes to the Rule as a Result of the Comments

The IRS did not receive specific comments from the public responding to the initial regulatory flexibility analysis in these final regulations. The IRS did receive comments from the public on the proposed amendments to 31 CFR part 10. A summary of the comments is set forth elsewhere in this preamble, along with the Treasury Department's and the IRS' assessment of the issues raised in the comments and descriptions of any revisions resulting from the comments.

3. Description and Estimate of the Number of Small Entities Subject to the Rule

The regulations affect individuals currently working as paid tax return preparers, individuals who want to become designated as a registered tax return preparer under the new oversight rules in Circular 230, and those small entities that are owned by or employ paid preparers. Only individuals, not businesses, can practice before the IRS or become a registered tax return preparer. Thus, the economic impact of these regulations on any small entity generally will be a result of an unenrolled individual owning a small business or on a small business that otherwise employs unenrolled paid return preparers.

The appropriate North American Industry Classification System (NAICS) codes for tax return preparers relate to tax preparation services (NAICS code 541213) and other accounting services (NAICS code 541219). Entities identified under these codes are considered small under the Small Business Administration size standards (13 CFR 121.201) if their annual revenue is less than $7 million or $8.5 million, respectively. The IRS estimates that approximately seventy to eighty percent of the individuals subject to these

USA-LOV-001232

regulations are paid preparers operating as or employed by small entities.

4. Description of the Projected Reporting, Recordkeeping and Related Requirements of the Rule, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirements and the Type of Professional Skills Necessary for Preparation of the Report or Record

The IRS estimates that there are approximately 600,000 to 700,000 unenrolled tax return preparers who are currently not attorneys, certified public accountants, or enrolled agents and who will seek status as a registered tax return preparer. Under the regulations, tax return preparers who become registered tax return preparers are subject to a recordkeeping requirement within the meaning of the Paperwork Reduction Act because they are required to maintain records and educational materials regarding their satisfaction of the qualifying continuing education requirements. These recordkeeping requirements do not require any specific professional skills other than general recordkeeping skills already needed to own and operate a small business or to competently act as a tax return preparer. It is estimated that practitioners will annually spend approximately 30 minutes to one hour in maintaining the required records, depending on individual circumstances.

The estimated 2,250 providers of qualifying continuing education programs will be required to maintain records and educational material concerning these programs and the persons who attended them. These continuing education providers will annually spend approximately five minutes per attendee per program maintaining the required records.

As previously discussed in section A4 of this preamble, the rule contains a number of other compliance requirements not subject to the Paperwork Reduction Act. These include the costs tax return preparers incur to take a competency examination, costs for continuing education classes, and other incidental costs and user fees. Small entities may be directly affected by these costs if they choose to pay any or all of these fees for their employees. In some cases, small entities may lose sales and profits while their employees prepare for and take the examination or participate in continuing education courses. Finally, some small entities that employ individuals who prepare tax returns may need to alter their business model if a significant number of their employees cannot satisfy the necessary qualifications and

competency requirements. The IRS and the Treasury Department believe that only a small percentage of small entities, if any, may need to cease doing business or radically change their business model due to these rules.

5. A Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting Any Alternative Adopted in the Final Rule and Why Other Significant Alternatives Affecting the Impact on Small Entities That the Agency Considered Were Rejected

The Treasury Department and the IRS have considered alternatives to the final regulations at multiple points. These final regulations are, in large measure, an outgrowth of, and in part carry out, the Report, which extensively reviewed different approaches to improving how the IRS oversees and interacts with tax return preparers. As part of the Report, the IRS received a large volume of comments on the oversight and enforcement of tax return preparers from all interested parties, including tax professional groups representing large and small entities, Federal and state organizations, IRS advisory groups, software vendors, individual return preparers, and the public. The input received from this large and diverse community overwhelmingly expressed support for the requirements proposed in the Report.

In concert with this tremendous public support for increased IRS oversight of tax return preparers, the IRS and the Treasury Department considered various alternatives in determining the best ways to implement proposed changes to the regulation of paid preparers. These alternatives included:

(1) Requiring all tax return preparers to comply with the ethical standards in Circular 230 or a code of ethics similar to Circular 230, but not requiring any tax return preparers to demonstrate their qualifications and competency;

(2) Requiring tax return preparers who are not currently authorized to practice before the IRS to apply for authorization with the IRS, satisfy annual continuing education requirements, and meet certain ethical standards, but not to pass a minimum competency examination;

(3) Requiring all tax return preparers who are not currently authorized to practice before the IRS to pass a minimum competency examination and meet other requirements, but "grandfather in" tax return preparers

who have accurately and competently prepared tax returns for a certain number of years; and

(4) Requiring all unenrolled tax return preparers to complete testing and continuing education requirements.

The proposed regulations proposed that all unenrolled tax return preparers must complete testing and continuing education requirements. Many commentators on the proposed regulations expressed support for efforts to increase the oversight of tax return preparers, particularly for those who are not attorneys, certified public accountants, or other individuals previously authorized to practice before the IRS. As discussed in this preamble, many commentators requested, however, that the IRS exempt individuals who prepare tax returns under the supervision of Circular 230 practitioners from the requirements of these regulations. These commentators were concerned that unnecessary time and cost would be incurred with respect to the testing and continuing education requirements for individuals who do not sign tax returns but prepare them under the supervision of a practitioner ultimately responsible for the tax return. In response to these comments, the IRS published Notice 2011–6, generally allowing individuals to obtain PTINs if the individuals are employed by law firms, certified public accounting firms and certain other recognized firms and who are supervised by attorneys, certified public accountants, enrolled agents, enrolled retirement plan agents and enrolled actuaries who sign the returns that these individuals prepare. This step taken by the IRS will minimize the economic impact of these regulations on many small entities in which attorneys, certified public accountants, enrolled agents, enrolled retirement plan agents, or enrolled actuaries supervise and sign tax returns prepared individuals who are not attorneys, certified public accountants, or enrolled agents.

The IRS also received comments objecting to the rule in the proposed regulations requiring continuing education providers to obtain continuing education program approval from the IRS for each continuing education program offered. In response to these comments the IRS, the IRS eliminated such a requirement. This step taken by the IRS will minimize the economic impact of these regulations on some small entities that offer continuing education programs. These regulations do require continuing education providers to obtain a continuing education provider number and a continuing education provider program

USA-LOV-001233

number. Although the IRS is not currently proposing charging providers a fee to obtain a continuing education provider number or a continuing education provider program number, these regulations provide that the payment of any applicable user fee established in future regulations is required to obtain either number.

The Treasury Department and the IRS are not aware of any additional steps that the IRS could take to minimize the economic impact on small entities that would be consistent with the objectives of these final regulations. These regulations do not impose any more requirements on small entities than are necessary to effectively administer the internal revenue laws. These regulations do not subject small entities to requirements that are not also applicable to larger entities covered by the regulations. After considering the alternatives and the input provided through the public comment process, the IRS and the Treasury Department concluded that the provisions of the final regulations are necessary for sound tax administration and are the best way to increase oversight of all paid preparers. The testing requirements in the rules will ensure that tax return preparers pass a minimum competency examination to obtain their professional credentials, while the continuing education requirements will help ensure that tax return preparers remain current on Federal tax law and continue to expand their tax knowledge. The extension of the rules in Circular 230 to registered tax return preparers will require all practitioners to meet certain ethical standards and allow the IRS to suspend or otherwise discipline tax return preparers who engage in unethical or disreputable conduct. Accordingly, the implementation of the qualification and competency standards in these rules is expected to increase taxpayer compliance, ensure uniformity, and allow taxpayers to be confident that the tax return preparers to whom they turn for assistance are knowledgeable, skilled and ethical.

**Drafting Information**

The principal author of these regulations is Matthew D. Lucey of the Office of the Associate Chief Counsel (Procedure and Administration).

**List of Subjects in 31 CFR Part 10**

Accountants, Administrative practice and procedure, Lawyers, Reporting and recordkeeping requirements, Taxes.

**Adoption of Amendments to the Regulations**

Accordingly, 31 CFR part 10 is amended to read as follows:

**PART 10—PRACTICE BEFORE THE INTERNAL REVENUE SERVICE**

■ **Paragraph 1.** The authority citation for 31 CFR part 10 is revised to read as follows:

**Authority:** Sec. 3, 23 Stat. 258, secs. 2–12, 60 Stat. 237 et seq.; 5 U.S.C. 301, 500, 551–559; 31 U.S.C. 321; 31 U.S.C. 330; Reorg. Plan No. 26 of 1950, 15 FR 4935, 64 Stat. 1280, 3 CFR, 1949–1953 Comp., p. 1017.

■ **Par. 2.** Section 10.0 is revised to read as follows:

**§ 10.0  Scope of part.**

(a) This part contains rules governing the recognition of attorneys, certified public accountants, enrolled agents, enrolled retirement plan agents, registered tax return preparers, and other persons representing taxpayers before the Internal Revenue Service. Subpart A of this part sets forth rules relating to the authority to practice before the Internal Revenue Service; subpart B of this part prescribes the duties and restrictions relating to such practice; subpart C of this part prescribes the sanctions for violating the regulations; subpart D of this part contains the rules applicable to disciplinary proceedings; and subpart E of this part contains general provisions relating to the availability of official records.

(b) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 3.** Section 10.1 is revised to read as follows:

**§ 10.1  Offices.**

(a) *Establishment of office(s).* The Commissioner shall establish the Office of Professional Responsibility and any other office(s) within the Internal Revenue Service necessary to administer and enforce this part. The Commissioner shall appoint the Director of the Office of Professional Responsibility and any other Internal Revenue official(s) to manage and direct any office(s) established to administer or enforce this part. Offices established under this part include, but are not limited to:

(1) The Office of Professional Responsibility, which shall generally have responsibility for matters related to practitioner conduct and discipline, including disciplinary proceedings and sanctions; and

(2) An office with responsibility for matters related to authority to practice before the Internal Revenue Service, including acting on applications for enrollment to practice before the Internal Revenue Service and administering competency testing and continuing education.

(b) Officers and employees within any office established under this part may perform acts necessary or appropriate to carry out the responsibilities of their office(s) under this part or as otherwise prescribed by the Commissioner.

(c) *Acting.* The Commissioner will designate an officer or employee of the Internal Revenue Service to perform the duties of an individual appointed under paragraph (a) of this section in the absence of that officer or employee or during a vacancy in that office.

(d) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 4.** Section 10.2 is amended by revising paragraphs (a)(4) and (a)(5), adding paragraph (a)(8), and revising paragraph (b) to read as follows:

**§ 10.2  Definitions.**

(a) * * *

(4) *Practice before the Internal Revenue Service* comprehends all matters connected with a presentation to the Internal Revenue Service or any of its officers or employees relating to a taxpayer's rights, privileges, or liabilities under laws or regulations administered by the Internal Revenue Service. Such presentations include, but are not limited to, preparing documents; filing documents; corresponding and communicating with the Internal Revenue Service; rendering written advice with respect to any entity, transaction, plan or arrangement, or other plan or arrangement having a potential for tax avoidance or evasion; and representing a client at conferences, hearings, and meetings.

(5) *Practitioner* means any individual described in paragraphs (a), (b), (c), (d), (e), or (f) of § 10.3.

*   *   *   *   *

(8) *Tax return preparer* means any individual within the meaning of section 7701(a)(36) and 26 CFR 301.7701–15.

(b) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 5.** Section 10.3 is amended by:
■ 1. Revising paragraphs (d)(3) and (e)(3);
■ 2. Redesignating paragraphs (f), (g), (h), and (i) as paragraphs (g), (h), (i), and (j) respectively;
■ 3. Adding new paragraph (f); and
■ 4. Revising newly designated paragraph (j).

USA-LOV-001234

The revisions and additions read as follows:

## §10.3  Who may practice.

\*    \*    \*    \*    \*

(d) \* \* \*

(3) An individual who practices before the Internal Revenue Service pursuant to paragraph (d)(1) of this section is subject to the provisions of this part in the same manner as attorneys, certified public accountants, enrolled agents, enrolled retirement plan agents, and registered tax return preparers.

(e) \* \* \*

(3) An individual who practices before the Internal Revenue Service pursuant to paragraph (e)(1) of this section is subject to the provisions of this part in the same manner as attorneys, certified public accountants, enrolled agents, enrolled actuaries, and registered tax return preparers.

(f) *Registered tax return preparers.* (1) Any individual who is designated as a registered tax return preparer pursuant to § 10.4(c) of this part who is not currently under suspension or disbarment from practice before the Internal Revenue Service may practice before the Internal Revenue Service.

(2) Practice as a registered tax return preparer is limited to preparing and signing tax returns and claims for refund, and other documents for submission to the Internal Revenue Service. A registered tax return preparer may prepare all or substantially all of a tax return or claim for refund of tax. The Internal Revenue Service will prescribe by forms, instructions, or other appropriate guidance the tax returns and claims for refund that a registered tax return preparer may prepare and sign.

(3) A registered tax return preparer may represent taxpayers before revenue agents, customer service representatives, or similar officers and employees of the Internal Revenue Service (including the Taxpayer Advocate Service) during an examination if the registered tax return preparer signed the tax return or claim for refund for the taxable year or period under examination. Unless otherwise prescribed by regulation or notice, this right does not permit such individual to represent the taxpayer, regardless of the circumstances requiring representation, before appeals officers, revenue officers, Counsel or similar officers or employees of the Internal Revenue Service or the Treasury Department. A registered tax return preparer's authorization to practice under this part also does not include the authority to provide tax advice to a client or another person except as necessary to prepare a tax return, claim for refund, or other document intended to be submitted to the Internal Revenue Service.

(4) An individual who practices before the Internal Revenue Service pursuant to paragraph (f)(1) of this section is subject to the provisions of this part in the same manner as attorneys, certified public accountants, enrolled agents, enrolled retirement plan agents, and enrolled actuaries.

\*    \*    \*    \*    \*

(j) *Effective/applicability date.* This section is generally applicable beginning August 2, 2011.

■ Par. 6. Section 10.4 is revised to read as follows:

## §10.4  Eligibility to become an enrolled agent, enrolled retirement plan agent, or registered tax return preparer.

(a) *Enrollment as an enrolled agent upon examination.* The Commissioner, or delegate, will grant enrollment as an enrolled agent to an applicant eighteen years of age or older who demonstrates special competence in tax matters by written examination administered by, or administered under the oversight of, the Internal Revenue Service, who possesses a current or otherwise valid preparer tax identification number or other prescribed identifying number, and who has not engaged in any conduct that would justify the suspension or disbarment of any practitioner under the provisions of this part.

(b) *Enrollment as a retirement plan agent upon examination.* The Commissioner, or delegate, will grant enrollment as an enrolled retirement plan agent to an applicant eighteen years of age or older who demonstrates special competence in qualified retirement plan matters by written examination administered by, or administered under the oversight of, the Internal Revenue Service, who possesses a current or otherwise valid preparer tax identification number or other prescribed identifying number, and who has not engaged in any conduct that would justify the suspension or disbarment of any practitioner under the provisions of this part.

(c) *Designation as a registered tax return preparer.* The Commissioner, or delegate, may designate an individual eighteen years of age or older as a registered tax return preparer provided an applicant demonstrates competence in Federal tax return preparation matters by written examination administered by, or administered under the oversight of, the Internal Revenue Service, or otherwise meets the requisite standards prescribed by the Internal Revenue Service, possesses a current or otherwise valid preparer tax identification number or other prescribed identifying number, and has not engaged in any conduct that would justify the suspension or disbarment of any practitioner under the provisions of this part.

(d) *Enrollment of former Internal Revenue Service employees.* The Commissioner, or delegate, may grant enrollment as an enrolled agent or enrolled retirement plan agent to an applicant who, by virtue of past service and technical experience in the Internal Revenue Service, has qualified for such enrollment and who has not engaged in any conduct that would justify the suspension or disbarment of any practitioner under the provisions of this part, under the following circumstances:

(1) The former employee applies for enrollment on an Internal Revenue Service form and supplies the information requested on the form and such other information regarding the experience and training of the applicant as may be relevant.

(2) The appropriate office of the Internal Revenue Service provides a detailed report of the nature and rating of the applicant's work while employed by the Internal Revenue Service and a recommendation whether such employment qualifies the applicant technically or otherwise for the desired authorization.

(3) Enrollment as an enrolled agent based on an applicant's former employment with the Internal Revenue Service may be of unlimited scope or it may be limited to permit the presentation of matters only of the particular specialty or only before the particular unit or division of the Internal Revenue Service for which the applicant's former employment has qualified the applicant. Enrollment as an enrolled retirement plan agent based on an applicant's former employment with the Internal Revenue Service will be limited to permit the presentation of matters only with respect to qualified retirement plan matters.

(4) Application for enrollment as an enrolled agent or enrolled retirement plan agent based on an applicant's former employment with the Internal Revenue Service must be made within three years from the date of separation from such employment.

(5) An applicant for enrollment as an enrolled agent who is requesting such enrollment based on former employment with the Internal Revenue Service must have had a minimum of five years continuous employment with the Internal Revenue Service during which the applicant must have been

JA 81

regularly engaged in applying and interpreting the provisions of the Internal Revenue Code and the regulations relating to income, estate, gift, employment, or excise taxes.

(6) An applicant for enrollment as an enrolled retirement plan agent who is requesting such enrollment based on former employment with the Internal Revenue Service must have had a minimum of five years continuous employment with the Internal Revenue Service during which the applicant must have been regularly engaged in applying and interpreting the provisions of the Internal Revenue Code and the regulations relating to qualified retirement plan matters.

(7) For the purposes of paragraphs (d)(5) and (6) of this section, an aggregate of 10 or more years of employment in positions involving the application and interpretation of the provisions of the Internal Revenue Code, at least three of which occurred within the five years preceding the date of application, is the equivalent of five years continuous employment.

(e) *Natural persons.* Enrollment or authorization to practice may be granted only to natural persons.

(f) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 7.** Section 10.5 is revised to read as follows:

### § 10.5 Application to become an enrolled agent, enrolled retirement plan agent, or registered tax return preparer.

(a) *Form; address.* An applicant to become an enrolled agent, enrolled retirement plan agent, or registered tax return preparer must apply as required by forms or procedures established and published by the Internal Revenue Service, including proper execution of required forms under oath or affirmation. The address on the application will be the address under which a successful applicant is enrolled or registered and is the address to which all correspondence concerning enrollment or registration will be sent.

(b) *Fee.* A reasonable nonrefundable fee may be charged for each application to become an enrolled agent, enrolled retirement plan agent, or registered tax return preparer. See 26 CFR part 300.

(c) *Additional information; examination.* The Internal Revenue Service may require the applicant, as a condition to consideration of an application, to file additional information and to submit to any written or oral examination under oath or otherwise. Upon the applicant's written request, the Internal Revenue Service will afford the applicant the

opportunity to be heard with respect to the application.

(d) *Compliance and suitability checks.* (1) As a condition to consideration of an application, the Internal Revenue Service may conduct a Federal tax compliance check and suitability check. The tax compliance check will be limited to an inquiry regarding whether an applicant has filed all required individual or business tax returns and whether the applicant has failed to pay, or make proper arrangements with the Internal Revenue Service for payment of, any Federal tax debts. The suitability check will be limited to an inquiry regarding whether an applicant has engaged in any conduct that would justify suspension or disbarment of any practitioner under the provisions of this part on the date the application is submitted, including whether the applicant has engaged in disreputable conduct as defined in § 10.51. The application will be denied only if the results of the compliance or suitability check are sufficient to establish that the practitioner engaged in conduct subject to sanctions under §§ 10.51 and 10.52.

(2) If the applicant does not pass the tax compliance or suitability check, the applicant will not be issued an enrollment or registration card or certificate pursuant to § 10.6(b) of this part. An applicant who is initially denied enrollment or registration for failure to pass a tax compliance check may reapply after the initial denial if the applicant becomes current with respect to the applicant's tax liabilities.

(e) *Temporary recognition.* On receipt of a properly executed application, the Commissioner, or delegate, may grant the applicant temporary recognition to practice pending a determination as to whether status as an enrolled agent, enrolled retirement plan agent, or registered tax return preparer should be granted. Temporary recognition will be granted only in unusual circumstances and it will not be granted, in any circumstance, if the application is not regular on its face, if the information stated in the application, if true, is not sufficient to warrant granting the application to practice, or the Commissioner, or delegate, has information indicating that the statements in the application are untrue or that the applicant would not otherwise qualify to become an enrolled agent, enrolled retirement plan agent, or registered tax return preparer. Issuance of temporary recognition does not constitute either a designation or a finding of eligibility as an enrolled agent, enrolled retirement plan agent, or registered tax return preparer, and the

temporary recognition may be withdrawn at any time.

(f) *Protest of application denial.* The applicant will be informed in writing as to the reason(s) for any denial of an application. The applicant may, within 30 days after receipt of the notice of denial of the application, file a written protest of the denial as prescribed by the Internal Revenue Service in forms, guidance, or other appropriate guidance. A protest under this section is not governed by subpart D of this part.

(g) *Effective/applicability date.* This section is applicable to applications received August 2, 2011.

■ **Par. 8.** Section 10.6 is revised to read as follows:

### § 10.6 Term and renewal of status as an enrolled agent, enrolled retirement plan agent, or registered tax return preparer.

(a) *Term.* Each individual authorized to practice before the Internal Revenue Service as an enrolled agent, enrolled retirement plan agent, or registered tax return preparer will be accorded active enrollment or registration status subject to renewal of enrollment or registration as provided in this part.

(b) *Enrollment or registration card or certificate.* The Internal Revenue Service will issue an enrollment or registration card or certificate to each individual whose application to practice before the Internal Revenue Service is approved. Each card or certificate will be valid for the period stated on the card or certificate. An enrolled agent, enrolled retirement plan agent, or registered tax return preparer may not practice before the Internal Revenue Service if the card or certificate is not current or otherwise valid. The card or certificate is in addition to any notification that may be provided to each individual who obtains a preparer tax identification number.

(c) *Change of address.* An enrolled agent, enrolled retirement plan agent, or registered tax return preparer must send notification of any change of address to the address specified by the Internal Revenue Service within 60 days of the change of address. This notification must include the enrolled agent's, enrolled retirement plan agent's, or registered tax return preparer's name, prior address, new address, tax identification number(s) (including preparer tax identification number), and the date the change of address is effective. Unless this notification is sent, the address for purposes of any correspondence from the appropriate Internal Revenue Service office responsible for administering this part shall be the address reflected on the practitioner's most recent application

USA-LOV-001236

for enrollment or registration, or application for renewal of enrollment or registration. A practitioner's change of address notification under this part will not constitute a change of the practitioner's last known address for purposes of section 6212 of the Internal Revenue Code and regulations thereunder.

(d) *Renewal*—(1) *In general.* Enrolled agents, enrolled retirement plan agents, and registered tax return preparers must renew their status with the Internal Revenue Service to maintain eligibility to practice before the Internal Revenue Service. Failure to receive notification from the Internal Revenue Service of the renewal requirement will not be justification for the individual's failure to satisfy this requirement.

(2) *Renewal period for enrolled agents.* (i) All enrolled agents must renew their preparer tax identification number as prescribed by forms, instructions, or other appropriate guidance.

(ii) Enrolled agents who have a Social Security number or tax identification number that ends with the numbers 0, 1, 2, or 3, except for those individuals who received their initial enrollment after November 1, 2003, must apply for renewal between November 1, 2003, and January 31, 2004. The renewal will be effective April 1, 2004.

(iii) Enrolled agents who have a social security number or tax identification number that ends with the numbers 4, 5, or 6, except for those individuals who received their initial enrollment after November 1, 2004, must apply for renewal between November 1, 2004, and January 31, 2005. The renewal will be effective April 1, 2005.

(iv) Enrolled agents who have a social security number or tax identification number that ends with the numbers 7, 8, or 9, except for those individuals who received their initial enrollment after November 1, 2005, must apply for renewal between November 1, 2005, and January 31, 2006. The renewal will be effective April 1, 2006.

(v) Thereafter, applications for renewal as an enrolled agent will be required between November 1 and January 31 of every subsequent third year as specified in paragraph (d)(2)(i), (d)(2)(ii), or (d)(2)(iii) of this section according to the last number of the individual's Social Security number or tax identification number. Those individuals who receive initial enrollment as an enrolled agent after November 1 and before April 2 of the applicable renewal period will not be required to renew their enrollment before the first full renewal period

following the receipt of their initial enrollment.

(3) *Renewal period for enrolled retirement plan agents.* (i) All enrolled retirement plan agents must renew their preparer tax identification number as prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance.

(ii) Enrolled retirement plan agents will be required to renew their status as enrolled retirement plan agents between April 1 and June 30 of every third year subsequent to their initial enrollment.

(4) *Renewal period for registered tax return preparers.* Registered tax return preparers must renew their preparer tax identification number and their status as a registered tax return preparer as prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance.

(5) *Notification of renewal.* After review and approval, the Internal Revenue Service will notify the individual of the renewal and will issue the individual a card or certificate evidencing current status as an enrolled agent, enrolled retirement plan agent, or registered tax return preparer.

(6) *Fee.* A reasonable nonrefundable fee may be charged for each application for renewal filed. See 26 CFR part 300.

(7) *Forms.* Forms required for renewal may be obtained by sending a written request to the address specified by the Internal Revenue Service or from such other source as the Internal Revenue Service will publish in the Internal Revenue Bulletin (see 26 CFR 601.601(d)(2)(ii)(*b*)) and on the Internal Revenue Service webpage (*http:// www.irs.gov*).

(e) *Condition for renewal: continuing education.* In order to qualify for renewal as an enrolled agent, enrolled retirement plan agent, or registered tax return preparer, an individual must certify, in the manner prescribed by the Internal Revenue Service, that the individual has satisfied the requisite number of continuing education hours.

(1) *Definitions.* For purposes of this section—

(i) *Enrollment year* means January 1 to December 31 of each year of an enrollment cycle.

(ii) *Enrollment cycle* means the three successive enrollment years preceding the effective date of renewal.

(iii) *Registration year* means each 12-month period the registered tax return preparer is authorized to practice before the Internal Revenue Service.

(iv) The *effective date of renewal* is the first day of the fourth month following the close of the period for renewal described in paragraph (d) of this section.

(2) *For renewed enrollment as an enrolled agent or enrolled retirement plan agent*—(i) *Requirements for enrollment cycle.* A minimum of 72 hours of continuing education credit, including six hours of ethics or professional conduct, must be completed during each enrollment cycle.

(ii) *Requirements for enrollment year.* A minimum of 16 hours of continuing education credit, including two hours of ethics or professional conduct, must be completed during each enrollment year of an enrollment cycle.

(iii) *Enrollment during enrollment cycle*—(A) *In general.* Subject to paragraph (e)(2)(iii)(B) of this section, an individual who receives initial enrollment during an enrollment cycle must complete two hours of qualifying continuing education credit for each month enrolled during the enrollment cycle. Enrollment for any part of a month is considered enrollment for the entire month.

(B) *Ethics.* An individual who receives initial enrollment during an enrollment cycle must complete two hours of ethics or professional conduct for each enrollment year during the enrollment cycle. Enrollment for any part of an enrollment year is considered enrollment for the entire year.

(3) *Requirements for renewal as a registered tax return preparer.* A minimum of 15 hours of continuing education credit, including two hours of ethics or professional conduct, three hours of Federal tax law updates, and 10 hours of Federal tax law topics, must be completed during each registration year.

(f) *Qualifying continuing education*—(1) *General*—(i) *Enrolled agents.* To qualify for continuing education credit for an enrolled agent, a course of learning must—

(A) Be a qualifying continuing education program designed to enhance professional knowledge in Federal taxation or Federal tax related matters (programs comprised of current subject matter in Federal taxation or Federal tax related matters, including accounting, tax return preparation software, taxation, or ethics); and

(B) Be a qualifying continuing education program consistent with the Internal Revenue Code and effective tax administration.

(ii) *Enrolled retirement plan agents.* To qualify for continuing education credit for an enrolled retirement plan agent, a course of learning must—

(A) Be a qualifying continuing education program designed to enhance professional knowledge in qualified retirement plan matters; and

<div align="center">JA 83</div>

USA-LOV-001237

(B) Be a qualifying continuing education program consistent with the Internal Revenue Code and effective tax administration.

(iii) *Registered tax return preparers.* To qualify for continuing education credit for a registered tax return preparer, a course of learning must—

(A) Be a qualifying continuing education program designed to enhance professional knowledge in Federal taxation or Federal tax related matters (programs comprised of current subject matter in Federal taxation or Federal tax related matters, including accounting, tax return preparation software, taxation, or ethics); and

(B) Be a qualifying continuing education program consistent with the Internal Revenue Code and effective tax administration.

(2) *Qualifying programs*—(i) *Formal programs.* A formal program qualifies as a continuing education program if it—

(A) Requires attendance and provides each attendee with a certificate of attendance;

(B) Is conducted by a qualified instructor, discussion leader, or speaker (in other words, a person whose background, training, education, and experience is appropriate for instructing or leading a discussion on the subject matter of the particular program);

(C) Provides or requires a written outline, textbook, or suitable electronic educational materials; and

(D) Satisfies the requirements established for a qualified continuing education program pursuant to § 10.9.

(ii) *Correspondence or individual study programs (including taped programs).* Qualifying continuing education programs include correspondence or individual study programs that are conducted by continuing education providers and completed on an individual basis by the enrolled individual. The allowable credit hours for such programs will be measured on a basis comparable to the measurement of a seminar or course for credit in an accredited educational institution. Such programs qualify as continuing education programs only if they—

(A) Require registration of the participants by the continuing education provider;

(B) Provide a means for measuring successful completion by the participants (for example, a written examination), including the issuance of a certificate of completion by the continuing education provider;

(C) Provide a written outline, textbook, or suitable electronic educational materials; and

(D) Satisfy the requirements established for a qualified continuing education program pursuant to § 10.9.

(iii) *Serving as an instructor, discussion leader or speaker.* (A) One hour of continuing education credit will be awarded for each contact hour completed as an instructor, discussion leader, or speaker at an educational program that meets the continuing education requirements of paragraph (f) of this section.

(B) A maximum of two hours of continuing education credit will be awarded for actual subject preparation time for each contact hour completed as an instructor, discussion leader, or speaker at such programs. It is the responsibility of the individual claiming such credit to maintain records to verify preparation time.

(C) The maximum continuing education credit for instruction and preparation may not exceed four hours annually for registered tax return preparers and six hours annually for enrolled agents and enrolled retirement plan agents.

(D) An instructor, discussion leader, or speaker who makes more than one presentation on the same subject matter during an enrollment cycle or registration year will receive continuing education credit for only one such presentation for the enrollment cycle or registration year.

(3) *Periodic examination.* Enrolled Agents and Enrolled Retirement Plan Agents may establish eligibility for renewal of enrollment for any enrollment cycle by—

(i) Achieving a passing score on each part of the Special Enrollment Examination administered under this part during the three year period prior to renewal; and

(ii) Completing a minimum of 16 hours of qualifying continuing education during the last year of an enrollment cycle.

(g) *Measurement of continuing education coursework.* (1) All continuing education programs will be measured in terms of contact hours. The shortest recognized program will be one contact hour.

(2) A contact hour is 50 minutes of continuous participation in a program. Credit is granted only for a full contact hour, which is 50 minutes or multiples thereof. For example, a program lasting more than 50 minutes but less than 100 minutes will count as only one contact hour.

(3) Individual segments at continuous conferences, conventions and the like will be considered one total program. For example, two 90-minute segments (180 minutes) at a continuous

conference will count as three contact hours.

(4) For university or college courses, each semester hour credit will equal 15 contact hours and a quarter hour credit will equal 10 contact hours.

(h) *Recordkeeping requirements.* (1) Each individual applying for renewal must retain for a period of four years following the date of renewal the information required with regard to qualifying continuing education credit hours. Such information includes—

(i) The name of the sponsoring organization;

(ii) The location of the program;

(iii) The title of the program, qualified program number, and description of its content;

(iv) Written outlines, course syllibi, textbook, and/or electronic materials provided or required for the course;

(v) The dates attended;

(vi) The credit hours claimed;

(vii) The name(s) of the instructor(s), discussion leader(s), or speaker(s), if appropriate; and

(viii) The certificate of completion and/or signed statement of the hours of attendance obtained from the continuing education provider.

(2) To receive continuing education credit for service completed as an instructor, discussion leader, or speaker, the following information must be maintained for a period of four years following the date of renewal—

(i) The name of the sponsoring organization;

(ii) The location of the program;

(iii) The title of the program and copy of its content;

(iv) The dates of the program; and

(v) The credit hours claimed.

(i) *Waivers.* (1) Waiver from the continuing education requirements for a given period may be granted for the following reasons—

(i) Health, which prevented compliance with the continuing education requirements;

(ii) Extended active military duty;

(iii) Absence from the United States for an extended period of time due to employment or other reasons, provided the individual does not practice before the Internal Revenue Service during such absence; and

(iv) Other compelling reasons, which will be considered on a case-by-case basis.

(2) A request for waiver must be accompanied by appropriate documentation. The individual is required to furnish any additional documentation or explanation deemed necessary. Examples of appropriate documentation could be a medical certificate or military orders.

JA 84

USA-LOV-001238

(3) A request for waiver must be filed no later than the last day of the renewal application period.

(4) If a request for waiver is not approved, the individual will be placed in inactive status. The individual will be notified that the waiver was not approved and that the individual has been placed on a roster of inactive enrolled agents, enrolled retirement plan agents, or registered tax return preparers.

(5) If the request for waiver is not approved, the individual may file a protest as prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance. A protest filed under this section is not governed by subpart D of this part.

(6) If a request for waiver is approved, the individual will be notified and issued a card or certificate evidencing renewal.

(7) Those who are granted waivers are required to file timely applications for renewal of enrollment or registration.

(j) *Failure to comply.* (1) Compliance by an individual with the requirements of this part is determined by the Internal Revenue Service. The Internal Revenue Service will provide notice to any individual who fails to meet the continuing education and fee requirements of eligibility for renewal. The notice will state the basis for the determination of noncompliance and will provide the individual an opportunity to furnish the requested information in writing relating to the matter within 60 days of the date of the notice. Such information will be considered in making a final determination as to eligibility for renewal. The individual must be informed of the reason(s) for any denial of a renewal. The individual may, within 30 days after receipt of the notice of denial of renewal, file a written protest of the denial as prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance. A protest under this section is not governed by subpart D of this part.

(2) The continuing education records of an enrolled agent, enrolled retirement plan agent, or registered tax return preparer may be reviewed to determine compliance with the requirements and standards for renewal as provided in paragraph (f) of this section. As part of this review, the enrolled agent, enrolled retirement plan agent or registered tax return preparer may be required to provide the Internal Revenue Service with copies of any continuing education records required to be maintained under this part. If the enrolled agent, enrolled retirement plan agent or registered tax return preparer fails to comply with this

requirement, any continuing education hours claimed may be disallowed.

(3) An individual who has not filed a timely application for renewal, who has not made a timely response to the notice of noncompliance with the renewal requirements, or who has not satisfied the requirements of eligibility for renewal will be placed on a roster of inactive enrolled individuals or inactive registered individuals. During this time, the individual will be ineligible to practice before the Internal Revenue Service.

(4) Individuals placed in inactive status and individuals ineligible to practice before the Internal Revenue Service may not state or imply that they are eligible to practice before the Internal Revenue Service, or use the terms enrolled agent, enrolled retirement plan agent, or registered tax return preparer, the designations "EA" or "ERPA" or other form of reference to eligibility to practice before the Internal Revenue Service.

(5) An individual placed in inactive status may be reinstated to an active status by filing an application for renewal and providing evidence of the completion of all required continuing education hours for the enrollment cycle or registration year. Continuing education credit under this paragraph (j)(5) may not be used to satisfy the requirements of the enrollment cycle or registration year in which the individual has been placed back on the active roster.

(6) An individual placed in inactive status must file an application for renewal and satisfy the requirements for renewal as set forth in this section within three years of being placed in inactive status. Otherwise, the name of such individual will be removed from the inactive status roster and the individual's status as an enrolled agent, enrolled retirement plan agent, or registered tax return preparer will terminate. Future eligibility for active status must then be reestablished by the individual as provided in this section.

(7) Inactive status is not available to an individual who is the subject of a pending disciplinary matter before the Internal Revenue Service.

(k) *Inactive retirement status.* An individual who no longer practices before the Internal Revenue Service may request to be placed in an inactive retirement status at any time and such individual will be placed in an inactive retirement status. The individual will be ineligible to practice before the Internal Revenue Service. An individual who is placed in an inactive retirement status may be reinstated to an active status by filing an application for renewal and

providing evidence of the completion of the required continuing education hours for the enrollment cycle or registration year. Inactive retirement status is not available to an individual who is ineligible to practice before the Internal Revenue Service or an individual who is the subject of a pending disciplinary matter under this part.

(l) *Renewal while under suspension or disbarment.* An individual who is ineligible to practice before the Internal Revenue Service by virtue of disciplinary action under this part is required to conform to the requirements for renewal of enrollment or registration before the individual's eligibility is restored.

(m) *Enrolled actuaries.* The enrollment and renewal of enrollment of actuaries authorized to practice under paragraph (d) of § 10.3 are governed by the regulations of the Joint Board for the Enrollment of Actuaries at 20 CFR 901.1 through 901.72.

(n) *Effective/applicability date.* This section is applicable to enrollment or registration effective beginning August 2, 2011.

■ **Par. 9.** Section 10.7 is amended by:
■ 1. Revising the section heading.
■ 2. Removing paragraph (c)(1)(viii).
■ 3. Revising paragraph (c)(2), and (d).
■ 4. Removing paragraph (e).
■ 5. Redesignating paragraphs (f) and (g) as paragraphs (e) and (f) and revising them.

The revisions read as follows:

**§ 10.7　Representing oneself; participating in rulemaking; limited practice; and special appearances.**

\*　　\*　　\*　　\*　　\*

(c) * * *

(2) *Limitations.* (i) An individual who is under suspension or disbarment from practice before the Internal Revenue Service may not engage in limited practice before the Internal Revenue Service under paragraph (c)(1) of this section.

(ii) The Commissioner, or delegate, may, after notice and opportunity for a conference, deny eligibility to engage in limited practice before the Internal Revenue Service under paragraph (c)(1) of this section to any individual who has engaged in conduct that would justify a sanction under § 10.50.

(iii) An individual who represents a taxpayer under the authority of paragraph (c)(1) of this section is subject, to the extent of his or her authority, to such rules of general applicability regarding standards of conduct and other matters as prescribed by the Internal Revenue Service.

(d) *Special appearances.* The Commissioner, or delegate, may, subject

USA-LOV-001239

to conditions deemed appropriate, authorize an individual who is not otherwise eligible to practice before the Internal Revenue Service to represent another person in a particular matter.

(e) *Fiduciaries.* For purposes of this part, a fiduciary (for example, a trustee, receiver, guardian, personal representative, administrator, or executor) is considered to be the taxpayer and not a representative of the taxpayer.

(f) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 10.** Section 10.8 is revised to read as follows:

### § 10.8 Return preparation and application of rules to other individuals.

(a) *Preparing all or substantially all of a tax return.* Any individual who for compensation prepares or assists with the preparation of all or substantially all of a tax return or claim for refund must have a preparer tax identification number. Except as otherwise prescribed in forms, instructions, or other appropriate guidance, an individual must be an attorney, certified public accountant, enrolled agent, or registered tax return preparer to obtain a preparer tax identification number. Any individual who for compensation prepares or assists with the preparation of all or substantially all of a tax return or claim for refund is subject to the duties and restrictions relating to practice in subpart B, as well as subject to the sanctions for violation of the regulations in subpart C.

(b) *Preparing a tax return and furnishing information.* Any individual may for compensation prepare or assist with the preparation of a tax return or claim for refund (provided the individual prepares less than substantially all of the tax return or claim for refund), appear as a witness for the taxpayer before the Internal Revenue Service, or furnish information at the request of the Internal Revenue Service or any of its officers or employees.

(c) *Application of rules to other individuals.* Any individual who for compensation prepares, or assists in the preparation of, all or a substantial portion of a document pertaining to any taxpayer's tax liability for submission to the Internal Revenue Service is subject to the duties and restrictions relating to practice in subpart B, as well as subject to the sanctions for violation of the regulations in subpart C. Unless otherwise a practitioner, however, an individual may not for compensation prepare, or assist in the preparation of, all or substantially all of a tax return or

claim for refund, or sign tax returns and claims for refund. For purposes of this paragraph, an individual described in 26 CFR 301.7701–15(f) is not treated as having prepared all or a substantial portion of the document by reason of such assistance.

(d) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 11.** Section 10.9 is added to subpart A to read as follows:

### § 10.9 Continuing education providers and continuing education programs.

(a) *Continuing education providers—* (1) *In general.* Continuing education providers are those responsible for presenting continuing education programs. A continuing education provider must—

(i) Be an accredited educational institution;

(ii) Be recognized for continuing education purposes by the licensing body of any State, territory, or possession of the United States, including a Commonwealth, or the District of Columbia;

(iii) Be recognized and approved by a qualifying organization as a provider of continuing education on subject matters within § 10.6(f) of this part. The Internal Revenue Service may, at its discretion, identify a professional organization, society or business entity that maintains minimum education standards comparable to those set forth in this part as a qualifying organization for purposes of this part in appropriate forms, instructions, and other appropriate guidance; or

(iv) Be recognized by the Internal Revenue Service as a professional organization, society, or business whose programs include offering continuing professional education opportunities in subject matters within § 10.6(f) of this part. The Internal Revenue Service, at its discretion, may require such professional organizations, societies, or businesses to file an agreement and/or obtain Internal Revenue Service approval of each program as a qualified continuing education program in appropriate forms, instructions or other appropriate guidance.

(2) *Continuing education provider numbers—*(i) *In general.* A continuing education provider is required to obtain a continuing education provider number and pay any applicable user fee.

(ii) *Renewal.* A continuing education provider maintains its status as a continuing education provider during the continuing education provider cycle by renewing its continuing education provider number as prescribed by forms, instructions or other appropriate

guidance and paying any applicable user fee.

(3) *Requirements for qualified continuing education programs.* A continuing education provider must ensure the qualified continuing education program complies with all the following requirements—

(i) Programs must be developed by individual(s) qualified in the subject matter;

(ii) Program subject matter must be current;

(iii) Instructors, discussion leaders, and speakers must be qualified with respect to program content;

(iv) Programs must include some means for evaluation of the technical content and presentation to be evaluated;

(v) Certificates of completion bearing a current qualified continuing education program number issued by the Internal Revenue Service must be provided to the participants who successfully complete the program; and

(vi) Records must be maintained by the continuing education provider to verify the participants who attended and completed the program for a period of four years following completion of the program. In the case of continuous conferences, conventions, and the like, records must be maintained to verify completion of the program and attendance by each participant at each segment of the program.

(4) *Program numbers—*(i) *In general.* Every continuing education provider is required to obtain a continuing education provider program number and pay any applicable user fee for each program offered. Program numbers shall be obtained as prescribed by forms, instructions or other appropriate guidance. Although, at the discretion of the Internal Revenue Service, a continuing education provider may be required to demonstrate that the program is designed to enhance professional knowledge in Federal taxation or Federal tax related matters (programs comprised of current subject matter in Federal taxation or Federal tax related matters, including accounting, tax return preparation software, taxation, or ethics) and complies with the requirements in paragraph (a)(2)of this section before a program number is issued.

(ii) *Update programs.* Update programs may use the same number as the program subject to update. An update program is a program that instructs on a change of existing law occurring within one year of the update program offering. The qualifying education program subject to update must have been offered within the two

USA-LOV-001240

year time period prior to the change in existing law.

(iii) *Change in existing law.* A change in existing law means the effective date of the statute or regulation, or date of entry of judicial decision, that is the subject of the update.

(b) *Failure to comply.* Compliance by a continuing education provider with the requirements of this part is determined by the Internal Revenue Service. A continuing education provider who fails to meet the requirements of this part will be notified by the Internal Revenue Service. The notice will state the basis for the determination of noncompliance and will provide the continuing education provider an opportunity to furnish the requested information in writing relating to the matter within 60 days of the date of the notice. The continuing education provider may, within 30 days after receipt of the notice of denial, file a written protest as prescribed by the Internal Revenue Service in forms, instructions, or other appropriate guidance. A protest under this section is not governed by subpart D of this part.

(c) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 12.** Section 10.20 is amended by
■ 1. Redesignating paragraphs (b) and (c) as (a)(3) and (b).
■ 2. Revising newly designated paragraphs (a)(3) and (b).
■ 3. Adding paragraph (c).
    The revisions and additions read as follows:

### § 10.20   Information to be furnished.

(a) * * *

(3) When a proper and lawful request is made by a duly authorized officer or employee of the Internal Revenue Service, concerning an inquiry into an alleged violation of the regulations in this part, a practitioner must provide any information the practitioner has concerning the alleged violation and testify regarding this information in any proceeding instituted under this part, unless the practitioner believes in good faith and on reasonable grounds that the information is privileged.

(b) *Interference with a proper and lawful request for records or information.* A practitioner may not interfere, or attempt to interfere, with any proper and lawful effort by the Internal Revenue Service, its officers or employees, to obtain any record or information unless the practitioner believes in good faith and on reasonable grounds that the record or information is privileged.

(c) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 13.** Section 10.25 is amended by revising paragraphs (c)(2) and (e) to read as follows:

### § 10.25   Practice by former government employees, their partners and their associates.

(c) * * *

(2) When isolation of a former Government employee is required under paragraph (c)(1) of this section, a statement affirming the fact of such isolation must be executed under oath by the former Government employee and by another member of the firm acting on behalf of the firm. The statement must clearly identify the firm, the former Government employee, and the particular matter(s) requiring isolation. The statement must be retained by the firm and, upon request, provided to the office(s) of the Internal Revenue Service administering or enforcing this part.

* * * * *

(e) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 14.** Section 10.30 is amended by revising paragraphs (a)(1) and (e) to read as follows:

### § 10.30   Solicitation.

(a) *Advertising and solicitation restrictions.* (1) A practitioner may not, with respect to any Internal Revenue Service matter, in any way use or participate in the use of any form of public communication or private solicitation containing a false, fraudulent, or coercive statement or claim; or a misleading or deceptive statement or claim. Enrolled agents, enrolled retirement plan agents, or registered tax return preparers, in describing their professional designation, may not utilize the term "certified" or imply an employer/employee relationship with the Internal Revenue Service. Examples of acceptable descriptions for enrolled agents are "enrolled to represent taxpayers before the Internal Revenue Service," "enrolled to practice before the Internal Revenue Service," and "admitted to practice before the Internal Revenue Service." Similarly, examples of acceptable descriptions for enrolled retirement plan agents are "enrolled to represent taxpayers before the Internal Revenue Service as a retirement plan agent" and "enrolled to practice before the Internal Revenue Service as a retirement plan agent." An example of an acceptable description for registered tax return preparers is "designated as a registered tax return preparer by the Internal Revenue Service."

* * * * *

(e) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

* * * * *

■ **Par. 15.** Section 10.34 is amended by:
■ 1. Adding paragraph (a).
■ 2. Redesignating paragraph (f) as paragraph (e).
■ 3. Revising newly designated paragraph (e).
    The revision and addition read as follows:

### § 10.34   Standards with respect to tax returns and documents, affidavits and other papers.

(a) *Tax returns.* (1) A practitioner may not willfully, recklessly, or through gross incompetence—

(i) Sign a tax return or claim for refund that the practitioner knows or reasonably should know contains a position that—

(A) Lacks a reasonable basis;

(B) Is an unreasonable position as described in section 6694(a)(2) of the Internal Revenue code (Code) (including the related regulations and other published guidance); or

(C) Is a willful attempted by the practitioner to understate the liability for tax or a reckless or intentional disregard of rules or regulations by the practitioner as described in section 6694(b)(2) of the Code (including the related regulations and other published guidance).

(ii) Advise a client to take a position on a tax return or claim for refund, or prepare a portion off a tax return or claim for refund containing a position, that—

(A) Lacks a reasonable basis;

(B) Is an unreasonable position as described in section 6694(a)(2) of the Code (including the related regulations and other published guidance); or

(C) Is a willful attempt by the practitioner to understate the liability for tax or a reckless or intentional disregard of rules or regulations by the practitioner as described in section 6694(b)(2) of the Code (including the related regulations and other published guidance).

(2) A pattern of conduct is a factor that will be taken into account in determining whether a practitioner acted willfully, recklessly, or through gross incompetence.

* * * * *

(e) *Effective/applicability date.* Paragraph (a) of this section is

USA-LOV-001241

applicable for returns or claims for refund filed, or advice provided, beginning August 2, 2011. Paragraphs (b) through (d) of this section are applicable to tax returns, documents, affidavits, and other papers filed on or after September 26, 2007.

■ **Par. 16.** Section 10.36 is amended by:
■ 1. Redesignating paragraph (b) as paragraph (c).
■ 2. Adding new paragraph (b).
■ 3. Revising newly designated paragraph (c).

The addition and revisions read as follows:

### § 10.36 Procedures to ensure compliance.

* * * * *

(b) *Requirements for tax returns and other documents.* Any practitioner who has (or practitioners who have or share) principal authority and responsibility for overseeing a firm's practice of preparing tax returns, claims for refunds, or other documents for submission to the Internal Revenue Service must take reasonable steps to ensure that the firm has adequate procedures in effect for all members, associates, and employees for purposes of complying with Circular 230. Any practitioner who has (or practitioners who have or share) this principal authority will be subject to discipline for failing to comply with the requirements of this paragraph if—

(1) The practitioner through willfulness, recklessness, or gross incompetence does not take reasonable steps to ensure that the firm has adequate procedures to comply with Circular 230, and one or more individuals who are members of, associated with, or employed by, the firm are, or have, engaged in a pattern or practice, in connection with their practice with the firm, of failing to comply with Circular 230; or

(2) The practitioner knows or should know that one or more individuals who are members of, associated with, or employed by, the firm are, or have, engaged in a pattern or practice, in connection with their practice with the firm, that does not comply with Circular 230, and the practitioner, through willfulness, recklessness, or gross incompetence fails to take prompt action to correct the noncompliance.

(c) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 17.** Section 10.38 is revised to read as follows:

### § 10.38 Establishment of advisory committees.

(a) *Advisory committees.* To promote and maintain the public's confidence in

tax advisors, the Internal Revenue Service is authorized to establish one or more advisory committees composed of at least six individuals authorized to practice before the Internal Revenue Service. Membership of an advisory committee must be balanced among those who practice as attorneys, accountants, enrolled agents, enrolled actuaries, enrolled retirement plan agents, and registered tax return preparers. Under procedures prescribed by the Internal Revenue Service, an advisory committee may review and make general recommendations regarding the practices, procedures, and policies of the offices described in § 10.1.

(b) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 18.** Section 10.50 is amended by
■ 1. Revising paragraph (b)(1).
■ 2. Removing paragraphs (d) and (e) as paragraphs (e) and (f).
■ 3. Adding new paragraph (d).
■ 4. Revising newly redesignated paragraph (f).

The revisions and addition read as follows:

### § 10.50 Sanctions.

* * * * *

(b) * * *

(1) If any appraiser is disqualified pursuant to this subpart C, the appraiser is barred from presenting evidence or testimony in any administrative proceeding before the Department of Treasury or the Internal Revenue Service, unless and until authorized to do so by the Internal Revenue Service pursuant to § 10.81, regardless of whether the evidence or testimony would pertain to an appraisal made prior to or after the effective date of disqualification.

* * * * *

(d) *Authority to accept a practitioner's consent to sanction.* The Internal Revenue Service may accept a practitioner's offer of consent to be sanctioned under § 10.50 in lieu of instituting or continuing a proceeding under § 10.60(a).

* * * * *

(f) *Effective/applicability date.* This section is applicable to conduct occurring on or after August 2, 2011, except that paragraphs (a), (b)(2), and (e) apply to conduct occurring on or after September 26, 2007, and paragraph (c) applies to prohibited conduct that occurs after October 22, 2004.

■ **Par. 19.** Section 10.51 is amended by adding paragraphs (a)(16), (17), and (18) and revising paragraph (b) to read as follows:

### § 10.51 Incompetence and disreputable conduct.

(a) * * *

(16) Willfully failing to file on magnetic or other electronic media a tax return prepared by the practitioner when the practitioner is required to do so by the Federal tax laws unless the failure is due to reasonable cause and not due to willful neglect.

(17) Willfully preparing all or substantially all of, or signing, a tax return or claim for refund when the practitioner does not possess a current or otherwise valid preparer tax identification number or other prescribed identifying number.

(18) Willfully representing a taxpayer before an officer or employee of the Internal Revenue Service unless the practitioner is authorized to do so pursuant to this part.

(b) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 20.** Section 10.53 is revised to read as follows:

### § 10.53 Receipt of information concerning practitioner.

(a) *Officer or employee of the Internal Revenue Service.* If an officer or employee of the Internal Revenue Service has reason to believe a practitioner has violated any provision of this part, the officer or employee will promptly make a written report of the suspected violation. The report will explain the facts and reasons upon which the officer's or employee's belief rests and must be submitted to the office(s) of the Internal Revenue Service responsible for administering or enforcing this part.

(b) *Other persons.* Any person other than an officer or employee of the Internal Revenue Service having information of a violation of any provision of this part may make an oral or written report of the alleged violation to the office(s) of the Internal Revenue Service responsible for administering or enforcing this part or any officer or employee of the Internal Revenue Service. If the report is made to an officer or employee of the Internal Revenue Service, the officer or employee will make a written report of the suspected violation and submit the report to the office(s) of the Internal Revenue Service responsible for administering or enforcing this part.

(c) *Destruction of report.* No report made under paragraph (a) or (b) of this section shall be maintained unless retention of the report is permissible under the applicable records control schedule as approved by the National Archives and Records Administration

USA-LOV-001242

and designated in the Internal Revenue Manual. Reports must be destroyed as soon as permissible under the applicable records control schedule.

(d) *Effect on proceedings under subpart D.* The destruction of any report will not bar any proceeding under subpart D of this part, but will preclude the use of a copy of the report in a proceeding under subpart D of this part.

(e) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 21.** Section 10.60 is amended by revising paragraphs (a), (b), and (d) to read as follows:

### § 10.60  Institution of proceeding.

(a) Whenever it is determined that a practitioner (or employer, firm or other entity, if applicable) violated any provision of the laws governing practice before the Internal Revenue Service or the regulations in this part, the practitioner may be reprimanded in accordance with § 10.62, or subject to a proceeding for sanctions described in § 10.50.

(b) Whenever a penalty has been assessed against an appraiser under the Internal Revenue Code and an appropriate officer or employee in an office established to enforce this part determines that the appraiser acted willfully, recklessly, or through gross incompetence with respect to the proscribed conduct, the appraiser may be reprimanded in accordance with § 10.62 or subject to a proceeding for disqualification. A proceeding for disqualification of an appraiser is instituted by the filing of a complaint, the contents of which are more fully described in § 10.62.

\*  \*  \*  \*  \*

(d) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 22.** Section 10.61 is amended by revising paragraphs (a), (b)(2), and (c) to read as follows:

### § 10.61  Conferences.

(a) *In general.* The Commissioner, or delegate, may confer with a practitioner, employer, firm or other entity, or an appraiser concerning allegations of misconduct irrespective of whether a proceeding has been instituted. If the conference results in a stipulation in connection with an ongoing proceeding in which the practitioner, employer, firm or other entity, or appraiser is the respondent, the stipulation may be entered in the record by either party to the proceeding.

(b) \*  \*  \*

(2) *Discretion; acceptance or declination.* The Commissioner, or

delegate, may accept or decline the offer described in paragraph (b)(1) of this section. When the decision is to decline the offer, the written notice of declination may state that the offer described in paragraph (b)(1) of this section would be accepted if it contained different terms. The Commissioner, or delegate, has the discretion to accept or reject a revised offer submitted in response to the declination or may counteroffer and act upon any accepted counteroffer.

(c) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 23.** Section 10.62 is revised to read as follows:

### § 10.62  Contents of complaint.

(a) *Charges.* A complaint must name the respondent, provide a clear and concise description of the facts and law that constitute the basis for the proceeding, and be signed by an authorized representative of the Internal Revenue Service under § 10.69(a)(1). A complaint is sufficient if it fairly informs the respondent of the charges brought so that the respondent is able to prepare a defense.

(b) *Specification of sanction.* The complaint must specify the sanction sought against the practitioner or appraiser. If the sanction sought is a suspension, the duration of the suspension sought must be specified.

(c) *Demand for answer.* The respondent must be notified in the complaint or in a separate paper attached to the complaint of the time for answering the complaint, which may not be less than 30 days from the date of service of the complaint, the name and address of the Administrative Law Judge with whom the answer must be filed, the name and address of the person representing the Internal Revenue Service to whom a copy of the answer must be served, and that a decision by default may be rendered against the respondent in the event an answer is not filed as required.

(d) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 24.** Section 10.63 is amended by revising paragraphs (c) and (f) to read as follows:

### § 10.63  Service of complaint; service of other papers; service of evidence in support of complaint; filing of papers.

\*  \*  \*  \*  \*

(c) *Service of papers on the Internal Revenue Service.* Whenever a paper is required or permitted to be served on the Internal Revenue Service in connection with a proceeding under this

part, the paper will be served on the Internal Revenue Service's authorized representative under § 10.69(a)(1) at the address designated in the complaint, or at an address provided in a notice of appearance. If no address is designated in the complaint or provided in a notice of appearance, service will be made on the office(s) established to enforce this part under the authority of § 10.1, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC 20224.

\*  \*  \*  \*  \*

(f) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 25.** Section 10.64 is amended by revising paragraph (a) and adding paragraph (f) to read as follows:

### § 10.64  Answer; default.

(a) *Filing.* The respondent's answer must be filed with the Administrative Law Judge, and served on the Internal Revenue Service, within the time specified in the complaint unless, on request or application of the respondent, the time is extended by the Administrative Law Judge.

\*  \*  \*  \*  \*

(f) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 26.** Section 10.65 is amended by revising paragraphs (a) and (c) to read:

### § 10.65  Supplemental charges.

(a) *In general.* Supplemental charges may be filed against the respondent by amending the complaint with the permission of the Administrative Law Judge if, for example—

(1) It appears that the respondent, in the answer, falsely and in bad faith, denies a material allegation of fact in the complaint or states that the respondent has insufficient knowledge to form a belief, when the respondent possesses such information; or

(2) It appears that the respondent has knowingly introduced false testimony during the proceedings against the respondent.

\*  \*  \*  \*  \*

(c) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 27.** Section 10.66 is revised to read as follows:

### § 10.66  Reply to answer.

(a) The Internal Revenue Service may file a reply to the respondent's answer, but unless otherwise ordered by the Administrative Law Judge, no reply to the respondent's answer is required. If a reply is not filed, new matter in the answer is deemed denied.

USA-LOV-001243

(b) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 28.** Section 10.69 is revised to read as follows:

### § 10.69  Representation; ex parte communication.

(a) *Representation.* The Internal Revenue Service may be represented in proceedings under this part by an attorney or other employee of the Internal Revenue Service. An attorney or an employee of the Internal Revenue Service representing the Internal Revenue Service in a proceeding under this part may sign the complaint or any document required to be filed in the proceeding on behalf of the Internal Revenue Service.

(b) *Ex parte communication.* The Internal Revenue Service, the respondent, and any representatives of either party, may not attempt to initiate or participate in ex parte discussions concerning a proceeding or potential proceeding with the Administrative Law Judge (or any person who is likely to advise the Administrative Law Judge on a ruling or decision) in the proceeding before or during the pendency of the proceeding. Any memorandum, letter or other communication concerning the merits of the proceeding, addressed to the Administrative Law Judge, by or on behalf of any party shall be regarded as an argument in the proceeding and shall be served on the other party.

(c) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 29.** Section 10.72 is amended by revising paragraphs (a)(3)(iv)(A), (d)(1), and (g) to read as follows:

### § 10.72  Hearings.

(a) * * *

(3) * * *

(iv) * * *

(A) The Internal Revenue Service withdraws the complaint;

* * * * *

(d) *Publicity*—(1) *In general.* All reports and decisions of the Secretary of the Treasury, or delegate, including any reports and decisions of the Administrative Law Judge, under this subpart D are, subject to the protective measures in paragraph (d)(4) of this section, public and open to inspection within 30 days after the agency's decision becomes final.

* * * * *

(g) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 30.** Section 10.76 is amended by revising paragraphs (c), and (e) to read as follows:

### § 10.76  Decision of Administrative Law Judge.

* * * * *

(c) *Copy of decision.* The Administrative Law Judge will provide the decision to the Internal Revenue Service's authorized representative, and a copy of the decision to the respondent or the respondent's authorized representative.

* * * * *

(e) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 31.** Section 10.77 is revised to read as follows:

### § 10.77  Appeal of decision of Administrative Law Judge.

(a) *Appeal.* Any party to the proceeding under this subpart D may appeal the decision of the Administrative Law Judge by filing a notice of appeal with the Secretary of the Treasury, or delegate deciding appeals. The notice of appeal must include a brief that states exceptions to the decision of Administrative Law Judge and supporting reasons for such exceptions.

(b) *Time and place for filing of appeal.* The notice of appeal and brief must be filed, in duplicate, with the Secretary of the Treasury, or delegate deciding appeals, at an address for appeals that is identified to the parties with the decision of the Administrative Law Judge. The notice of appeal and brief must be filed within 30 days of the date that the decision of the Administrative Law Judge is served on the parties. The appealing party must serve a copy of the notice of appeal and the brief to any non-appealing party or, if the party is represented, the non-appealing party's representative.

(c) *Response.* Within 30 days of receiving the copy of the appellant's brief, the other party may file a response brief with the Secretary of the Treasury, or delegate deciding appeals, using the address identified for appeals. A copy of the response brief must be served at the same time on the opposing party or, if the party is represented, the opposing party's representative.

(d) *No other briefs, responses or motions as of right.* Other than the appeal brief and response brief, the parties are not permitted to file any other briefs, responses or motions, except on a grant of leave to do so after a motion demonstrating sufficient cause, or unless otherwise ordered by the Secretary of the Treasury, or delegate deciding appeals.

(e) *Additional time for briefs and responses.* Notwithstanding the time for filing briefs and responses provided in

paragraphs (b) and (c) of this section, the Secretary of the Treasury, or delegate deciding appeals, may, for good cause, authorize additional time for filing briefs and responses upon a motion of a party or upon the initiative of the Secretary of the Treasury, or delegate deciding appeals.

(f) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 32.** Section 10.78 is amended by revising paragraphs (c) and (d) to read as follows:

### § 10.78  Decision on review.

* * * * *

(c) *Copy of decision on review.* The Secretary of the Treasury, or delegate, will provide copies of the agency decision to the authorized representative of the Internal Revenue Service and the respondent or the respondent's authorized representative.

(d) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 33.** Section 10.79 is revised to read as follows:

### § 10.79  Effect of disbarment, suspension, or censure.

(a) *Disbarment.* When the final decision in a case is against the respondent (or the respondent has offered his or her consent and such consent has been accepted by the Internal Revenue Service) and such decision is for disbarment, the respondent will not be permitted to practice before the Internal Revenue Service unless and until authorized to do so by the Internal Revenue Service pursuant to § 10.81.

(b) *Suspension.* When the final decision in a case is against the respondent (or the respondent has offered his or her consent and such consent has been accepted by the Internal Revenue Service) and such decision is for suspension, the respondent will not be permitted to practice before the Internal Revenue Service during the period of suspension. For periods after the suspension, the practitioner's future representations may be subject to conditions as authorized by paragraph (d) of this section.

(c) *Censure.* When the final decision in the case is against the respondent (or the Internal Revenue Service has accepted the respondent's offer to consent, if such offer was made) and such decision is for censure, the respondent will be permitted to practice before the Internal Revenue Service, but the respondent's future representations may be subject to conditions as

USA-LOV-001244

authorized by paragraph (d) of this section.

(d) *Conditions.* After being subject to the sanction of either suspension or censure, the future representations of a practitioner so sanctioned shall be subject to specified conditions designed to promote high standards of conduct. These conditions can be imposed for a reasonable period in light of the gravity of the practitioner's violations. For example, where a practitioner is censured because the practitioner failed to advise the practitioner's clients about a potential conflict of interest or failed to obtain the clients' written consents, the practitioner may be required to provide the Internal Revenue Service with a copy of all consents obtained by the practitioner for an appropriate period following censure, whether or not such consents are specifically requested.

(e) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 34.** Section 10.80 is revised to read as follows:

### § 10.80   Notice of disbarment, suspension, censure, or disqualification.

(a) *In general.* On the issuance of a final order censuring, suspending, or disbarring a practitioner or a final order disqualifying an appraiser, notification of the censure, suspension, disbarment or disqualification will be given to appropriate officers and employees of the Internal Revenue Service and interested departments and agencies of the Federal government. The Internal Revenue Service may determine the manner of giving notice to the proper authorities of the State by which the censured, suspended, or disbarred person was licensed to practice.

(b) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 35.** Section 10.81 is revised to read as follows:

### § 10.81   Petition for reinstatement.

(a) *In general.* A disbarred practitioner or a disqualified appraiser may petition for reinstatement before the Internal Revenue Service after the expiration of 5 years following such disbarment or disqualification. Reinstatement will not be granted unless the Internal Revenue Service is satisfied that the petitioner is not likely to conduct himself, thereafter, contrary to the regulations in this part, and that granting such reinstatement would not be contrary to the public interest.

(b) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 36.** Section 10.82 is amended by revising paragraphs (a), (c) introductory text, (c)(3), (d), (e), (f), (g), and (h) to read as follows:

### § 10.82   Expedited suspension.

(a) *When applicable.* Whenever the Commissioner, or delegate, determines that a practitioner is described in paragraph (b) of this section, proceedings may be instituted under this section to suspend the practitioner from practice before the Internal Revenue Service.

\*    \*    \*    \*    \*

(c) *Instituting a proceeding.* A proceeding under this section will be instituted by a complaint that names the respondent, is signed by an authorized representative of the Internal Revenue Service under § 10.69(a)(1), and is filed and served according to the rules set forth in paragraph (a) of § 10.63. The complaint must give a plain and concise description of the allegations that constitute the basis for the proceeding. The complaint must notify the respondent—

\*    \*    \*    \*    \*

(3) That the respondent may request a conference to address the merits of the complaint and that any such request must be made in the answer; and

\*    \*    \*    \*    \*

(d) *Answer.* The answer to a complaint described in this section must be filed no later than 30 calendar days following the date the complaint is served, unless the time for filing is extended. The answer must be filed in accordance with the rules set forth in § 10.64, except as otherwise provided in this section. A respondent is entitled to a conference only if the conference is requested in a timely filed answer. If a request for a conference is not made in the answer or the answer is not timely filed, the respondent will be deemed to have waived the right to a conference and may be suspended at any time following the date on which the answer was due.

(e) *Conference.* An authorized representative of the Internal Revenue Service will preside at a conference described in this section. The conference will be held at a place and time selected by the Internal Revenue Service, but no sooner than 14 calendar days after the date by which the answer must be filed with the Internal Revenue Service, unless the respondent agrees to an earlier date. An authorized representative may represent the respondent at the conference. Following the conference, upon a finding that the respondent is described in paragraph (b) of this section, or upon the respondent's

failure to appear at the conference either personally or through an authorized representative, the respondent may be immediately suspended from practice before the Internal Revenue Service.

(f) *Duration of suspension.* A suspension under this section will commence on the date that written notice of the suspension is issued. The suspension will remain effective until the earlier of the following:

(1) The Internal Revenue Service lifts the suspension after determining that the practitioner is no longer described in paragraph (b) of this section or for any other reason; or

(2) The suspension is lifted by an Administrative Law Judge or the Secretary of the Treasury in a proceeding referred to in paragraph (g) of this section and instituted under § 10.60.

(g) *Proceeding instituted under § 10.60.* If the Internal Revenue Service suspended a practitioner under this section, the practitioner may ask the Internal Revenue Service to issue a complaint under § 10.60. The request must be made in writing within 2 years from the date on which the practitioner's suspension commences. The Internal Revenue Service must issue a complaint requested under this paragraph within 30 calendar days of receiving the request.

(h) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

■ **Par. 37.** Section 10.90 is amended by:
■ 1. Revising paragraph (a).
■ 2. Redesignating the second paragraph (b) as paragraph (c).
■ 3. Revising newly designated paragraph (c).

The revisions read as follows:

### § 10.90   Records.

(a) *Roster.* The Internal Revenue Service will maintain and make available for public inspection in the time and manner prescribed by the Secretary, or delegate, the following rosters—

(1) Individuals (and employers, firms, or other entities, if applicable) censured, suspended, or disbarred from practice before the Internal Revenue Service or upon whom a monetary penalty was imposed.

(2) Enrolled agents, including individuals—

(i) Granted active enrollment to practice;

(ii) Whose enrollment has been placed in inactive status for failure to meet the requirements for renewal of enrollment;

(iii) Whose enrollment has been placed in inactive retirement status; and

(iv) Whose offer of consent to resign from enrollment has been accepted by

USA-LOV-001245

the Internal Revenue Service under § 10.61.

(3) Enrolled retirement plan agents, including individuals—

(i) Granted active enrollment to practice;

(ii) Whose enrollment has been placed in inactive status for failure to meet the requirements for renewal of enrollment;

(iii) Whose enrollment has been placed in inactive retirement status; and

(iv) Whose offer of consent to resign from enrollment has been accepted under § 10.61.

(4) Registered tax return preparers, including individuals—

(i) Authorized to prepare all or substantially all of a tax return or claim for refund;

(ii) Who have been placed in inactive status for failure to meet the requirements for renewal;

(iii) Who have been placed in inactive retirement status; and

(iv) Whose offer of consent to resign from their status as a registered tax return preparer has been accepted by the Internal Revenue Service under § 10.61.

(5) Disqualified appraisers.

(6) Qualified continuing education providers, including providers—

(i) Who have obtain a qualifying continuing education provider number

(ii) Whose qualifying continuing education number has been revoked for failure to comply with the requirements of this part.

* * * * *

(c) *Effective/applicability date.* This section is applicable beginning August 2, 2011.

**Steven T. Miller,**
*Deputy Commissioner for Services and Enforcement.*

Approved: May 20, 2011.

**George Madison,**
*General Counsel, Office of the Secretary.*

[FR Doc. 2011–13666 Filed 5–31–11; 11:15 am]

**BILLING CODE 4830–01–P**

USA-LOV-001246

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SABINA LOVING; ELMER              )
KILIAN; and JOHN GAMBINO,         )
                                  )
          Plaintiffs,             )
                                  )        No.  1:12-cv-00385-JEB
     v.                           )
                                  )
UNITED STATES OF AMERICA;         )
INTERNAL REVENUE SERVICE;         )
and DOUGLAS H. SHULMAN,           )
COMMISSIONER OF INTERNAL          )
REVENUE,                          )
                                  )
          Defendants.             )
                                  )

## DEFENDANTS' NOTICE OF APPEAL

Notice is hereby given that the Defendants United States of America,

Internal Revenue Service, and Commissioner of Internal Revenue[1] appeal to the

United States Court of Appeals for the District of Columbia Circuit from the

Order entered on January 18, 2013 (Docket No. 21), the Memorandum Opinion

entered on January 18, 2013 (Docket No. 22), and the Memorandum Opinion and

Order entered on February 1, 2013 (Docket No. 28).  This appeal includes an

appeal from all interlocutory orders, rulings, and findings that gave rise to the

     //

     //

---

[1] The Plaintiffs' complaint named then-Commissioner of Internal Revenue
Douglas H. Shulman as a defendant.  The current Acting Commissioner of
Internal Revenue is Steven T. Miller.

foregoing.

Dated:   February 20, 2013                Respectfully submitted,

                                          /s/ Geoffrey J. Klimas  ___
                                          GEOFFREY J. KLIMAS
                                          Trial Attorney, Tax Division
                                          U. S. Department of Justice
                                          Post Office Box 227
                                          Washington, DC  20044
                                          Telephone:  (202) 307-6346
                                          Fax: (202) 514-6866
                                          Email: geoffrey.j.klimas@usdoj.gov

OF COUNSEL:
RONALD C. MACHEN, JR.
United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2013, I caused to be served via the

Court's ECF system the foregoing DEFENDANTS' NOTICE OF APPEAL on

counsel for the Plaintiffs:

Dan Alban
Institute for Justice
901 N. Glebe Road, Suite 900
Arlington, VA  22203

/s/ Geoffrey J. Klimas
GEOFFREY J. KLIMAS
Trial Attorney, Tax Division
U. S. Department of Justice
Post Office Box 227
Washington, DC  20044
Telephone:  (202) 307-6346
Fax: (202) 514-6866
Email: geoffrey.j.klimas@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2013, I electronically filed the foregoing Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature    /s/ Patrick J. Urda